**[ORAL ARGUMENT NOT YET SCHEDULED]**

**Nos. 25-5266, 25-5267**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee,*

v.

OFFICE OF MANAGEMENT AND BUDGET, *et al.,*
*Defendants-Appellants.*

---

PROTECT DEMOCRACY PROJECT,
*Plaintiff-Appellee,*

v.

OFFICE OF MANAGEMENT AND BUDGET, *et al.,*
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia

---

## REPLY BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY.................................................................. 1

ARGUMENT ................................................................................................. 3

I.      Plaintiffs Lack Article III Standing............................................................. 3

II.     Plaintiffs' Claims Are Unavailing on the Merits ..................................13

III.    The District Court's Injunctions Are Improperly Overbroad ...............25

CONCLUSION...............................................................................................33

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Baker v. Carr,*
　369 U.S. 186 (1962)..................................................................................4

*Campaign for Accountability v. U.S. Dep't of Just.,*
　155 F.4th 724 (D.C. Cir. 2025) .............................................................. 8

*Campaign Legal Ctr. v. FEC,*
　31 F.4th 781 (D.C. Cir. 2022) ............................................................... 8

*Cheney v. U.S. Dist. Ct. for D.C.,*
　542 U.S. 367 (2004)...............................................................................14

*Clapper v. Amnesty Int'l USA,*
　568 U.S. 398 (2013) ............................................................................. 12

*Clinton v. Jones,*
　520 U.S. 681 (1997) ............................................................................. 13

*FDA v. Alliance for Hippocratic Med.,*
　602 U.S. 367 (2024) ....................................................................... 12, 13

*FEC v. Akins,*
　524 U.S. 11 (1998) ...................................................... 4, 6, 6-7, 7

*Friends of Animals v. Jewell,*
　828 F.3d 989 (D.C. Cir. 2016) ............................................................. 9

*Harrington v. Bush,*
　553 F.2d 190 (D.C. Cir. 1977) ...................................................... 23, 24

*Levitt, Ex parte,*
　302 U.S. 633 (1937).................................................................................4

*Monsanto Co. v. Geertson Seed Farms,*
　561 U.S. 139 (2010) ............................................................................. 32

*National Sec. Archive v. CIA,*
　104 F.4th 267 (D.C. Cir. 2024) ......................................................... 8-9

*Nixon v. Administrator of Gen. Servs.*,
433 U.S. 425 (1977) ........................................................... 13, 21, 23

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) .................................................................... 30

*Prisology, Inc. v. Federal Bureau of Prisons*,
852 F.3d 1114 (D.C. Cir. 2017) ............................................... 10

*Public Citizen v. U.S. Dep't of Just.*,
491 U.S. 440 (1989) .................................................................... 6

*Public Citizen, Inc. v. NHTSA*,
489 F.3d 1279 (D.C. Cir. 2007) ................................................. 5

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U.S. 477 (1989) .................................................................... 5

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .................................................................. 15

*Telecommunications Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ............................................... 30-31

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................................... 9

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) .................................................................. 14

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) (per curiam) .............. 28, 28-29, 29

*United States v. Richardson*,
418 U.S. 166 (1974) ........................................................ 3, 4, 23, 24

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977) .................................................................. 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .................................................................. 16

iii

**U.S. Constitution:**

Art. I, § 9, cl. 7 ............................................................................... 22

**Statute:**

5 U.S.C. § 706(1) .............................................................................. 30

**Other Authority:**

Office of Legal Counsel, U.S. Dep't of Justice, *Constitutionality of the Presidential Records Act*, 2026 WL 963007 (Apr. 1, 2026) ......................... 14

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |
| OMB | Office of Management and Budget |

## INTRODUCTION AND SUMMARY

The district court entered injunctions requiring OMB to provide—automatically and within two business days—all apportionments, including potentially sensitive information. The court entered those injunctions at the behest of plaintiffs who concededly have no particularized right to the information. It did so notwithstanding the Executive Branch's determination that such disclosures impair the Executive's ability to carry out core Article II functions. And it extended the injunctions to broadly require defendants to comply with the court's interpretation of the 2022 and 2023 Acts, rather than limiting it to the specific agency actions that plaintiffs challenged. Those injunctions should be reversed or vacated.

At the threshold, plaintiffs lack standing. Plaintiffs effectively concede that the Acts provide them with no right to the information they seek. Without such a particularized right, plaintiffs are no differently situated from any party, and their interest in having the government follow the Acts reflects a generalized grievance. Indeed, plaintiffs have no persuasive way to distinguish Supreme Court precedent holding as much in similar circumstances.

On the merits, plaintiffs primarily focus on Congress's enumerated powers. But there is no dispute that the Acts fall within those powers; the relevant issue is instead whether they infringe on the President's own authorities. As to that question, plaintiffs have little to say. They nowhere contend that the Acts' overbroad disclosure requirements are tailored to advancing any congressional power. And although they quibble with OMB's determination that the Acts have impaired the President's ability to control his subordinates' exercise of his executive power, they provide no firm basis for rejecting the agency's conclusion.

Even setting aside the merits, plaintiffs cannot rehabilitate the district court's overbroad injunctions, which incorporate the Acts in all their particulars. Plaintiffs' argument that the injunctions provide fair notice and are limited to their claims in the case is belied by the multiple rounds of post-injunction proceedings, each of which has included new complaints about new problems that plaintiffs perceive. Moreover, plaintiffs are unable to square the court's injunctions with normal principles of APA review; plaintiffs nowhere even attempt to identify any discrete agency action whose scope matches the court's relief.

The injunctions should be reversed or vacated.

# ARGUMENT

## I.    Plaintiffs Lack Article III Standing

Plaintiffs assert a generalized grievance. In all material respects, their case is identical to *United States v. Richardson*, 418 U.S. 166 (1974), where the Supreme Court held there was no Article III case or controversy. Plaintiffs do not contend that the Acts vest in them any particularized right to receive specific information. Thus, plaintiffs' interest in this case reduces to the general interest in having the Executive Branch comply with the Acts, and the suit is foreclosed by *Richardson*.

**1.** Plaintiffs assert a generalized grievance indistinguishable from the grievance presented in *Richardson*, which likewise involved an effort to obtain information about government spending. Plaintiffs' only response to that case is their attempt (at 35) to cabin it to "taxpayer standing," claiming that the Supreme Court's analysis turned on requirements of that doctrine that do not apply to asserted informational injuries. But *Richardson* rejected the plaintiff's attempt to claim an informational injury, explaining in particular that it did not suffice "that without detailed information on CIA expenditures—and hence its activities—[the plaintiff could not] intelligently follow the actions of Congress or the Executive, nor [could] he properly fulfill

3

his obligations as a member of the electorate in voting for candidates seeking national office." 418 U.S. at 176. That is the injury that the Supreme Court rejected as an impermissible "generalized grievance," relying on cases outside the taxpayer context. *See id.* at 176-78 (citing, among other cases, *Ex parte Levitt*, 302 U.S. 633 (1937), and *Baker v. Carr*, 369 U.S. 186 (1962)). The Court focused on taxpayer standing because the claimed injury in *Richardson* related to an interest in the way taxpayer dollars were spent; that is the same injury at issue here but markedly different from the cases on which plaintiffs rely. *Cf. FEC v. Akins*, 524 U.S. 11, 24-25 (1998) (noting that "the informational injury at issue" was "directly related to voting, the most basic of political rights").

Plaintiffs' asserted informational injury here is materially identical to the injury asserted in *Richardson*: plaintiffs contend that they have a personal stake in receiving information that they believe the Acts require OMB to disclose. As in *Richardson*, plaintiffs cannot demonstrate any particularized injury because the Acts do not vest in them any right to receive the information.

Nor do plaintiffs succeed when they argue that their harms are sufficiently particularized because they are not "abstract and indefinite" but

4

are instead tied to their use of the information to "monitor and educate the public about government spending." Br. 34-35 (quoting *Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1293 n.1 (D.C. Cir. 2007)). That is essentially what the plaintiff in *Richardson* said. And regardless, plaintiffs' asserted injury is precisely the sort of "abstract and indefinite" injury that *Public Citizen* identifies: "harm to the common concern for obedience to law." *Public Citizen*, 489 F.3d at 1293 n.1 (quotation omitted). Because the Acts do not vest any right in plaintiffs to receive apportionment information, plaintiffs' asserted harm boils down to a concern that OMB is not following those statutes. As *Richardson* makes clear, that concern cannot support Article III standing.

Plaintiffs do not advance their argument by asserting that *Richardson* "predates modern standing doctrine." Br. 35 (quoting Henderson Statement 10 n.4). The Supreme Court has become more stringent about Article III standing since the 1970s—and, at a minimum, it certainly has not become more forgiving. And because *Richardson* is materially identical to this case, plaintiffs could not prevail even if it had. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on

reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls[.]").

**2.** Because plaintiffs cannot establish any particularized injury as a matter of first principles—or harmonize their theory of standing with *Richardson*—they are left to fall back on the assertion that they meet the test for informational standing that has been articulated in precedents of the Supreme Court and this Court. *See* Br. 28-34, 36-38. But the government has already explained why those cases cannot bear the weight that plaintiffs place on them, and plaintiffs have no compelling response.

At the outset, *Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989), and *Akins*, 524 U.S. 11, do not support plaintiffs' claim to standing. As explained, *see* Opening Br. 37, the plaintiffs in those cases were able to identify particularized injuries. Thus, in *Public Citizen*, the plaintiff's particularized injury stemmed from the fact that he had "specifically requested, and been refused," the relevant information. 491 U.S. at 449. And in *Akins*, the statute contained indications—such as providing for aggrieved parties to pursue administrative and judicial remedies—that Congress intended to vest the plaintiffs with a specific right to information. 524 U.S. at

6

19. Plaintiffs do not grapple with those important features of the relevant cases, and they nowhere identify any similar particularized right or injury.

Indeed, plaintiffs' lack of standing is only underscored by their description of the interaction between *Akins* and *Richardson*. In plaintiffs' view, *Richardson* does not apply to circumstances involving "a statute which" seeks "to protect individuals such as [the plaintiffs] from the kind of harm they say they have suffered, *i.e.*, failing to receive particular information." Br. 35-36 (alteration in original) (quoting *Akins*, 524 U.S. at 22). As an initial matter, plaintiffs misread the relevant portion of *Akins*, which is relevant only to claims of taxpayer standing not at issue here. *Compare Akins*, 524 U.S. at 21-22 (focusing on "taxpayer standing"), *with id.* at 23-25 (separately addressing the "contention that this lawsuit involves only a 'generalized grievance'").

But, regardless, even on plaintiffs' own terms, their assertion of standing fails. Unlike the statute at issue in *Akins*, which contained a mechanism allowing parties to challenge any failure to disclose information, the Acts are unconcerned with protecting organizations like plaintiffs. As explained, they do not, for example, speak in rights-creating terms, contain any mechanism allowing private parties to request specific records, or

7

provide for administrative or judicial review of any asserted failure to comply. Instead, the Acts do no more than create an obligation on OMB to disclose information, without creating any concomitant right in some or all members of the public to receive that information. And in that circumstance, *Richardson* squarely applies.

Nor do plaintiffs make any headway when they contend (at 32-33, 36-38) that this Court has recognized standing to challenge an agency's asserted failure to comply with similar obligations. The government has acknowledged as much. *See* Opening Br. 37-39. But the cases on which plaintiffs rely are inapposite here. In one, the plaintiffs had sought information under the same statute at issue in *Akins*. *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 789 (D.C. Cir. 2022). In holding that the plaintiffs had standing, this Court relied on *Akins*, explaining that the Supreme Court had established that the statute "grants voters a cognizable interest in information" that the plaintiffs sought. *Id.* That holding has no relevance to the Acts, which grant no such interest to plaintiffs.

In two other cases, the plaintiff had "asked for particular agency records" under FOIA and the agency had "denied its request." *Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 735 (D.C. Cir. 2025); *see*

*also National Sec. Archive v. CIA*, 104 F.4th 267 (D.C. Cir. 2024). There is no dispute here that FOIA creates a cognizable right to information in those who request it, but that has no bearing on whether the Acts create such a right. And the remaining case—in which this Court did not specifically consider the generalized grievance question—likewise involved a scheme permitting parties to file petitions with the agency and a provision providing parties with the right to enforce the statute's requirements in court. *Friends of Animals v. Jewell*, 828 F.3d 989, 990-92 (D.C. Cir. 2016).

Thus, plaintiffs have still failed to identify any precedent of this Court or the Supreme Court that addresses and resolves the specific question presented by plaintiffs' attempt to enforce the Acts' disclosure requirements even though those statutes do not grant them any particularized right. *See* Opening Br. 38. Instead, the only on-point precedent is *Richardson.*

Plaintiffs also err in urging (at 36-38) that a plaintiff may assert particularized injury even without having made a specific request or even if the injury is widely shared, as with "public-disclosure or sunshine laws that entitle all members of the public to certain information." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441 (2021). Plaintiffs' argument misses the critical

9

distinction between an obligation on the government and a right—even a broadly shared right—inhering in private parties.

Of course, Congress may vest many, or even all, members of the public with an individual right to information whose asserted violation would give rise to a particularized injury. This is, for example, what Congress has done in FOIA by "requir[ing] an agency to make nonexempt records" "available to any person upon that person's request." *Prisology, Inc. v. Federal Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017) (quotation omitted). That scheme vests all persons who request information with a particularized right to receive it. *See* Opening Br. 30-31. By contrast, as plaintiffs do not contest, the Acts do not vest any member of the public with a right to receive apportionment information; instead, they only impose an obligation on OMB. And this Court has properly explained that the "alleged failure to publish" information that an agency is required by statute to disclose does not—in the absence of some "particularized" "right to receive" the information—generate Article III standing. *Prisology*, 852 F.3d at 1116-17.

**3.** Protect Democracy fares no better when it invokes its decision to invest in creating a website displaying apportionment information. As explained, *see* Opening Br. 40-41, this purported economic injury is

quintessential self-inflicted harm. If OMB's decision not to disclose information does not itself inflict a particularized injury on Protect Democracy, the organization cannot create its own injury by choosing to expend funds in anticipation that OMB will disclose the information in question. That limitless theory of standing would enable nearly any plaintiff to manufacture standing to challenge nearly any defendant's action, and it is foreclosed by Supreme Court precedent.

In response, plaintiffs attempt to distinguish the relevant precedent by claiming that Protect Democracy's investments predated the challenged conduct and were "in reliance on what the Government" had already done rather than "as a reaction to what the Government might do." Br. 45-46 (emphases and quotation omitted). That is incorrect factually and legally. Factually, the only relevant reliance is on plaintiffs' prediction that OMB would continue to provide apportionment information as it had before, not reliance on apportionment data that had already been posted. Thus, plaintiffs are forced to admit that their investment "relied upon OMB's ongoing"—not merely its past—"apportionment disclosures." *Id.*

But more to the point, as a legal matter, the relative timing of Protect Democracy's expenditures and OMB's conduct is irrelevant. Plaintiffs

11

"cannot manufacture standing merely by inflicting harm on themselves"—such as by spending funds—in circumstances where the defendant's actions do not directly give rise to an Article III injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). That is true whether the expenditures are in anticipation of a defendant's future actions, *id.*, or whether the expenditures are "in response to a defendant's actions," *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

Plaintiffs' reliance on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), is also misguided. In that case, a local government denied a property developer's request to rezone a parcel of land, upon which the developer intended to build a housing development. *See id.* at 257-58. In that case, it is unsurprising that the plaintiff had standing: the challenged government action directly prohibited the developer from "constructing the housing" that it sought to build. *Id.* at 261. And "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Alliance for Hippocratic*, 602 U.S. at 382. The Supreme Court's recognition that a housing developer has standing to challenge a decision forbidding it from developing housing provides no support for

plaintiffs' attempt to manufacture standing to challenge OMB's actions—which do not directly injure or regulate plaintiffs at all—in this case. *Cf. id.* (standing "is ordinarily substantially more difficult to establish" where "a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*" (quotation omitted)).

## II.    Plaintiffs' Claims Are Unavailing on the Merits

On the merits, the Executive Branch cannot be compelled to comply with the disclosure requirements in the Acts because they unconstitutionally impair the President's ability to effectively direct his subordinates in their execution of the laws.

**1.** The relevant principles applicable to interbranch conflicts are clear: one branch may "not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (quotation omitted). And such impairment occurs when Congress prevents the President "from accomplishing [his] constitutionally assigned functions" through a statute whose effects are not "justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977); *see also* Opening Br. 46-50 (additionally

citing *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004); and *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020)).

In response, plaintiffs fail to seriously engage with the cases developing that standard. Instead, they wave away (at 55) *Cheney* and *Mazars* as arising in different contexts. But the contexts of those cases are relevantly similar: each involved an interbranch dispute where the Executive Branch asserted that a coordinate branch had unconstitutionally impaired the Executive's functioning. And, as explained in the government's opening brief, *see* Opening Br. 46-50, the Court's treatment of those cases (along with *Nixon*) reflects a throughline of relevant principles supplying the governing legal framework for resolving such disputes.

Plaintiffs' treatment of *Nixon* is even less persuasive. As to that case, plaintiffs stress (at 55-56) that the Court held the disputed statute constitutional. But plaintiffs advance no argument that the legal framework articulated in *Nixon* should not apply here.[1] (On the separate question whether *Nixon* supports plaintiffs on the merits, plaintiffs are also incorrect.

---

[1] The government objects, in part, to how the *Nixon* Court applied this framework, *see* Office of Legal Counsel, U.S. Dep't of Justice, *Constitutionality of the Presidential Records Act*, 2026 WL 963007, at *30-33 (Apr. 1, 2026), but not to the framework itself.

*See infra* pp. 21-22.) And plaintiffs are incorrect to contend (at 55), based on *Nixon*, that interference with some of the President's functions—rather than "broad[]" impairment—could not suffice to support a constitutional claim. Plaintiffs cite nothing in that opinion (or in logic) supporting this distinction. And accepting it would be inconsistent with the many precedents holding statutes unconstitutional because they impair the President's ability to exercise even a single constitutionally conferred power. *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 204-05 (2020) (holding unconstitutional as a violation of "the separation of powers" a statute that provided an independent agency's director with removal protection).

Plaintiffs make no headway when they argue (at 53-54) that the President is compelled to faithfully execute all laws, including the Acts, and thus those statutes cannot encroach on his constitutional authorities. That argument is inconsistent with *Nixon*, which evaluated on the merits whether a statute—which, under plaintiffs' theory, the President was obligated to faithfully execute—impaired the President's exercise of other constitutional authorities. Nor can it be squared with the many additional cases, including *Seila Law*, concluding that other statutes similarly violate the separation of powers by encroaching on the President's prerogatives.

Nor are plaintiffs correct when they assert (at 52-53) that the appropriate framework for resolving this case is the one developed in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring in the judgment and opinion of the Court). That framework applies when the President seeks to support some affirmative act—for example, the seizure of steel mills at issue in *Youngstown*. *Id.* That framework has no relevance to the separate question whether congressional action unduly impairs the President's ability to carry out his functions. Perhaps for that reason, plaintiffs cite no case addressing an interbranch dispute that applied *Youngstown*'s framework or required the President to identify "conclusive and preclusive" powers, *id.* at 638, as the basis for his impairment claim.

**2.** On the substance, plaintiffs have no persuasive response to the government's explanation of the ways in which the Acts impair the President's constitutional authority to supervise and control his subordinates' exercise of executive power. As the "senior-most career official responsible for supporting the OMB Director" has explained, JA 131, those Acts effectively require OMB to remove sensitive information not fit for public disclosure from apportionments, *see* JA 133-37. But OMB has

determined that including such information—which may include, for example, details about OMB's concerns about the agencies' plans or information about the timing or intended recipients of funds—within apportionments is critical to OMB's ability to supervise and control agencies' spending. *See id.* The Acts thus impermissibly impair OMB's—and, by extension, the President's—ability to effective control the President's subordinates in their exercise of his executive power.

In response, plaintiffs do not dispute that the President has a constitutionally grounded interest in effectively supervising his subordinates. Nor do plaintiffs dispute that appropriations often leave substantial discretion to the Executive Branch, such that decisions about how to obligate funds reflect quintessential exercises of executive power that the President must be able to effectively control. Instead, plaintiffs primarily quibble (at 56-58) with the Executive Branch's determination about the effect of the Acts' disclosure requirements on the President's ability to maintain that necessary control. But plaintiffs' arguments are unpersuasive.

At the outset, plaintiffs emphasize (at 56-57) that it is possible to comply with the Acts and with OMB's other duties and that the government has not shown that the relevant information is privileged or implicates

17

national security concerns. But those features of the statutory scheme are barely relevant—and are certainly not dispositive. A statute may impair the President's ability to carry out his constitutionally prescribed functions in many ways, and the flexible framework articulated in *Nixon* takes account of that reality by declining to limit how such impairment might be shown.

Indeed, plaintiffs cite no support for the proposition that interbranch impairment claims are only available in the case of (for example) impossibility or intrusion on foreign relations. Here, the government's impairment claim rests on the ways in which the Acts impermissibly undermine the President's ability to effectively control, through the OMB Director, his subordinates' exercise of executive power. Nothing about that claim turns on whether the disclosures are privileged—and, indeed, because the government has affirmatively disavowed any claim of privilege, the Court need not and should not consider whether Congress may compel the Executive to disclose privileged information—or whether it is literally impossible to comply with the Acts. Nor does it matter whether the disclosures are relevant to national security; the President wields executive power in domestic matters as much as in foreign ones.

Plaintiffs fare no better when they second-guess (at 57-58) the OMB Director's determination that OMB's ability to have nonpublic communications with agencies outside the apportionment process does not eliminate the harm that the Acts cause to OMB's ability to direct and control agencies' spending. The record reflects OMB's conclusion that certain information—including sensitive information not fit for public disclosure—is "key information" to include in apportionments for OMB to effectively administer its delegated authority. JA 133-35. And although OMB initially attempted to thread the needle by omitting sensitive information from the apportionments, OMB ultimately concluded that such omissions impaired the agency's ability to supervise Executive Branch spending. *See* JA 134-37.

Those conclusions are not surprising. Apportionments reflect the single most direct and binding method for OMB to supervise agencies' spending. And plaintiffs offer no firm basis to second-guess OMB's conclusion that its ability to provide instructions through that process (free from the risk that they may be publicly disclosed) is critically important to its effective supervision of agency spending. *See* JA 152.

These problems have only been exacerbated by plaintiffs' more recent insistence that the Acts cover not only apportionments but also external

19

documents incorporated into apportionments. As explained, OMB has used "spend plans" as a mechanism for communicating sensitive information to agencies to supervise and control spending. *See* Opening Br. 18-20, 54-55. In response (and notwithstanding their insistence in the response brief that OMB need only move any sensitive instructions out of apportionments to avoid disclosing them), plaintiffs have successfully moved the district court to interpret and enforce its injunction as also requiring the disclosure of spend plans incorporated into apportionments. The court's (and plaintiffs') late-breaking understanding of the extreme reach of the Acts only further underscores the ways in which those Acts impair the President's ability to direct and control (through OMB) his subordinates' spending decisions.

Nor are plaintiffs correct when they assert (at 58-59) that the government's argument in this case would call into question the constitutionality of other public disclosure statutes, such as FOIA. In describing the ways in which the Acts impair the President's exercise of his constitutional authorities, the government has focused on the specific statutory features that reflect a burden on the President outweighing any congressional interest. These include that the Acts require the automatic disclosure of all apportionment information, that the disclosures must be

within two business days, and that no provision is made for redacting even sensitive information. *See* Opening Br. 50. Plaintiffs' observation (at 59) that they could request the materials at issue here under FOIA does not account for this constellation of factors. The impairment worked by the Acts comes from the totality of the ways in which they burden the Executive, not merely from the substantive disclosures they compel in a particular case.

Indeed, it is in this respect that *Nixon* is particularly instructive. As plaintiffs do not dispute, the Court upheld the relevant disclosure statute there only after cataloguing the various ways that the statute included safeguards, which the Court believed would operate to ensure that the statute did not "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon*, 433 U.S. at 443-44; *see also* Opening Br. 47-48. Those included that the statute provided for the Executive Branch to keep "custody" of the relevant materials for "screening" purposes and that the disclosure requirements were "expressly qualified by any rights, defense, or privileges that any person may invoke." *Nixon*, 433 U.S. at 443-44. The statute was also justified based on Congress's unique needs in the aftermath of the Watergate scandal, where there existed a significant possibility that President Nixon would destroy incriminating

21

records. *See id.* at 432-35. The Acts include no such safeguards and do not reflect any such unique needs.

**3.** Plaintiffs also miss the mark when they focus (at 47-51) on Congress's general authority to enact appropriations and to require disclosure of appropriation-related information. The government does not dispute that Congress has general authority to enact disclosure requirements. And plaintiffs' resort to generalities about the power of the purse and the related requirement that the Executive account for public expenditures has little bearing on this case. In this case, the government neither asserts authority to expend funds without congressional authorization nor to decline to publish a "Statement and Account of the Receipts and Expenditures of all public Money," U.S. Const. art. I, § 9, cl. 7. Those constitutional provisions are not at issue in this case, which instead involves OMB's directives to agencies regarding how funds should be apportioned before they are expended. Plaintiffs point to no historical understanding or founding-era precedent for apportionments or publications thereof, and their discussion of the history of distinct issues is irrelevant.

The relevant question is instead whether the substantial burdens imposed on the President's own constitutional authorities by the Acts are

22

justified by some "overriding need to promote objectives within the constitutional authority of Congress," *Nixon*, 433 U.S. at 443. As to that relevant question, plaintiffs have nothing to say. The Acts' requirements are plainly overbroad, requiring automatic public disclosure of all manner of sensitive information. Plaintiffs nowhere explain why Congress could not have safeguarded its own constitutional authority through narrower disclosure requirements, such as requirements that apportionments be disclosed to Congress (rather than the public) or requirements providing the Executive Branch with authority to redact sensitive information or requirements providing additional time for compliance. In all respects, the Acts reflect a maximalist—and maximally intrusive—approach to disclosure, for which plaintiffs offer no reasonable justification or historical analogue.

Moreover, to the extent that plaintiffs contend that Congress has "plenary power" to enact any apportionment-disclosure requirement "it considers appropriate in the public interest," regardless of the burdens placed on the Executive, Br. 49 (quotation omitted), plaintiffs are wrong. As support for their "plenary power" theory, plaintiffs cite only *Richardson*, 418 U.S. at 178 n.11, and *Harrington v. Bush*, 553 F.2d 190, 194 n.7 (D.C. Cir. 1977). But in addition to relating to the distinct obligation to account for

monies that had already been spent, those cases were primarily emphasizing Congress's power relative to private parties, in explaining why private parties may not seek direct judicial enforcement of the constitutional provision requiring the disclosure of statements and accounts. *See Richardson*, 418 U.S. at 178 n.11; *Harrington*, 553 F.2d at 194 n.7 (explaining that the plaintiff's "rights to information" in this area "are to be defined solely by Congress"). Neither of those cases considered the distinct question of when Congress may impermissibly intrude on the President's authorities. As to that question, *Nixon* provides the governing framework.

Finally, although plaintiffs identify various circumstances in which they believe Congress could require disclosures, those circumstances are divorced from the reality of the Acts. Plaintiffs assert (at 51) that disclosure requirements reflect Congress's "set[ting] the terms and conditions for appropriated funds." But even assuming Congress would have some additional authority in imposing conditions on the spending of appropriations (an assumption that plaintiffs do not justify), the Acts do not reflect such conditions. They instead impose freestanding disclosure requirements that automatically attach to all apportionments, not conditions on any underlying appropriations.

24

Similarly, plaintiffs complain (at 52) that the President lacks inherent constitutional authority to apportion funds. But as plaintiffs do not dispute, Congress has chosen to provide the Executive Branch with discretionary authority in many statutes to determine how to apportion and obligate funds. *See* Opening Br. 41-44. Like all executive power, that discretion is ultimately vested in the President. And so, having made the choice to provide the Executive Branch with discretion, Congress is constitutionally compelled to permit the President to supervise and control his subordinates' exercise of his own constitutional authority.

## III.    The District Court's Injunctions Are Improperly Overbroad

Even if plaintiffs were correct on the merits, they fail to justify the district court's overbroad injunctions, which require that defendants "post apportionment information on a publicly available website in the time and manner required by the 2022 and 2023 Acts." JA 78; *see also* JA 81. By simply incorporating the entirety of the statutes' requirements, those injunctions fail to provide the requisite notice and clarity to defendants. And they sweep in all manner of potential future conduct unrelated to the claims adjudicated in this suit, allowing plaintiffs to bring any future dispute about

25

the statutes' application to this district court in the guise of an enforcement or contempt proceeding. They should be vacated.

**1.** The district court's injunctions are improper because they instruct the government to follow every particular of (the court's interpretation of) the Acts. Plaintiffs do not dispute that such follow-the-law injunctions are impermissible where "they enjoin all violations of a statute in the abstract without any further specification." Br. 62 (quotation omitted). But that is exactly what the injunctions here do: they require defendants to broadly post all covered information "in the time and manner required by" the statutes, JA 78, without any further specification.

Although plaintiffs assert that the injunctions are permissible because the Acts themselves "describe with specificity" the required conduct and so defendants cannot claim that they lack notice or clarity, Br. 63, plaintiffs are incorrect. As the government explained, *see* Opening Br. 59-61, there may be all manner of disputes among the parties about the statute's requirements that have nothing to do with the facial constitutional objection addressed in this suit.

Most saliently, plaintiffs themselves have already returned to the district court and persuaded the court to resolve a dispute between the

parties about whether the government was compelled to publicly disclose certain "spend plans." In response to plaintiffs' motion, the court engaged in new statutory interpretation and ultimately determined that the plans in question "are subject to the 2022 and 2023 Acts" and, thus, "the Court's earlier order." JA 92-93 (quotation omitted). Plaintiffs properly do not claim that the statute's application to spend plans was addressed and resolved by the original injunction; to the contrary, plaintiffs admit that they did not understand how OMB was using spend plans "until *after* the [initial] decision." Br. 67.

Indeed, more recently plaintiffs have also complained to the district court that the spend plans that OMB has posted following the enforcement order contain asserted "deficiencies that render the disclosure not in accordance with the Acts," such as by not being in "a format that qualifies as an Open Government Data Asset." *See* Dkt. No. 47, at 3 (No. 1:25-cv-1051); *see also* Dkt. No. 47, at 4 (No. 1:25-cv-1111) (similar). But of course, nothing in plaintiffs' underlying claims, or the court's underlying order, addresses any potential disagreement among the parties about any statutory formatting requirements. And those are just some illustrations of the potential notice and clarity problems embedded within the injunction. Even

27

beyond spend plans and formatting questions, there may be all manner of future disputes about (for example) the particular information covered by the relevant statutes. But the injunction itself provides no fair notice of how the court might approach any such disputes, and its bare incorporation of the statute in all its particulars renders it overbroad.

A comparison to *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) (per curiam), on which plaintiffs primarily rely (at 62-63), is instructive. In that case, the district court had enjoined the defendant tobacco companies from making certain false statements and from committing acts of racketeering "relating in any way to the manufacturing, marketing, promotion, health consequences or sale of cigarettes in the United States." *Philip Morris*, 566 F.3d at 1136 (quotation omitted). In rejecting defendants' argument that the injunction failed to provide specific notice of the enjoined acts, this Court emphasized that the injunction was limited only to specific "matters about which Defendants are to avoid making false statements or committing racketeering acts" and was issued "in the context of the district court's legal conclusions and 4,088 findings of fact about fraud in the manufacture, promotion, and sale of cigarettes." *Id.* at

28

1137. In that circumstance, the court concluded that the defendants were provided "with fair notice of the prohibited conduct." *Id.*

Here, by contrast, the district court's underlying opinion resolves only a single legal question about the facial constitutionality of the Acts. The court did not purport to otherwise resolve any disputes about the contours and reach of those statutes. And without additional detail regarding how the court interprets the government's statutory obligations, the court's bare direction to follow the statutes does not provide the fair notice required to support an injunction.

**2.** The injunctions' improper breadth is only underscored by the nature of plaintiffs' claims. As plaintiffs do not seriously contest, the APA requires them to identify discrete agency action that they seek to challenge or compel. And any relief must be properly limited to that specific action. *See* Opening Br. 61-62. The district court's injunctions violate those limitations by broadly requiring defendants to follow the statutes in the future, untethered from any specific, challengeable agency action.

This lawsuit was filed in response to OMB's decision that it would no longer comply with the Acts insofar as they require the publication of apportionments, on the ground that the Acts are facially unconstitutional.

29

The relief in this case thus should straightforwardly have been prohibiting OMB from relying on that decision, which the district court concluded was premised on a mistaken understanding of constitutional law. Any dispute about OMB's interpretation of the Acts would be the subject of a new lawsuit, to the extent that any party could satisfy the relevant prerequisites.

In response, plaintiffs do not identify any challenged or challengeable agency action that could support the scope of the district court's injunctions. Instead, they first contend (at 65) that the proper scope of injunctive relief is dictated by the extent of the relevant violations. But although the scope of the relevant violations may limit the proper relief, so too does the scope of plaintiffs' claims. *Cf.* 5 U.S.C. § 706(1) (permitting a reviewing court to "compel" specific, discrete "agency action unlawfully withheld or unreasonably delayed"); *see Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004). And plaintiffs cite no support for the remarkable principle that they may properly obtain injunctive relief that is not tethered to the discrete agency actions that their claims challenge. Nor can plaintiffs seriously contend that they would be entitled to immediate injunctive relief to remedy every failure to publish a particular piece of information based on a disagreement about the meanings of the Acts. *Cf. Telecommunications*

*Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("In the context of a claim of unreasonable delay, the first stage of judicial inquiry is to consider whether the agency's delay is so egregious as to warrant mandamus.").

Plaintiffs fare no better when they complain (at 65-66) that limiting relief to discrete challenged actions would require them to return to court when they wish to challenge new actions. For one, plaintiffs' concerns in this respect are overblown. If the district court prohibited OMB from relying on its determination that the Acts are unconstitutional, OMB could not comply by only posting 1% of apportionments unless it had a good-faith basis for doing so that did not depend on the determination that the court had invalidated. And Protect Democracy seems to have challenged (as agency action unlawfully withheld) the failure to post discrete apportionments; as a remedy on those claims, the court might have required OMB to post all previously finalized apportionments. *See* Opening Br. 61-62.

Moreover, to the extent OMB has developed a policy of declining to post apportionments based on its constitutional objection, plaintiffs might properly challenge that categorical policy and the court might properly enjoin OMB from implementing it in the future. Such an injunction could not,

31

however, prohibit OMB from declining to post apportionment information based on new and different agency actions. And to the extent plaintiffs' argument reduces to a complaint that they will be required to bring a new suit if the agency engages in new action that plaintiffs believe is unlawful, that outcome is a feature of APA review. *Cf. Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162-63 (2010) (explaining that a permanent injunction prohibiting future conduct was "not now needed to guard against any present or imminent risk of likely irreparable harm" because "if and when" the agency pursued such conduct, plaintiffs "may file a new suit challenging such action and seeking appropriate preliminary relief").

Finally, plaintiffs' observation (at 68) that permanent injunctions may be entered in APA cases is irrelevant. The government does not dispute that principle—or even, assuming plaintiffs' success on the merits, that some permanent injunction would be appropriate here. The relevant question is instead whether any such injunction must be limited to the specific, discrete agency actions that plaintiffs have challenged. And on that score, plaintiffs' authority undermines their argument. Thus, in *Monsanto*, 561 U.S. at 159-60, the Supreme Court held that the district court had erred in entering a permanent injunction because the injunction was not limited to the

32

"particular agency order" that the plaintiffs had challenged and the district court had assessed. So too here.

## CONCLUSION

For the foregoing reasons and those in the government's opening brief, the district court's final judgments should be reversed or vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

June 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6487 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
Sean R. Janda