NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 25-5266, 25-5267

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

────────────────

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

*Plaintiff-Appellee,*

v.

OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

────────────────

PROTECT DEMOCRACY PROJECT,
*Plaintiff-Appellee,*

v.

U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

────────────────

On Appeal from the United States District Court
for the District of Columbia

────────────

## APPELLEE CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON'S OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR A STAY PENDING APPEAL

Nikhel S. Sus
Yoseph T. Desta
Citizens for Responsibility
  and Ethics in Washington
P.O. Box 14596
Washington, DC 20004
(202) 408-5565

Adina H. Rosenbaum
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Citizens for Responsibility and Ethics in Washington*

## INTRODUCTION

Defendant Office of Management and Budget (OMB) is required by law to post, on a publicly accessible website, a database with documents reflecting OMB's "apportionments"—that is, final and legally binding decisions about an agency's use of congressionally appropriated funds. *See* 31 U.S.C. § 1513 note. For nearly three years after Congress's enactment of this public disclosure requirement, OMB followed the law, posting to a public database—referred to here as the Public Apportionments Database—the apportionment information that Congress required it to share with the public. In March 2025, however, OMB took down the public database; OMB has been violating the statutory mandate and failing to publicly post the final apportionment documents ever since.

On July 21, 2025, the district court ordered an end to OMB's illegal behavior. "Defendants," it declared, are "required to stop violating the law!" App.8.[1]

_____

[1] Citations to "App." refer to the Appendix to Appellants' Emergency Motion for Immediate Stay.

Defendants now seek this Court's permission to continue violating the law for the time it will take for their appeal to be resolved. Defendants' motion, however, meets none of the requirements for a stay: They have not established that they are likely succeed on the merits; they have not established that they will be irreparably injured absent a stay; and both Plaintiff Citizens for Responsibility and Ethics in Washington (CREW) and the public interest will be injured by a delay in making the apportionment information public as required by law.

In denying Defendants' motion in the district court for a stay pending appeal, the district court stated that it would "not be complicit in further delaying Plaintiff and the public of information they are entitled to know as a matter of federal law!!" Dkt. 25-1051, Minute Order, July 23, 2025. Here, too, the request for a stay pending appeal should be denied.

## STATEMENT

### Apportionment of Appropriated Funds

The Constitution vests in Congress the exclusive power to appropriate funds. *See* U.S. Const. art. I, § 9, cl. 7. Congress's "exclusive power over the federal purse … was one of the most important authorities

allocated to Congress in the Constitution's necessary partition of power among the several departments." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,* 665 F.3d 1339, 1346 (D.C. Cir. 2012) (cleaned up).

After Congress appropriates funds, the funds must be "apportioned"—that is, allocated according to a budgetary decision about how much money to allow an agency to spend in a given time period and for what purpose. *See* App. 11. Specifically, the Anti-Deficiency Act provides that "[t]he President shall apportion in writing" the appropriations available to executive agencies, 31 U.S.C. § 1513(b)(1), to prevent agencies from spending more than Congress has provided or from spending funds too quickly or, for certain types of funds, ineffectively, *id.* § 1512(a). Appropriated funds are apportioned by "time period[]" or "activities, functions, projects, or objects," or a combination of both. *Id.* § 1512(b)(1). An apportionment is a "legally binding" budget decision. OMB, Circular No. A-11, *Preparation, Submission, and Execution of the Budget* (OMB Circular No. A-11), § 120.1 (2024).[2] Federal officials "may not make or authorize an expenditure or obligation exceeding … an apportionment," 31 U.S.C. § 1517(a)(1), and federal officials responsible

---

[2] https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf.

for exceeding an apportionment "shall be" subject to administrative discipline and may be subject to criminal penalties, *id.* §§ 1518–19.

The President, by executive order, delegated this statutory apportionment authority to OMB. *See* Exec. Order No. 6,166 (June 10, 1933), *as amended by* Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987). Through apportionments, OMB "formally controls agency spending." Eloise Pasachoff, *The President's Budget as a Source of Agency Policy Control*, 125 Yale L.J. 2182, 2229 (2016). OMB "sometimes uses apportionment to impose conditions on agency spending or to demand changes in agency practices." *Id.* (citation omitted).

OMB also may attach "footnotes" to apportionments that "become part of the apportionment" or direct agencies to take certain actions with respect to the appropriated funds. OMB Circular No. A-11 § 120.36; *see id.* § 120.34. "For example, an apportionment footnote might condition the availability of funds on some subsequent OMB action, such as approving an agency's 'spend plan'; detail policy goals that should be achieved in a spend plan; or preclude an agency from obligating funds that were previously available to the agency to use." Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 Geo. Wash. L. Rev. 359,

370 (2024). As OMB has explained, footnotes for apportioned amounts are part of the apportionment decision, "have legal effect," and are subject to the Anti-Deficiency Act. OMB Circular A-11 § 120.34.

**The 2022 Act and 2023 Act**

Prior to 2022, there was a troubling "lack of transparency" around OMB's apportionments and "no easy way for Congress or the public to see what OMB's directions were." Pasachoff, *Modernizing the Power of the Purse Statutes*, at 371–72. Because of this "[a]pportionment secrecy," Congress and the public generally had to rely either on whistleblowers or an agency's noncompliance with an apportionment to reveal an abuse of the apportionment process, "thus imped[ing] both Congress's ability to control the power of the purse and the public's ability to hold the executive branch accountable for its spending." *Id.*

In 2022, Congress passed and the President signed into law transparency requirements concerning OMB's apportionment of appropriated funds. The Consolidated Appropriations Act, 2022 (2022 Act) required OMB to post on a publicly accessible website a database with OMB's documents and associated footnotes apportioning appropriated funds. Specifically, the statute required OMB to

"implement[] … an automated system to post each document apportioning an appropriation … including any associated footnotes … not later than 2 business days after the date of approval of such apportionment" and to "place on such website each document apportioning an appropriation … including any associated footnotes[] already approved [for] the current fiscal year." Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257 (Mar. 15, 2022), *codified at* 31 U.S.C. § 1513 note. The statute further required that "[e]ach document apportioning an appropriation … that is posted on a publicly accessible website pursuant to such section shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *Id.* § 204(c).

The following fiscal year, Congress made the public disclosure requirements in the 2022 Act permanent in the Consolidated Appropriations Act, 2023 (2023 Act). The 2023 Act requires that "[i]n fiscal year 2023 and each fiscal year thereafter," OMB "shall operate and maintain the automated system required to be implemented" by the 2022 Act and "shall continue to post each document apportioning an appropriation … including any associated footnotes" within two business

days after the apportionment's approval. Pub. L. No. 117-328, div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022), *codified at* 31 U.S.C. § 1513 note. The 2023 Act further provides that, for each document posted on the publicly accessible website, the requirement of posting a written explanation of the rationale for footnotes for apportioned amounts "shall continue to apply." *Id.* § 204(2).

**The Public Apportionments Database**

In July 2022, OMB implemented the disclosure requirements of the 2022 Act by posting the Public Apportionments Database at https://apportionment-public.max.gov/. The Public Apportionments Database contained, for fiscal year 2022, all documents apportioning an appropriation, including associated footnotes, and written explanations for footnotes for apportioned amounts. *See* Approved Apportionments, Public Apportionments Database (as of July 14, 2022).[3]

From July 2022 until about March 24, 2025, OMB continued to maintain and operate the Public Apportionments Database, as required by the 2022 and 2023 Acts. During that time, OMB posted to the database

---

[3] https://web.archive.org/web/20220714005315/https://apportionment-public.max.gov/.

apportionments, including associated footnotes and written explanations, within two business days of the approval date of the apportionment, making that information publicly accessible. *See id.*

**Defendants' Removal of the Public Apportionments Database**

In March 2025, Defendants took down the Public Apportionments Database. App.15. The website that had housed the Public Apportionments Database has been replaced with a "Page Not Found" message. *Id.*; *see* MAX Homepage, https://apportionment-public.max.gov/.

On March 24, 2025, senior Members of the House and Senate Appropriations Committees and the House Budget Committee demanded that OMB immediately restore access to the Public Apportionments Database. *See* App.15. Five days later, Defendants sent a letter to members of Congress stating that OMB "will no longer operate and maintain the publicly available system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023." App. 16. Defendants asserted in the letter that maintaining the system "requires the disclosure of sensitive, predecisional, and deliberative information." *Id.*

On April 8, 2025, the Government Accountability Office (GAO) stated in a letter to Defendants that their removal of the Public Apportionments Database is "very concerning because of the potential implications for review of such records for federal audits, congressional oversight, specifically with regard to Congress's power of the purse." *See* GAO, Letter from Edda Emmanuelli Perez, Gen. Couns., to Russell T. Vought, Dir., OMB (Apr. 8, 2025) (GAO Letter).[4] GAO further stated that it "disagree[d]" with the assertions that Defendants had made in the OMB Letter. *Id.*

**This Lawsuit**

Plaintiff CREW, a non-partisan, non-profit government watchdog organization, is committed to monitoring and informing the public about key government activities, including the Executive Branch's use of appropriated funds. *See* App.17. To accomplish that work, CREW routinely relies on the Public Apportionments Database and information within it. App.17–18.

---

[4]     https://www.budget.senate.gov/imo/media/doc/gao_letter_to_omb_on_apportionments4.pdf.

On April 8, 2025, CREW filed suit challenging Defendants' removal of the Public Apportionments Database, and, on April 18, it moved for a preliminary injunction and for partial summary judgment. On April 14, Appellee Protect Democracy Project similarly filed a lawsuit challenging the removal of the database, and, on April 22, moved for expedited summary judgment, or in the alternative a preliminary injunction or mandamus.

On July 21, 2025, in a detailed decision, the district court granted CREW's motion for partial summary judgment as to its claim that Defendants' removal of the Public Apportionments Database violated the 2022 and 2023 Acts, and granted in part and denied in part CREW's motion as to its claim that the removal violated the Paperwork Reduction Act (PRA). The court first held that CREW has informational standing to challenge Defendants' illegal actions, because "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." App.27 (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)); *see* App.29–40. The court then rejected

Defendants' arguments that the requirement to post the apportionment information is unconstitutional, explaining that the 2022 and 2023 Acts do not "impair the ability of the Executive Branch to take care that the laws are faithfully executed or impermissibly interfere in the Executive Branch's role" and do not require the release of any predecisional, deliberative information. App.44 (capitalization altered); *see generally* App.42–52.

The district court ordered Defendants to restore the Public Apportionments Database and make publicly available the apportionment information required to be disclosed by the 2022 and 2023 Acts, and it permanently enjoined the Defendants from removing the database or otherwise ceasing to post apportionment information on a publicly available website as required by law without statutory authorization. In granting these remedies, the court determined that Defendants' removal of the database caused CREW to "suffer[] irreparable harms," App.57, and that requiring Defendants' to maintain the Public Apportionments Database as required by law serves the public interest, App 60.

## LEGAL STANDARD

A stay "is not a matter of right," but rather "an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). To obtain a stay, the moving party must make "a strong showing that [it] is likely to succeed on the merits," that it "will be irreparably injured absent a stay," that a stay will not "substantially injure the other parties interested in the proceeding," and that the "public interest" supports a stay. *Id*. at 426 (citation omitted).

## ARGUMENT

Defendants have not borne their burden of establishing any of the factors to justify a stay of the district court's order.

## I.   Defendants have not established that they are likely to succeed on the merits.

### A. Defendants have not established that they are likely to succeed in their argument that CREW lacks standing.

**1.** As this Court has repeatedly stated, "[t]he law is settled that a denial of access to information qualifies as an injury in fact where a statute … requires that the information be publicly disclosed and there is no reason to doubt [plaintiffs'] claim that the information would help them." *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022) (quoting *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356

(D.C. Cir. 2020) (per curiam)); *Env'tl Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (quoting *Friends of Animals*, 824 F.3d at 1040–41). Here, the statutes at issue indisputably require public disclosure of the information that CREW seeks. *See* 2022 Act, 31 U.S.C. § 1513 note; 2023 Act, 31 U.S.C. § 1513 note; Paperwork Reduction Act, 44 U.S.C. § 3506. And there is "no reason to doubt," *Campaign Legal Ctr.*, 31 F.4th at 783, that the Public Apportionments Database helps CREW monitor and evaluate the Executive Branch's use of congressionally appropriated funds—a core part of CREW's public education, legislative policy, and litigation work. *See* App.17 (citing Wentworth Decl., ECF 9-3, ¶¶ 6–22). Before Defendants took down the database, CREW routinely accessed apportionment information as soon as it was posted and used that information to analyze and inform the public about potential misuses of taxpayer funds. *See* ECF 9-3, ¶¶ 6–10, 14. And its need to access the database is particularly pressing now, because CREW relies on apportionment data to monitor and inform the public about potential violations of the Impoundment Control Act and DOGE's activities—two matters of ongoing national concern. *See id.* ¶¶ 10–22.

Moreover, by being deprived of the apportionment information, CREW is "suffer[ing] … the type of harm Congress sought to prevent by requiring disclosure," *Friends of Animals*, 828 F.3d at 992—that is, the harm of keeping members of the public, including CREW, in the dark about how taxpayer funds are spent. That CREW disseminates information to the public as part of its core work monitoring government spending reinforces the concrete and particularized nature of the harm it faces. *See, e.g., Campaign Legal Ctr. & Democracy 21*, 952 F.3d at 356 (holding that nonprofit organizations dedicated to enforcing campaign finance laws had informational standing where the information they sought would "further their efforts to defend and implement campaign finance reform").

**2.** A wealth of precedent undermines Defendants' assertion that CREW lacks standing because it asserts a "generalized grievance" suffered by "all members of the public." Motion 11. As this Court has explained, "the fact that a number of people could be similarly injured does not render the claim an impermissible generalized grievance: 'where a harm is concrete, though widely shared, the Court has found injury in fact.'" *Pub. Citizen v. NHTSA*, 489 F.3d 1279, 1292 (D.C. Cir. 2007)

14

(quoting *FEC v. Akins*, 524 U.S. 11, 24 (1998)); *see Pub. Citizen v. DOJ*, 491 U.S. 440, 449–50 (1989) (stating that "[t]he fact that other citizens or groups of citizens" are also deprived of the information "does not lessen [the plaintiffs'] asserted injury, any more than the fact that numerous citizens might request the same information under the Freedom of Information Act entails that those who have been denied access do not possess a sufficient basis to sue"); *Campaign Legal Ctr.*, 31 F.4th at 789 (similar). Thus, although "[p]lainly, the [statute] entitles the public generally to the disclosure," that "does not mean that the informational injury in this case is not particular to Plaintiff." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017).

*United States v. Richardson*, 418 U.S. 166 (1974), is not to the contrary. *Richardson* presented the "narrow[]" question whether a plaintiff had taxpayer standing under *Flast v. Cohen*, 392 U.S. 83 (1968), to assert a claim that a statute permitting the CIA to keep its expenditures nonpublic violated the Constitution's Statements and Accounts Clause. *Richardson*, 418 U.S. at 175. Quoting *Flast* for the proposition that, in taxpayer standing cases, there must be "a logical

15

nexus between the status asserted and the claim sought to be adjudicated," the Supreme Court held that Richardson lacked standing because there was "no 'logical nexus' between [his] asserted status of taxpayer and the claimed failure of the Congress to require the Executive to supply a more detailed report of the expenditures of that agency." *Id*. As the Supreme Court has explained, however, "the 'logical nexus' inquiry is not relevant" where a statute "seeks to protect individuals … from the kind of harm" that plaintiffs like CREW "say they have suffered, *i.e.,* failing to receive particular" information. *Akins*, 524 U.S. at 22. Thus, since *Richardson*, the Supreme Court has repeatedly affirmed that standing may be based on "the denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441 (2021) (finding no standing where "the plaintiffs did not allege that they failed to receive any required information" and distinguishing *Akins* and *Public Citizen v. DOJ*).

Here, in any event, CREW does not assert "taxpayer standing," and Defendants miss the mark in arguing that the relevant statutes do not give CREW a "personal right" to the apportionment information. Motion

15. As an initial matter, Defendants' focus on "rights-creating language," *id.* at 13, is a diversion that does not concern the question of particularized injury, but instead the different question whether CREW has stated a claim on which relief may be granted. *See TransUnion,* 594 U.S. at 426–27 ("[A]n important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."). Thus, Defendants' discussion of *Medina v. Planned Parenthood South Atlantic*, 145 S. Ct. 2219 (2025), *see* Motion 13, is inapposite. *See generally Medina*, 145 S. Ct. 2219 (holding that the plaintiff lacked a cause of action under 42 U.S.C. § 1983 to enforce a provision of Medicaid absent rights-creating language in that law, but not suggesting that the plaintiff had not suffered a particularized injury).[5]

---

[5] Defendants have never raised—and thus forefeited—any argument that CREW lacks a cause of action under the Administrative Procedure Act to assert violations of the 2022 and 2023 Acts. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("[A]bsent exceptional circumstances, a party forfeits an argument by failing to press it in district court.").

When it comes to standing, this Court's caselaw is clear that a statute need not require an agency to disclose information specifically to the plaintiff, rather than to the public, for a plaintiff to have suffered an injury in fact. *See Campaign Legal Ctr.*, 31 F.4th at 784 (involving statute that required public disclosure of information, not individualized disclosure to the plaintiff); *Env'tl Def. Fund*, 922 F.3d at 452 (same). Indeed, Defendants effectively concede as much, acknowledging that this Court has repeatedly found standing based on an "informational injury theory in circumstances where the statute did not clearly confer such an individual right to the information." Motion 17.

In short, to have informational standing, a plaintiff must show that the "statute (on the claimants' reading) requires that the information be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them." *Env'tl Def. Fund*, 922 F.3d at 452 (cleaned up). Because CREW has easily made that showing here, Defendants are unlikely to succeed on their argument that CREW lacks standing.

## B. Defendants have not established that they are likely to succeed on the merits of their constitutional theory.

Defendants make two arguments in support of their assertion that the statutory requirement to post apportionment information is

18

unconstitutional: that the information is privileged and that requiring them to post the information would impair their performance of their constitutional duties. Defendants are unlikely to succeed on either argument.

**1.** Defendants suggest that the deliberative process privilege applies to the apportionment information at issue here. It does not. The deliberative process privilege "may only be invoked for documents that are both predecisional and deliberative." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 362 (D.C. Cir. 2021). "A document is predecisional if it was generated before the agency's final decision on the matter," and it "is deliberative when it is prepared to help the agency formulate its position, and it reflects the give-and-take of the consultative process." *Id.* (cleaned up). The apportionment information required to be disclosed here is neither predecisional nor deliberative; instead, it reflects a final decision approved by OMB. *See* 2022 Act, § 204(b), *codified at* 31 U.S.C. § 1513 note (requiring disclosure "after the date of *approval* of … apportionment" (emphasis added)). Indeed, OMB has repeatedly stated that apportionments, including footnotes, are final "OMB-approved plan[s]" that are "legally binding." OMB Circular No. A-11

19

§ 120.1 (emphasis added); *see id.* § 20.3 (stating that an "[a]pportionment is a plan, *approved* by OMB, to spend resources" (emphasis added)).

The Anti-Deficiency Act confirms the point. That statute prohibits federal officials from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding … an apportionment." 31 U.S.C. § 1517(a). And it imposes legal consequences on federal officials who violate that law. *Id.* §§ 1518–19 (imposing administrative and criminal penalties); *see* GAO Letter, *supra* n.4, at 1 ("As apportionments are legally binding decisions on agencies under the Antideficiency Act, we note that such information, by definition, cannot be predecisional or deliberative." (citing 31 U.S.C. § 1517)). The deliberative process privilege does not shield decisional documents, such as these, that have "real operative effect." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 160 (1975)).

Defendants' contention that apportionments "generally constrain an agency's ability to obligate funds but create no rights or obligations that attach to private parties" is irrelevant. Motion 23. Whether a final, legally binding decision binds agencies as opposed to private parties does not determine whether it is predecisional or deliberative. Likewise, as

the district court explained, "Defendants' argument that OMB remains free to change apportionments does not make the information predecisional and deliberative." App.51. "The mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see Sears*, 421 U.S. at 158 n.25 ("The possibility that the decision reached in [a memorandum] may be overturned … does not affect its finality[.]"); *Nat'l Env'tl Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future." (citation omitted)).

Notably, Defendants cite no cases in which final, legally binding decisions were held to fall within the deliberative process privilege. *Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006), which states that "documents dated after [a final decision] may still be predecisional and deliberative with respect to other, nonfinal agency policies," does not suggest that a final, legally binding decision may itself be predecisional and deliberative. *Id.* at 151.

Defendants also state that, regardless of "whether specific apportionment information fits within the four corners of that

privilege"—that is, regardless of whether the information is protected by the privilege—"OMB's communications with agencies during the apportionment process can include sensitive and deliberative information." Motion 22. Defendants identify no privilege, however, that applies to information the government considers sensitive or deliberative that does not "fit[] within" the privilege, and they provide no authority for the argument that a legal requirement that the government make such information publicly available violates the Constitution.

**2.** Defendants fare no better on their claim that the requirement that they post the apportionment information "impair[s]" their "performance of [their] constitutional duties." Motion 22 (quoting *Clinton v. Jones*, 520 U.S. 681, 701 (1997)). As the district court explained, the 2022 and 2023 Acts "do not dictate how OMB should apportion funds, nor do they establish a congressional management role in the administration of apportionments. The Acts merely require that the final apportionment decisions be made publicly available to provide transparency to Congress and the public." App.46.

Moreover, "Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest." App. 43

(quoting *Richardson*, 418 U.S. at 178 n.11). Meanwhile, the Executive Branch lacks express constitutional power—as opposed to statutory authority—to apportion funds or determine how the apportionment process functions. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Although Defendants rely on the Executive Branch's responsibility to "take Care that the Laws be faithfully executed," Motion 17, Defendants neglect that they have a duty to "take care" that the statutory requirements at issue here are faithfully executed.

Nonetheless, Defendants claim that compliance with the 2022 and 2023 Acts will interfere with their constitutional duties because the apportionment documents contain information they deem "sensitive"— that is, *nonprivileged* information they do not want to release. They suggested that, if required to choose between releasing that nonprivileged information and omitting it from the documents, they will choose to omit it, even where doing so impairs their ability to "effectively administer [their] delegated apportionment authority." Motion 20. That argument is a dressed-up way of saying that they disagree with Congress's decision to make the apportionment information public. For

good reason, though, "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.). If the Executive Branch could avoid complying with laws by threatening not to perform constitutional duties if required to comply, the Executive Branch would be able to avoid compliance with any law with which it had a "policy disagreement," App.45, severely undermining the separation of powers.

**3.** Finally, Defendants assert that, "at the least," the Court should stay the provisions of the district court's order requiring them to comply with the legal requirement to post apportionment decisions within two business days of OMB's approval of the decisions. Motion 25. They claim this relief is necessary to allow more time to redact information they consider sensitive or deliberative. The apportionment decisions, however, are not deliberative; they are final, legally-binding decisions. And Defendants have no right to redact unprivileged information from the apportionment documents that they are required, by law, to post in full. Because they have no right to redact information, there is no basis to

excuse them from the statutory requirement to post the documents in the timeframe required by law.

## II. Defendants cannot establish that they will suffer irreparable harm absent a stay or that the balance of hardships and public interest support a stay.

Defendants give short shrift to the other stay factors, although they bear the burden as to each. To start, Defendants assert that a stay is warranted because the district court's order "interferes with the ability" of the Executive Branch to carry out its responsibilities and "chills OMB and relevant agencies from … frank and candid discussions." Motion 26. As the district court held, though, these "objections are a policy disagreement with the 2022 and 2023 Acts." App.45. And history proves the point: After enactment of the 2022 Act and then the 2023 Act, the Executive Branch complied for more than two years, until Defendants removed the database in March 2025. "OMB's then-General Counsel, who 'participated in setting up the automated apportionment posting system required by the statute' and 'advised OMB's budget staff on compliance with the statute'" averred in this case that, in his experience, "compliance with the apportionment transparency law was straightforward, did not interfere with the President's constitutional or

statutory responsibilities or OMB's supervision of the Executive Branch, and was fully consistent with effective and efficient governance." *Id*. Moreover, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." App.60 (citation omitted). And here, Defendants' violation of an unambiguous statute is particularly blatant. *See* App.7 (stating "the law is clear").

Further weighing against a stay, CREW will face irreparable harm from continued delay in access to information that Congress has indisputably required Defendants to publicly disclose. Arguing otherwise, Defendants only repeat their argument as to standing. That argument lacks merit. *See supra* I.A. And Defendants' statement that CREW will suffer no harm from waiting until the end of appellate proceedings, Motion 27, ignores the factual finding of the district court that CREW's "inability to continue their work monitoring and reporting on the Executive Branch's use of congressionally appropriated funds due to Defendants' removal of the Public Apportionments Database is an irreparable injury." App.58. As the Court explained: "When Defendants removed the Public Apportionments Database, they deprived CREW and Protect Democracy of information to which they are statutorily entitled,

and which they relied on to monitor government funding, respond to possible legal violations, and provide transparency to the public." App.59 (citing declarations). Without the database, CREW "no longer ha[s] timely access to apportionment information as required by the 2022 and 2023 Acts," *id*., and "is unable to evaluate ongoing concerns regarding ICA violations or provide the public with insight into how the Executive is spending funds," App. 58 (citing Wentworth Decl.). "The irreparable nature of these injuries is further supported by the fact that there are ongoing, imminent concerns of potential Executive Branch withholding or overspending." App. 59.

Finally, as the court explained, "[a] permanent injunction requiring Defendants to maintain the Public Apportionments Database as required by law directly serves the 'substantial public interest in having government agencies abide by the federal laws that govern their existence and operations.'" App.61 (citing *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up)). "[T]he Public Apportionments Database provides the public and their elected representatives with timely insight on how the Executive Branch is allocating taxpayer dollars." *Id*. In so doing, it "provides the public with

27

information about whether the Executive Branch is abiding by the laws governing the allocation of public funds, thereby enabling the public to hold the Executive Branch accountable if there is a misuse of appropriated funds." App.61–62.

For these reasons as well, the balance of hardships and the public interest weigh heavily against a stay in this case. Defendants' cursory argument otherwise falls well short of carrying its burden to justify a stay.

## CONCLUSION

The Emergency Motion for a Stay Pending Appeal should be denied.

Respectfully submitted,

 /s/ *Adina H. Rosenbaum*

Nikhel S. Sus
Yoseph T. Desta
Citizens for Responsibility
  and Ethics in Washington
P.O. Box 14596
Washington, DC 20044
(202) 408-5565

Adina H. Rosenbaum
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Appellee*
*Citizens for Responsibility and Ethics in Washington*

28

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,199 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared in proportionally spaced 14-point Century Schoolbook typeface.

*/s/ Adina H. Rosenbaum*
Adina H. Rosenbaum

29

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2025, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 25, 2025                    */s/ Adina H. Rosenbaum*
                                        Adina H. Rosenbaum