# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee,*
v.
OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

———————————

PROTECT DEMOCRACY PROJECT,
*Plaintiff-Appellee,*
v.
U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.     Parties and Amici

Plaintiff-appellee in No. 25-5266 is Citizens for Responsibility and Ethics in Washington. Defendants-appellants in No. 25-5266 are the Office of Management and Budget and Russell Vought, in his official capacity as Director, Office of Management and Budget.

Plaintiff-appellee in No. 25-5267 is Protect Democracy Project. Defendants-appellants in No. 25-5267 are the Office of Management and Budget and Russell Vought, in his official capacity as Director, Office of Management and Budget.

There were no amici in district court. The following amici have appeared in this Court as of the time of filing: the District of Columbia, Maryland, California, Massachusetts, Colorado, Connecticut, Hawaii, Illinois, Maine, Michigan, Nevada, New Jersey, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin.

**B.    Rulings Under Review**

The rulings under review were entered in *Citizens for Responsibility and Ethics in Washington v. Office of Management and Budget*, No. 25-cv-1051 (D.D.C.), and *Protect Democracy Project v. U.S. Office of Management and Budget*, No. 25-cv-1111 (D.D.C.), by the Honorable Emmet G. Sullivan on July 21, 2025. They are the Memorandum Opinion and Order entered at Dkt. Nos. 32 and 33 in No. 25-cv-1051 and at Dkt. Nos. 33 and 34 in No. 25-cv-1111. The Memorandum Opinion is published at 791 F. Supp. 3d 29.

**C.    Related Cases**

These cases were not previously before this Court. Other than these two consolidated cases, the undersigned counsel is unaware of any related cases currently pending in this Court or any other court.

*/s/ Sean R. Janda*
Sean R. Janda

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUES ........................................................... 4

PERTINENT STATUTES ................................................................... 4

STATEMENT OF THE CASE ............................................................. 4

    A.   Legal and Factual Background ..........................................4

    B.   Procedural Background ....................................................11

SUMMARY OF ARGUMENT ..............................................................20

STANDARD OF REVIEW ...................................................................25

ARGUMENT .........................................................................................25

I.   Plaintiffs Lack Article III Standing to Pursue Their Claims ...............25

    A.   Plaintiffs Assert a Generalized Grievance That Does Not Give Rise to Article III Standing ....................................26

    B.   The District Court's Contrary Conclusion Is Incorrect ...............35

II.   The District Court Erred in Entering Injunctions Requiring Defendants to Comply with the 2022 and 2023 Acts ...............................41

    A.   The 2022 and 2023 Acts Unconstitutionally Infringe on the President's Article II Authority ......................................41

    B.   The District Court's Follow-the-Law Injunctions Were Independently Improper ................................................58

CONCLUSION...................................................................................................63

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*Building & Constr. Trades Dep't v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ............................................................................44

*Campaign for Accountability v. U.S. Dep't of Just.,*
  155 F.4th 724 (D.C. Cir. 2025) .........................................................................31

*Center for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,*
  77 F.4th 679 (D.C. Cir. 2023) ...........................................................................38

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ...........................................................................48, 49, 51

*Clinton v. Jones,*
  520 U.S. 681 (1997) ..................................................................................47, 56

*Common Cause v. Federal Election Comm'n,*
  108 F.3d 413 (D.C. Cir. 1997) ...........................................................................38

*Environmental Def. Fund v. EPA,*
  922 F.3d 446 (D.C. Cir. 2019) ...........................................................................38

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) ...........................................................................................40

*Federal Election Comm'n v. Akins,*
  524 U.S. 11 (1998) .............................................................................................37

*Flast v. Cohen,*
  392 U.S. 83 (1968) .............................................................................................28

*Friends of Animals v. Jewell,*
  828 F.3d 989 (D.C. Cir. 2016) ......................................................................14, 38

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ...........................................................................................42

*Hispanic Affs. Project v. Acosta,*
901 F.3d 378 (D.C. Cir. 2018) ................................................25

*International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n,*
389 U.S. 64 (1967) ................................................................58

*Lincoln v. Vigil,*
508 U.S. 182 (1993) ..............................................................42

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................26, 27

*Medina v. Planned Parenthood S. Atl.,*
606 U.S. 357 (2025) ..............................................................32

*Meyer v. Bush,*
981 F.2d 1288 (D.C. Cir. 1993) ..........................................5, 46

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ................................................43

*Nixon v. Administrator of Gen. Servs.,*
433 U.S. 425 (1977) ....................................................47, 48, 51

*NLRB v. Express Pub. Co.,*
312 U.S. 426 (1941) ..............................................................59

*Norton v. Southern Utah Wilderness All.,*
542 U.S. 55 (2004) ..........................................................61, 62

*Prisology, Inc. v. Federal Bureau of Prisons,*
852 F.3d 1114 (D.C. Cir. 2017) ......................21, 30, 31, 36, 37

*Public Citizen v. U.S. Dep't of Just.,*
491 U.S. 440 (1989) ..............................................................37

*Public Citizen, Inc. v. National Highway Traffic Safety Admin.,*
489 F.3d 1279 (D.C. Cir. 2007) ..............................................15

*Public Citizen, Inc. v. OMB,*
    598 F.3d 865 (D.C. Cir. 2010) ............................................5

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974) .........................................................27

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ...........................................41, 43, 44, 45

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .........................................................27

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ...........................................25, 29, 30, 39

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) .........................................................60

*Trump v. Mazars USA, LLP,*
    591 U.S. 848 (2020) ...............................................49, 50, 51

*United States v. Richardson,*
    418 U.S. 166 (1974) ...........................14, 20, 26, 27, 28, 29, 33, 35

*Waite v. Macy,*
    246 U.S. 606 (1918) .........................................................60

**U.S. Constitution:**

Art. I, § 9, cl. 7 ...............................................................27

Art. II, § 1, cl. 1 .............................................................41

Art. II, § 3 ....................................................................41

**Statutes:**

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, div. E, tit. II, 136 Stat. 49 ............8, 9, 32, 33

Consolidated Appropriations Act, 2023,
    Pub. L. No. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (2022)............9

5 U.S.C. § 552(a)(3) ...................................................................................36

5 U.S.C. § 706(1) ......................................................................................61

28 U.S.C. § 1291 .........................................................................................4

28 U.S.C. § 1331 .........................................................................................3

28 U.S.C. § 1346(a)(2) ...............................................................................3

28 U.S.C. § 1361 .........................................................................................3

31 U.S.C. §§ 501-503 .................................................................................5

31 U.S.C. § 1512 .........................................................................................4

31 U.S.C. § 1512(a) ...............................................................................6, 43

31 U.S.C. § 1512(a)-(b) ...........................................................................45

31 U.S.C. § 1512(b) ...................................................................................5

31 U.S.C. § 1512(d) ...................................................................................8

31 U.S.C. § 1513(b) ...............................................................................5, 46

31 U.S.C. § 1517 .........................................................................................8

31 U.S.C. §§ 1517-1519 ...........................................................................46

31 U.S.C. §§ 1518-1519 .............................................................................8

44 U.S.C. § 3502(12) ...............................................................................57

44 U.S.C. § 3506(d)(1) .......................................................................16, 57

44 U.S.C. § 3506(d)(3) .............................................................................12

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CREW | Citizens for Responsibility and Ethics in Washington |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |
| OMB | Office of Management and Budget |

# INTRODUCTION

In 2022 and 2023, Congress enacted two statutes that together seek to require the Office of Management and Budget (OMB) to make publicly available—automatically and within two business days—certain communications between OMB and agencies regarding the apportionment of funds. The Executive Branch has determined that the statutes' requirement impermissibly infringes on the President's Article II authority by undermining his ability to efficiently and effectively direct subordinate officials in their execution of the laws. Consistent with that determination, in March 2025, the Director of OMB informed Congress that OMB would no longer comply with the statutes.

Plaintiffs—two nonprofit groups—brought this suit seeking to compel OMB to resume publishing the covered information, and the district court granted summary judgment in relevant part to plaintiffs. That decision was wrong on all levels.

At the threshold, the district court overlooked the fundamental Article III problem with plaintiffs' suit. Although the statutes in question seek to require OMB to disclose the covered information publicly, the statutes do not give plaintiffs any right to the information or any cause of action to obtain it.

Plaintiffs thus advance a generalized grievance of the sort that the Supreme Court has held is insufficient to meet Article III's requirements—even in the context of non-disclosure of information.

On the merits of the government's constitutional objection to the statutes, the district court gave short shrift to the determinations made by the Director regarding the ways in which the disclosure requirement impermissibly hampered OMB's ability to effectively carry out the authority delegated to OMB by the President—and to the explanation in the record provided by a high-ranking and long-serving career official at OMB expanding on those conclusions. Dismissing these determinations as mere "policy disagreement[s]," JA 56, the court failed to appreciate the ways in which the statutes intrude upon the Executive Branch's constitutional prerogatives.

To be clear, that intrusion does not stem from any claim that apportionment information is privileged—a claim that the government disavows for purposes of this appeal. Instead, the intrusion stems from the disclosure requirement's forcing OMB to omit sensitive information from internal apportionments, footnotes, and spend plans lest that information be publicly disclosed. OMB's ability to efficiently and effectively administer

appropriations laws—and, ultimately, the President's constitutional duty to take care that the laws be faithfully executed—is undermined as a result.

Finally, compounding those problems, the district court entered relief that went far beyond resolving OMB's assertion of the facial invalidity of the relevant statutes. Instead, the court entered injunctions that require defendants to comply with the relevant statutes in all their particulars moving forward. By entering that type of follow-the-law injunction, the court impermissibly arrogated to itself the authority to monitor the Executive Branch's ongoing compliance with the law and has strayed far beyond the bounds of proper APA review. And the court has already wielded this overbroad injunction, granting plaintiffs' motion to enforce the injunction with regard to an entirely new category of documents that were nowhere considered in the court's resolution of the underlying merits.

The district court's judgments should be vacated or reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. §§ 1331, 1346(a)(2), 1361. *See* JA 97, 172. For the reasons explained below, *see infra* pp. 25-41, the district court lacked jurisdiction because plaintiffs failed to establish Article III standing to sue. The district court entered

orders in both cases resolving each of plaintiffs' claims and permanently enjoining defendants on July 21, 2025. *See* JA 77-79, 80-81. The government filed timely notices of appeal in both district court cases on July 22, 2025. JA 156, 427. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether plaintiffs have established a particularized injury as necessary to support Article III standing;

2. Whether the 2022 and 2023 Acts unconstitutionally infringe on the President's Article II authority by impairing his ability to effectively and efficiently execute the laws; and

3. Whether the district court erred in entering injunctions requiring defendants to broadly follow the law.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

1. In general, after Congress appropriates funds, those funds must be "apportioned" before they may be obligated and expended. *See* 31 U.S.C. § 1512. For funds appropriated to Executive Branch agencies, Congress has

directly charged the President with responsibility for apportionment. *See id.* § 1513(b).

The President has delegated this authority to the Director of OMB. *See* JA 131-32. OMB is a component of the Executive Office of the President that assists the President in preparing the budget and overseeing agencies, *see* 31 U.S.C. §§ 501-503. As this Court has recognized, the "OMB Director, whose duties include aiding the President in managing the entire executive branch," is "the cabinet officer functionally, if not actually, closest to the President." *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993); *see also, e.g.*, *Public Citizen, Inc. v. OMB*, 598 F.3d 865, 867 (D.C. Cir. 2010) (explaining that one of OMB's roles is to "ensure[]" that "policies prepared by other federal agencies are consistent with Administration policy").

An apportionment is, essentially, a direction from OMB (exercising delegated Presidential authority) to an agency that divides appropriated funds "as the [apportioning] official considers appropriate" among different time periods, different projects, or both. *See* 31 U.S.C. § 1512(b). The goal of an apportionment is to ensure that funds that are available for a specific time period are expended at a rate that does not result in a deficiency or the need for a supplemental appropriation, and to ensure that funds that are available

for an indefinite period are used in the "most effective and economical" way. *Id.* § 1512(a). To fulfill those goals when making apportionments, OMB, acting on behalf of the President, must "exercis[e] significant discretion and judgment regarding the budgetary resources a program requires, including when those resources will be needed and for what purpose." JA 132.

OMB conveys those discretionary decisions to agencies "through Excel sheets that include designated funds" for particular time periods or activities. JA 133. These decisions reflect a "snapshot" of "OMB's best judgment in the moment about how an agency should use its funds." *Id.* Along with the apportionments, OMB "routinely also includes" in its apportionment decisions "footnotes" that "give an agency additional information or instructions beyond the dollar amounts provided." JA 133-34. These footnotes will often "provide additional restrictions on the use of funds, or will condition the availability of funds on further action by the agency, or on other future circumstances." *Id.* And the footnotes may disclose sensitive information that informs the relevant apportionment, including "OMB's current policy deliberations, assumptions about program needs, and even future economic assumptions." JA 134.

In addition to the ways in which apportionments allow the President, acting through OMB, to directly control Executive Branch agencies, OMB's apportionments and footnotes reflect a mechanism by which OMB may supervise and direct agencies' actions more indirectly. That is, "[a]pportionments are an internal Executive branch fiscal control mechanism designed to ensure that" agencies are spending funds "in accordance with the law and policy." JA 136. For example, apportionments and their footnotes may "assist [OMB] in gathering information from agencies" so that OMB can properly exercise its internal oversight rule, and they may reflect "ongoing negotiations between an agency and OMB." JA 134. For example, some apportionments may include footnotes that require the agency to provide reports to OMB, such as where OMB determines that "additional engagement [is] necessary with the agenc[y] before the funding could be provided for the purposes in question." *See, e.g.*, JA 136-37 (describing two recent apportionments with such requirements).

Apportionments are also not static. Instead, even after OMB makes an initial apportionment, "OMB's judgment about" various considerations may change, necessitating a revision of the apportionment. JA 134; *see also* JA 135-36 (Apportionments "are part of an iterative, internal Executive branch

decision-making process that involves ongoing conversations and instructions to the agencies to ensure that apportionments are updated to reflect current realities and future estimates."). And Congress has directed the apportioning official to review each apportionment "at least 4 times a year" to determine whether adjustments are necessary. 31 U.S.C. § 1512(d).

Consistent with apportionments' utility as a tool for the President, acting through OMB, to supervise and direct his subordinates within the Executive Branch, Congress has generally prohibited federal officials from authorizing any expenditures that exceed an apportionment. *See* 31 U.S.C. § 1517. Violators of that prohibition are subject to personnel actions and potential criminal penalties. *Id.* §§ 1518-1519.

2. In 2022, Congress enacted a statute that seeks to require OMB to implement "an automated system to post each document apportioning an appropriation," "including any associated footnotes," publicly "not later than 2 business days after the date of approval of such apportionment." Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257. Congress also provided that each publicly posted apportionment shall "include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for

apportioned amounts." *Id.* § 204(c), 136 Stat. at 257. And until OMB

implemented the public system, Congress provided that OMB "shall provide

to the Committees on Appropriations and the Budget of the House of

Representatives and the Senate" the same documents on the same

timeframe. *Id.* § 204(a), 136 Stat. at 256-57. Congress later extended to all

future fiscal years the requirement to post each apportionment document,

including any associated footnotes, publicly. Consolidated Appropriations

Act, 2023, Pub. L. No. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667

(2022).

After the enactment of the 2022 Act, OMB "began operating a publicly

available automated apportionment reporting system" in accordance with

that statute. JA 134. OMB realized over time, however, that the disclosure

"requirements made OMB's administration of apportionments more

difficult," because they caused OMB to omit from apportionments sensitive

information that would otherwise "assist OMB and agencies in guiding

allocations of resources throughout the funding process." JA 134-35. For

example, OMB had previously apportioned Energy Department funds for a

particular loan guarantee program in a way that "included identifying

references" for "individual loan borrowers" associated with "provisional

financial commitments subject to ongoing review and potential re-apportionment." JA 135. After the enactment of the 2022 Act, OMB determined to alter the details included in its apportionments "to protect sensitive information about who would receive Government funding in advance of public announcements." *Id.*

As another example, OMB had previously apportioned funds to a particular agency "with a footnote that detailed OMB's preliminary understanding of [the] agency's financial controls." JA 135. But after enactment of the 2022 Act, "OMB was reluctant to include such a footnote" containing OMB's understanding of the relevant sensitive "facts surrounding the apportionment." *Id.* The inability to include that information in the footnote "has impeded OMB's ability to most efficiently provide direction to and receive information from agencies." *Id.* In these and other instances, OMB had therefore been forced "to choose between compromising confidentiality" and using the "full scope of its apportionment authority." JA 137.

In March 2025, the OMB Director informed Congress that OMB would "no longer operate and maintain the publicly available automated system to which apportionments are posted." JA 153; *see also* JA 153-55. The Director

explained that OMB had "determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive" information and that such a disclosure requirement effectively prevents OMB and agencies from including that information in apportionments and footnotes. JA 152. As a result, the OMB Director stated, the disclosure provisions had "undermined OMB's effectiveness" in exercising the President's delegated statutory and constitutional authority to "supervis[e] agency spending." *Id.*

## B.    Procedural Background

1. Shortly after OMB's notification to Congress, plaintiffs Citizens for Responsibility and Ethics in Washington (CREW) and Protect Democracy Project brought these two suits challenging OMB's failure to publicly post apportionments as required by the 2023 Act.

a. CREW is a self-described "government watchdog organization" that is "committed to protecting the rights of citizens to be informed about the activities of government officials and agencies and to ensuring transparency, ethics, and integrity in government." JA 97. CREW avers that it has previously used OMB's public apportionment postings in various ways, including to "identify the potential misuse of public money" and as "part of

CREW's advocacy regarding the Impoundment Control Act." JA 98. And CREW states that without those public disclosures, "CREW will not be able to monitor apportionment data for possible impoundments, analyze the data as part of CREW's work in monitoring government operations and funding, and disseminate those findings to the public." *Id.*

In its suit, CREW primarily claims that OMB's "removal of" previously posted apportionments and its ongoing "failure to operate and maintain" the apportionments database is "arbitrary, capricious, and not in accordance with the requirements of the 2023 Act." JA 103-04. In addition, CREW claims that OMB's removal of the information with "no advance public notice" violated a provision of the Paperwork Reduction Act requiring that "an agency must 'provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products.'" JA 104-05 (quoting 44 U.S.C. § 3506(d)(3)).

b. Protect Democracy is a "nonprofit organization whose mission is to prevent American democracy from declining into a more authoritarian form of government." JA 172. Protect Democracy states that the organization's "work promoting checks and balances and the constitutional separation of powers includes efforts to support Congress's power of the purse." *Id.* As

part of those efforts, Protect Democracy maintained its own website that "drew on files OMB posted" and "displayed them in a user-friendly, interactive format to help Congress, the press, and the public better track and understand apportionments." JA 173; *see also* JA 181 (stating that Protect Democracy's website "has a wide range of users," including "Congress, litigants, journalists, public policy organizations, academics, libraries, budget experts, and the Wikipedia community").

In its suit, Protect Democracy claims, like CREW, that OMB's "ongoing failure to post apportionments and related required information on a public website violates the 2022 and 2023 Appropriations Acts." JA 185-86; *see also* JA 186-87 (claiming that OMB has "unlawfully withheld or unreasonably delayed taking actions required by law" (quotation omitted)). In addition, Protect Democracy's complaint contained a number of other similar claims contending that OMB's actions were arbitrary and capricious, asserting nonstatutory causes of action, and seeking a declaratory judgment and writ of mandamus. JA 187-90.

2. The district court granted summary judgment to plaintiffs in relevant part. At the outset, the court concluded that plaintiffs had established Article III standing to challenge OMB's actions based on their

assertions of an informational injury. The court stated that, to establish "an actionable informational injury," a plaintiff is required to demonstrate that "it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it" and that "it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." JA 38 (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)). Applying that standard, the court first held that plaintiffs had met the first requirement because the "2022 and 2023 Acts, and the [Paperwork Reduction Act] as to CREW, require" that apportionment information "be disclosed" to plaintiffs "as part of the public at large," and OMB's "removal of the Public Apportionments Database and failure to make public this information deprives Plaintiffs of the information." JA 41-42.

The district court also rejected the government's argument that plaintiffs' theory of informational injury reflected an impermissible generalized grievance under *United States v. Richardson*, 418 U.S. 166, 175-77 (1974), which held that a plaintiff seeking to challenge an agency's asserted failure to comply with a constitutional requirement that agencies publicly disclose information about their spending lacked any particularized

injury to support Article III standing. The court reasoned that "the mere fact that all members of the public have the same injury 'does not render the claim an impermissible generalized grievance.'" JA 47 (quoting *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007)). And the court stated that "each Plaintiff has articulated how their injuries are particularized," because each had stated how it would use the apportionment information. *Id.* Similarly, the court considered it irrelevant that the 2022 and 2023 Acts contain no private right of action to enforce the disclosure obligation, stating that "courts have concluded that plaintiffs have informational standing" even in circumstances "where, as here, the underlying statute did not include a private right of action." JA 48-49 (collecting cases). Finally, the court concluded that Protect Democracy had articulated "economic injury" because it had invested in an online database to track apportionment information, and that database "is now of considerably less value." JA 52 (quotation omitted).

Turning to the merits, the district court rejected the government's arguments that the 2022 and 2023 Acts violate Article II of the Constitution by impairing the Executive Branch's ability to effectively carry out its constitutional responsibility to take care that the laws are faithfully executed.

The court did not meaningfully dispute that the 2022 and 2023 Acts may impair OMB's ability to effectively carry out apportionments. *See* JA 55-56. But the court concluded that these concerns reflected "a policy disagreement" without "a constitutional foundation." JA 56. In addition, the court concluded that the apportionment information subject to disclosure was neither predecisional nor deliberative, as would be required to support an assertion of the deliberative process privilege. JA 58-63. And the court held that CREW was entitled to summary judgment on its claim under the Paperwork Reduction Act, concluding without substantial elaboration that OMB's actions "violate[d] the [statute's] requirement to provide the public with timely access to the information." JA 63 (citing 44 U.S.C. § 3506(d)(1)).

Finally, the district court turned to the question of remedies. The court first concluded that it would be appropriate for the court to "exercise its discretion to award declaratory relief" to "clarif[y] for the parties—and the public—that Defendants' knowing violation of the disclosure requirement in the 2022 and 2023 Acts is not legally justified by Executive powers or privileges." JA 65. The court next determined that it would "vacate and set aside" OMB's "unlawful action." JA 66-67. And the court concluded that it would be appropriate to enter a permanent injunction, not only to "ensure

that Plaintiffs regain access to" the apportionment information that OMB

had removed but also to ensure that OMB could not "remov[e] the database

or fail[] to comply with the 2022 and 2023 Acts in any other way in the

future." JA 71-72; *see also* JA 67-73.

The district court thus granted plaintiffs' motions for summary

judgment in relevant part. The court entered a final judgment, which

declared that OMB's actions "removing the Public Apportionments Database

and public access to apportionment information" violated the relevant

statutes and which vacated those actions. *See* JA 77-79, 80-81. In addition, the

court ordered OMB to "restore the Public Apportionments Database and

make publicly available the apportionment information required to be

disclosed by the 2022 and 2023 Acts." JA 78, 81. And the court permanently

enjoined defendants "from removing the Public Apportionments Database or

otherwise ceasing to post apportionment information on a publicly available

website in the time and manner required by the 2022 and 2023 Acts without

statutory authorization." *Id.*[1] The court subsequently directed the clerk to

enter final judgment on behalf of each plaintiff. *See* JA 158, 429.

---

[1] The district court also dismissed without prejudice as "prudentially moot" each plaintiff's remaining claims that the court declined to adjudicate. *See* JA 78, 81.

3. The government appealed and moved for a stay of the district court's injunction pending appeal. A panel of this Court denied that motion, concluding that the government had not "satisfied the stringent requirements for a stay pending appeal." *See* Order (Aug. 9, 2025) (per curiam). Judge Henderson, joined by Judge Wilkins, wrote a statement respecting the denial of the government's motion. Judge Henderson explained her view that the government was not likely to succeed on its arguments that plaintiffs present a generalized grievance and that the 2023 Act's disclosure requirement unconstitutionally infringes on the Executive Branch's authority. *See* Order 5-22 (Aug. 9, 2025) (Henderson, J., statement respecting the denial of a stay pending appeal). In addition, she explained that she did not believe that the government had demonstrated that it would suffer irreparable harm in the absence of an injunction or that the remaining equitable factors supported a stay pending appeal. *Id.* at 22-24.

4. While these appeals were pending, plaintiffs moved in district court to enforce the court's permanent injunctions. In their motions, plaintiffs asserted for the first time in this litigation that OMB's failure to publicly disclose "spend plans" referenced in apportionment footnotes violated the 2022 and 2023 Acts and, thus, the court's injunctions.

Spend plans are plans that are "developed by agencies" and that "serve the purpose of informing the allocation of resources for such agencies." JA 166. Such a plan generally reflects the agency's spending intentions "at a more granular level than an apportionment" and can thus provide "greater insight into how an agency intends to utilize its apportioned funds." *Id.* To ensure that "appropriated funds are being spent in accordance with the law and Administration policy, OMB may request for an agency to provide OMB with a spend[] plan." *Id.* And OMB has long referenced spend plans in apportionment footnotes in certain circumstances, providing (for example) that an agency's use of apportioned funds is conditioned on the submission to, or approval by, OMB of a spend plan. *See* JA 167-68. OMB has not, however, traditionally publicly disclosed spend plans (or, for that matter, "additional documents referenced in footnotes"), in part because "they routinely contain sensitive" information "not intended for public dissemination." JA 168-69.

The district court granted plaintiffs' motions to enforce. The court believed that if a footnote makes the terms of a spend plan legally binding, then the plan is "incorporated by reference" into the footnote and thus "becomes part of" the footnote. JA 89 (quotation omitted). Thus, the court concluded, in those circumstances, "the spend plan is a 'document

apportioning an appropriation' that must be disclosed under the 2022 and 2023 Acts." *Id.* And the court ordered defendants to comply with its previous injunctions "by posting in the Public Apportionments Database . . . spend plans whose terms are incorporated by reference in legally binding apportionment documents, including revised and new spend plans whose terms are incorporated by reference in legally binding apportionment documents." JA 94-95.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs' suits should be dismissed at the threshold because plaintiffs have failed to establish any particularized interest in OMB's compliance with the 2022 and 2023 Acts that could give rise to Article III standing. To satisfy Article III, a plaintiff must identify a particularized injury—as contrasted with a "generalized grievance" that is "undifferentiated and common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176-77 (1974) (quotation omitted). In *Richardson*, the Supreme Court applied this principle to conclude that a plaintiff lacked standing to challenge an agency's asserted failure to comply with a constitutional obligation generally requiring agencies to publicly disclose receipts and expenditures of public funds. *See id.* at 168-69, 176-77. And this

Court has applied similar principles in the statutory context in evaluating who may bring suit under FOIA. *See Prisology, Inc. v. Federal Bureau of Prisons*, 852 F.3d 1114, 1116-17 (D.C. Cir. 2017). Under these principles, a plaintiff who wishes to compel the government to provide him with particular information must identify a statute that creates a specific right in the plaintiff to receive the information—as distinct from a statute that imposes only a general obligation on the Executive Branch to disclose it to the public at large.

Applying that framework here, the 2022 and 2023 Acts do not create any particularized right to apportionment information that inheres in plaintiffs. To the contrary, those statutes create nothing more than a general obligation on OMB to disclose the covered information—and, to the extent they are concerned with any particular recipient, that recipient is Congress, not private third parties. Because plaintiffs cannot identify any particularized injury from OMB's failure to comply with the statutes, their suit reflects a generalized grievance that is not properly resolved in an Article III court.

**II.A.** On the merits, the 2022 and 2023 Acts are facially unconstitutional because they impermissibly impair the President's ability to effectively and efficiently direct his subordinates in their execution of the laws. In many

circumstances, Congress appropriates funds to agencies through broad appropriations that provide the agencies with significant policy discretion to determine how best to allocate funds among different programs, recipients, and objectives. In exercising that policy discretion to implement the relevant statutes, agencies exercise core Article II authority that is ultimately vested in the President.

In those circumstances, the President must be able to effectively oversee and direct his subordinates as they wield his Article II power. One mechanism by which he accomplishes that constitutionally required supervision is through the apportionment process, which enables the President, acting through the OMB Director, to direct and constrain subordinate officials in their expenditure of funds.

Because the apportionment process reflects a core exercise of the President's Article II authority, Congress may not unduly restrict the President's ability to effectively carry out that process. The Supreme Court has applied a similar framework in a number of cases evaluating claims of such interbranch impairment. In those cases, the Court has emphasized that any such impairment may only be tolerated when it is reasonably tailored and necessary to another branch's exercise of its own core authorities.

In light of those principles, the 2022 and 2023 Acts are unconstitutional. They seek to require the Executive Branch to disclose all apportionments and footnotes, including substantial sensitive information, automatically and within two business days. On their face, they do not take account of the serious burdens that they impose on the Executive Branch, and they are not tailored in any way to safeguarding Congress's own constitutional authority. Wholly apart from whether the information at issue is privileged—a claim that the government is not advancing in this appeal— the laws' requirement to disclose information in the manner provided has unduly burdened OMB's ability to use the apportionment process to effectively and efficiently carry out the President's delegated Article II supervisory authority. In fact, the record in this case provides specific examples confirming OMB's determination in this regard. The Executive Branch thus cannot be compelled to comply with the unconstitutional requirements.

**B.** Even setting aside the merits, the district court's follow-the-law injunctions were independently improper. The court broadly required defendants to comply in the future with (the district court's interpretation of)

the 2022 and 2023 Acts, in all their particulars. Those injunctions are flawed on multiple grounds.

First, the injunctions are not tailored to the specific, facial constitutional defense asserted by defendants in this case. Instead, by broadly requiring defendants to comply with the 2022 and 2023 Acts, the injunctions channel all manner of future disputes surrounding the validity of, and compliance with, those statutes—including disputes that are unrelated to the specific issues that have been presented in this case—to enforcement or contempt proceedings before the district court. That improper approach installs the district court as an ongoing monitor of OMB's compliance with the statutes generally. And it has already resulted in one enforcement order from the district court relating to a category of document that was nowhere considered in plaintiffs' underlying claims or the court's original opinion.

In addition, and relatedly, the injunctions are at odds with ordinary APA principles. To proceed under the APA, plaintiffs were required to identify specific, discrete final agency actions that they sought to challenge, such as defendants' previous removal of the apportionment database and defendants' past failure to post specific apportionments in accordance with the statutes. The proper relief on such claims must be directed at those

discrete, challenged final agency actions; the district court may not properly enter relief enjoining defendants from acting in particular ways with respect to all manner of future, hypothetical agency actions that are not yet challenged or challengeable.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 385 (D.C. Cir. 2018).

## ARGUMENT

## I.    Plaintiffs Lack Article III Standing to Pursue Their Claims

"The law of Art[icle] III standing is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (quotation omitted). "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes" and "do not exercise general legal oversight of the Legislative and Executive Branches." *Id.* at 423-24. Instead, to establish standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third

party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations, footnote, citations, and quotation omitted).

### A.  Plaintiffs Assert a Generalized Grievance That Does Not Give Rise to Article III Standing

Plaintiffs seek to enforce a statutory obligation to make apportionment information publicly available. But Congress has not provided plaintiffs with any particularized right to the information in question; instead, Congress has purported to create a general obligation to which the Executive Branch must adhere. Plaintiffs' suit thus impermissibly advances a generalized grievance that the government is not complying with the law.

1. As the Supreme Court has explained, to satisfy Article III, a plaintiff must identify a particularized injury—as contrasted with a "generalized grievance" that is "undifferentiated and common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176-77 (1974) (quotation omitted). The requirement of a particularized injury ensures that courts remain limited to carrying out their proper constitutional functions. That requirement is particularly important because "[v]indicating the *public interest* (including the public interest in Government observance of the

Constitution and laws) is the function of Congress and the Chief Executive,"
*Lujan*, 504 U.S. at 576—not the function of private litigants seeking recourse
in the courts and thereby usurping the prerogative of the political branches
to work out any disagreements in this area among themselves. Thus, the
"generalized interest of all citizens" in the government's following the law is
"an abstract injury" that does not give rise to Article III standing.
*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974);
*see also Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (explaining
that it would violate Article III if, "in the absence of any showing of concrete
injury," courts "were to entertain citizen suits to vindicate the public's
nonconcrete interest in the proper administration of the laws" (quotation
omitted)).

For example, in *Richardson*, the plaintiff sought to enforce a provision
of the Appropriations Clause requiring that "a regular Statement and
Account of the Receipts and Expenditures of all public Money shall be
published from time to time." 418 U.S. at 168 (quoting U.S. Const. art. I, § 9,
cl. 7). The plaintiff contended that the Central Intelligence Agency was
violating this provision by failing to provide adequate public disclosures, and

that a statute authorizing the agency's more limited disclosures was unconstitutional. *See id.* at 168-69.

The Supreme Court held that the plaintiff lacked standing. At the outset, the Court held that the plaintiff's asserted injuries failed to "meet the standards for taxpayer standing set forth in" *Flast v. Cohen*, 392 U.S. 83 (1968). *Richardson*, 418 U.S. at 175. Then, and more relevant here, the Court turned to the plaintiff's contention that he had a "personal stake" in the case giving rise to standing because his inability to obtain the information impaired his efforts to "follow the actions of Congress [and] the Executive" and to "properly fulfill his obligations as a member of the electorate in voting for candidates." *Id.* at 176 (quotation omitted). As to that claimed injury, the Court concluded that the plaintiff's suit reflected "the kind of a generalized grievance" that does not satisfy Article III's requirements, because "the impact on [the plaintiff] is plainly undifferentiated and common to all members of the public." *Id.* at 176-77 (quotation omitted). And that was true, the Court concluded, even though the specific plaintiff had "a genuine interest" in the federal government's spending, *id.* at 177—indeed, had explained how he intended to use the specific information he sought, *see id.* at 176.

In addition, in concluding that the plaintiff failed to identify a particularized injury, the Court recognized that the result of its decision might be that no plaintiff could "litigate this issue." *Richardson*, 418 U.S. at 179. But, the Court explained, "the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process." *Id.* "Any other conclusion," the Court continued, would undermine the Founders' determination that the courts are not intended as general forums to "oversee the conduct of the National Government by means of lawsuits." *Id.*; *see also TransUnion*, 594 U.S. at 423-24 ("Federal courts do not exercise general legal oversight of the Legislative and Executive Branches . . . ."). Instead, even though the Court has accepted "new categories of judicially cognizable injury," that acceptance "has not eliminated the basic principle that to invoke the judicial power the claimant must have a personal stake in the outcome" that constitutes "something more than [a] generalized grievance[]." *Richardson*, 418 U.S. at 179-80 (quotation omitted).

Thus, the Supreme Court has made clear that the asserted violation of a constitutional obligation to publicly disclose information does not, by itself,

generate a particularized injury allowing any plaintiff who wishes to obtain or use that information to sue. The asserted violation of such an obligation imposed through statute can no more give rise to a particularized injury than would the violation of the constitutional obligation at issue in *Richardson*. *Cf. TransUnion*, 594 U.S. at 426 (making clear that "Article III standing requires a concrete injury even in the context of a statutory violation" (quotation omitted)).

This Court has thus properly applied similar principles in the statutory context when evaluating whether a particular plaintiff has standing to seek to compel an agency to disclose particular information. For example, as this Court has explained, some portions of FOIA reflect Congress's determination to vest members of the public who follow the statute's procedures for requesting records with an individualized right to the records requested. *See Prisology, Inc. v. Federal Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017) (explaining that FOIA "requires an agency to make nonexempt records" "available to any person upon that person's request" (quotation omitted)). That rights-creating scheme vests each individual who requests information with a particularized right to receive it, such that the

requestor has Article III standing to challenge an agency's failure to provide the requested records.

By contrast, other provisions of FOIA generally direct federal agencies to make certain records "electronically available to the public." *Prisology, Inc.*, 852 F.3d at 1115. And as to those provisions, this Court has explained that the "alleged failure to publish" information that an agency is required by the statute to disclose does not—in the absence of some "particularized" "right to receive" the information—generate Article III standing. *Id.* at 1116-17; *cf. Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 734 (D.C. Cir. 2025) (explaining that a plaintiff may have Article III standing to seek disclosure under these provisions only if "the plaintiff expressly requested (and was denied) access to the records"). Such a plaintiff does not "differentiate" himself "from the public at large"; as a result, all he may establish "is a harm common to everyone" that does "not stat[e] an Article III case or controversy." *Prisology, Inc.*, 852 F.3d at 1116-17; *see also id.* at 1116 ("[A] plaintiff alleging harm common to every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." (quotation omitted)).

2. In short, to satisfy the particularized injury requirement, a plaintiff seeking to compel an agency to obey an information-disclosure law must identify not merely a statute that imposes a general obligation on the agency but instead a statute that confers a particular right on the plaintiff. *Cf. Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (describing the difference between statutes that "create individual rights" and those that simply "provide a benefit or protect an interest"). In the similar context of determining whether a Spending Clause statute creates enforceable individual rights, the Supreme Court has recently explained that courts should focus on whether "the law in question clearly and unambiguously uses rights-creating terms" and whether it "display[s] an unmistakable focus on individuals like the plaintiff." *Id.* (alterations and quotation omitted).

Here, plaintiffs have failed to identify any particularized right to information given to them by the 2022 or 2023 Acts. Nothing in those statutes evinces any desire by Congress to create private, enforceable rights. Indeed, the relevant section contains no rights-creating language, providing only that OMB "shall complete implementation" of the relevant system "to post each document apportioning an appropriation"—not that any party has a specific "right" to receive that information. 136 Stat. at 257. And unlike

other information-disclosure statutes, such as FOIA, the 2022 and 2023 Acts do not provide any mechanism for any private party to seek information that it believes ought to be made available, nor do the statutes provide a cause of action specifically permitting private parties to bring suit over any failure to provide such information.

Instead, to the extent the Acts reflect a concern with any particular recipient of the information, they are concerned with Congress—not private parties. Thus, the 2022 Act provides that OMB shall provide apportionment decisions directly to Congress until it implements the automated system, and it provides that the Executive Branch "shall make available classified documentation referenced in any apportionment" to certain congresspersons at their request. *See* 136 Stat. at 256-57. And the statute's focus on Congress's desire to receive the relevant information only underscores that any dispute regarding compliance with Congress's directions is properly resolved among the political branches, rather than in Article III courts at the behest of private parties. *See Richardson*, 418 U.S. at 179.

This conclusion is reinforced by plaintiffs' own descriptions of their interest in this suit, which confirm plaintiffs' attempt to enlist the judiciary to enforce the general public interest in compliance with the law. Thus, CREW

describes itself as a "government watchdog organization" that seeks to protect "the rights of citizens" generally to "be informed about the activities of" the government. JA 97. And CREW makes clear that it wishes to ensure OMB's compliance with the 2022 and 2023 Acts as part of CREW's desire to use public disclosures to "monitor[] government operations" and "disseminate [its] findings to the public." JA 98. Similarly, Protect Democracy describes itself as attempting "to support Congress's power of the purse" and as interested in OMB's disclosures as part of its goal "to help Congress, the press, and the public better track and understand" OMB's actions. JA 172-73. As plaintiffs' own descriptions make clear, they do not seek in this suit to vindicate any particularized right given to them by the relevant statutes; instead, they seek to vindicate the public's generalized interest in OMB's compliance with those statutes. That interest does not give rise to Article III standing.

Thus, the 2022 and 2023 Acts are analogous to the constitutional provision at issue in *Richardson*: they reflect an obligation on the Executive Branch to make information available, but they do not provide plaintiffs with a right to that information. And without such a particularized right, plaintiffs cannot—like the plaintiff in *Richardson*—bring suit. Nor, despite the district

court's suggestions otherwise, can plaintiffs possibly remove this barrier to standing by asserting that they use the information (to which they have no right) in particular ways or derive specific economic benefits from it. In this respect, they are no different from the plaintiff in *Richardson*, who also detailed the ways in which he would have used the information in question. 418 U.S. at 176. Indeed, setting aside the immaterial distinction between constitutional and statutory provisions, *see supra* pp. 29-30, the lack of standing here follows *a fortiori* from *Richardson*: because it was a generalized grievance even where a specific individual challenged a specific agency's failure to disclose its spending, it is necessarily a generalized grievance where public-interest organizations challenge OMB's failure to disclose the apportionment of spending for the entire government.

## B. The District Court's Contrary Conclusion Is Incorrect

1. In holding that plaintiffs had nevertheless established standing, the district court primarily relied (at JA 38-42, 47-49) on the Supreme Court's and this Court's informational-standing cases other than *Richardson*, which have held that a plaintiff may demonstrate a concrete informational injury where the plaintiff shows that "it has been deprived of information that, on its interpretation, a statute requires the government" to "disclose to it" and

that "it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." JA 38 (quotation omitted).

But in applying that test to conclude that plaintiffs had asserted a particularized injury, the district court incorrectly skipped over the relevant question: whether plaintiffs could demonstrate any personal right to receive the apportionment information. Although this Court and the Supreme Court have found standing on informational-injury theories in circumstances where many plaintiffs might share in the relevant right, those cases have often arisen in the context of statutes that more strongly reflect the creation of individual informational rights. As one example, in the FOIA context (as explained, *see supra* pp. 30-31), this Court has found a plaintiff "has suffered a particularized injury" where the plaintiff "has requested and been denied information Congress gave him a right to receive." *Prisology, Inc.*, 852 F.3d at 1117; *see id.* (explaining that FOIA "requires an agency to make nonexempt records" "'available to any person' upon that person's request" (quoting 5 U.S.C. § 552(a)(3))). By contrast, a FOIA plaintiff who has not made that particularized request and received that denial may not properly seek to enforce FOIA's obligation to make certain records publicly available,

because such a statutory violation does not give rise to "a particularized injury." *Id.*

Similarly, when concluding that plaintiffs had informational standing to seek compliance with the Federal Advisory Committee Act's disclosure requirements, the Supreme Court emphasized that—as in FOIA cases—the plaintiff had "specifically requested, and been refused," the relevant information, which gave rise to "a sufficiently distinct injury to provide standing to sue" (even if the Court did not analyze whether the statute spoke, like FOIA does, in rights-creating terms). *Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989). And in *Federal Election Commission v. Akins*, 524 U.S. 11, 19 (1998), the relevant statute permitted aggrieved parties to pursue administrative and judicial remedies for violations of the statute. Thus, although the Supreme Court recognized that the plaintiff's informational injury was "widely shared," the Court emphasized that that fact did "not deprive Congress of constitutional power to authorize its vindication in the federal courts." *Id.* at 24-25.

Although the district court identified a handful of this Court's precedents that found standing on an informational-injury theory in circumstances where the statute did not clearly confer such an individual

right to the information, *see, e.g.*, JA 48-49, those cases did not discuss the generalized-grievance limitation and thus did not grapple with the particular issue raised in this case. *See Center for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685-86 (D.C. Cir. 2023); *Environmental Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019); *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Because those cases did not specifically consider whether the plaintiffs there asserted a generalized grievance, they "cannot be considered binding precedent on that issue," and this Court may "consider the issue of [plaintiffs'] standing as an open question." *Common Cause v. Federal Election Comm'n*, 108 F.3d 413, 416 (D.C. Cir. 1997) (per curiam).

Finally, this understanding of the relevant cases is the only way to reconcile those cases with the result in *Richardson*. After all, if the Court in *Richardson* had simply applied the two-part test described by those cases to the plaintiff there, it is obvious that the plaintiff would have had standing. He was denied access to information that, on his view, the Statements of Accounts Clause entitled him to receive, and he suffered the type of harm— the inability to properly monitor government spending and use that information to inform his political participation—about which the Clause is

concerned. *See supra* pp. 27-28. Thus, to explain *Richardson*'s result, it must be the case that the generalized-grievance analysis conducted by that case sits alongside the two-part informational standing test applied in this Court's precedents, and a plaintiff seeking disclosure must clear both hurdles to establish his standing.

2. The district court's attempt to brush aside (at JA 47-49) the relevant analysis as speaking only to the existence of a cause of action—and not to the question of Article III standing—demonstrates its misunderstanding of the relevant point. That the 2022 and 2023 Acts contain no private right of action is relevant not because plaintiffs always need an express cause of action to have an Article III injury but because the lack of such a right to sue supports the conclusion that Congress did not intend to create any substantive right to the information.

As the Supreme Court explained in *TransUnion*, "Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 594 U.S. at 425-26 (quotation omitted). For that reason, a statute that creates an individual right to the disclosure of specific information may form the proper basis of a claim to standing, even if the failure to disclose that information would not—in the

absence of a statutory right—generate a particularized injury. Thus, plaintiffs' claim to standing properly turns on whether Congress has vested in them a right to the information. And it is that question to which the lack of any private right of action is relevant.

3. Finally, the district court's reliance on Protect Democracy's asserted economic injuries, JA 52, does not pass muster. The court did not conclude that the government's actions had inflicted any direct economic harm on Protect Democracy. Instead, the court concluded only that OMB's failure to disclose the relevant information led to a diminution of the value that Protect Democracy could realize from its previous choice to create a database to track the disclosed information. *See id.*

But a plaintiff "that has not suffered a concrete injury" may not "manufacture its own standing" by "expending money." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Because OMB's failure to disclose apportionment data does not inflict a particularized injury on Protect Democracy, the organization may not bootstrap its way to standing by spending funds in anticipation of the receipt of that data—any more than, for example, the plaintiff in *Richardson* could have manufactured his own standing by creating a subscription-based newsletter to inform the public

about the agency's anticipated disclosures. Were the rule otherwise, any plaintiff could turn an impermissible generalized grievance into a particularized injury simply by choosing to expend funds in reliance on its expectation that the government will comply with the law. That is not how standing works.

## II. The District Court Erred in Entering Injunctions Requiring Defendants to Comply with the 2022 and 2023 Acts

### A. The 2022 and 2023 Acts Unconstitutionally Infringe on the President's Article II Authority

1. When the President, acting through the OMB Director, issues instructions to his subordinate officers in the form of apportionments, he is exercising core Article II authority. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3).

One critically important way in which the President carries out his power and duty to faithfully execute the laws comes in his exercise of discretion to administer funding that Congress has provided to the Executive Branch. In many circumstances, Congress appropriates funds to the Executive Branch through broad appropriations that provide the

administering agency with significant policy discretion to determine how best to spend the funds. As the Supreme Court has explained, when Congress appropriates funds to an Executive Branch agency through "a lump-sum appropriation," it gives the agency broad—indeed, judicially unreviewable— policy discretion to allocate the funds among different permissible uses in order "to adapt to changing circumstances and meet [the agency's] statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). These allocation decisions "require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

And even when Congress provides the Executive Branch with more prescriptive directions regarding how to expend appropriated funds, the Executive Branch still must exercise significant discretion in administering the funding. Thus, many funding programs leave to the agency "the decision

about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted). And even when a particular appropriation for a fiscal year is narrowly circumscribed, the agency may nevertheless be required to engage in discretionary administration of the appropriation—exercising its authority to determine, for example, how to spread out expenditures over the course of the fiscal year to avoid creating a deficiency or how to use the funds in the "most effective and economical" manner. 31 U.S.C. § 1512(a).

These discretionary determinations about how to expend funds in order to most efficiently and effectively implement statutory programs across the federal government reflect quintessential exercises of the executive power that is vested in the President—and about which the President will be held "directly accountable [by] the people." *Seila Law LLC*, 591 U.S. at 224. But of course, as in most contexts, "it would be impossible for one man to perform all the great business" of making these determinations;

instead, "lesser executive officers" must necessarily assist the President "in discharging the duties of his trust" by making these discretionary determinations. *Id.* at 213 (alteration and quotation omitted).

To safeguard his core Article II authority, however, the President must be able to effectively "oversee[]" and "control[]" those who execute the laws" on his behalf. *Seila Law LLC*, 591 U.S. at 213 (quotation omitted). It is, after all, the President's "authority" that those officials "wield," and it is the President whose "political accountability"—"enhanced by the solitary nature of the Executive Branch, which provides a single object for the jealousy and watchfulness of the people"—is on the line. *Id.* at 213, 224 (quotation omitted); *see also id.* at 224 ("The President cannot delegate ultimate responsibility or the active obligation to supervise that goes with it, because Article II makes a single President responsible for the actions of the Executive Branch." (quotation omitted)). To that end, the President has authority to exercise "general administrative control of those executing the laws, throughout the Executive Branch of government, of which he is the head." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (citation and quotation omitted). And the Framers' design in this respect reflects their determination that "an energetic executive," able to act

with "dispatch" to supervise and control his subordinate officials, is "essential to" the "steady administration of the laws" and "the security of liberty." *Seila Law LLC*, 591 U.S. at 223-24 (quotation omitted).

In the specific context of determining how best to expend appropriated funds, the apportionment process provides a mechanism for the President, acting through the OMB Director, to exercise his core Executive authority to supervise and direct the subordinate officials executing the law on his behalf. Most directly, apportionments allow the President to control his subordinates' execution of the law by requiring that they divide expenditures among different time periods and different projects in accordance with the President's policy determinations, or by conditioning expenditures on additional restrictions that he considers important. *See* 31 U.S.C. § 1512(a)-(b); *see also* JA 132-34. And beyond that, the apportionment process provides the President an opportunity to "gather[] information from agencies" and engage in dialogue with his subordinates such that he may more effectively and efficiently exercise his authority to supervise their actions. *See* JA 134-36.

Consistent with the apportionment process's role as a critical exercise of the President's Article II authority, Congress has directly charged the

President, rather than any subordinate official, with the responsibility for apportionments of funds appropriated to Executive Branch agencies. *See* 31 U.S.C. § 1513(b). And Congress has ensured that this tool represents an effective control mechanism by generally prohibiting federal officials, on pain of personnel actions and potential criminal penalties, from authorizing any expenditures that exceed an apportionment. *Id.* §§ 1517-1519. Moreover, the President has delegated this authority to the Director of OMB, *see* JA 131-32—who this Court has described as "the cabinet officer functionally, if not actually, closest to the President." *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993).

In short, the apportionment process provides the mechanism by which the President exercises his core Executive authority to ensure that his subordinate officials are acting consistent with his preferences and directions when they exercise the broad discretion that Congress has provided to the Executive Branch to effectively and efficiently expend federal funds to execute the laws.

2. Because the President's actions in the apportionment process, through the OMB Director, reflect the exercise of his core Article II authorities, any attempt by Congress to regulate that process implicates the

constitutional principle that one branch may "not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (quotation omitted). As the Supreme Court has explained, if a statute causes "disruption" by "prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions," then the statute may only be constitutional if "that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977).

The Supreme Court has applied this principle on a number of occasions in assessing whether another branch's demand that the Executive disclose information passes constitutional muster. Thus, for example, in *Nixon*, the Court evaluated a statute that directed the Administrator of General Services "to take custody of the Presidential papers and tape recordings of" former President Nixon in order to "process[] and screen[]" those materials and to "determine the terms and conditions upon which public access may eventually be had to those materials" that were not "personal and private in nature." 433 U.S. at 429. The Court rejected the argument that the statute impermissibly intruded upon the President's Article II authorities. In so doing, however, the Court emphasized its view that various specific features

of the statute combined to ensure that the statute would not "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 443. These included the "highly relevant" feature that the statute "provides for custody of the materials in officials of the Executive Branch" for "screening" and that the statute's disclosure provisions were "expressly qualified by any rights, defense, or privileges that any person may invoke." *Id.* at 443-44.

The Court applied similar principles in assessing the permissibility of discovery orders requiring "the Vice President and other senior officials in the Executive Branch to produce information about a task force established to give advice and make policy recommendations to the President." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 372 (2004). In vacating the court of appeals' refusal to grant the Executive Branch relief, the Court emphasized the "separation-of-powers concerns" that arose from the "overbroad" discovery requests that "ask[ed] for everything under the sky." *Id.* at 383, 387. On the one hand, the Court suggested that the court's discovery orders imposed a constitutionally significant burden on the Executive Branch—both by undermining "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its

communications" and also by requiring "the Executive Branch to bear the onus of" responding to "the unacceptable discovery requests line by line." *Id.* at 385, 388. Conversely, although the requests arose in a suit intended to enforce a federal statute, the Court explained that the Executive Branch's failure to disclose the relevant information would not necessarily "impair[]" "Congress' central Article I powers." *Id.* at 385.

More recently, the Court again relied on similar principles in articulating the appropriate framework for assessing "congressional subpoenas for the President's information." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 866 (2020). The Court explained that such subpoenas raise "significant separation of powers issues"; in particular, the Court feared that "[w]ithout limits on its subpoena powers, Congress could exert an imperious controul over the Executive Branch" and seek to "compel compliance" with its requests "in court" rather than "negotiating over information requests" with the Executive. *Id.* at 866-67 (quotation omitted). In light of those concerns, the Court made clear that, in assessing the constitutionality of such subpoenas, "courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake." *Id.* at 869. Specifically, the Court directed, that analysis should include (among other

considerations) whether Congress's asserted interest "warrants the significant step of involving the President" or could instead be pursued through "other sources," whether the subpoena is "no broader than reasonably necessary to support Congress's legislative objective," and whether the subpoena imposes undue "burdens" on the President. *Id.* at 869-71.

In light of those constitutional principles, the 2022 and 2023 Acts impermissibly intrude on the Executive Branch's Article II authorities on their face. The Acts require the Executive Branch to establish an automated system to disclose all information contained in apportionments and footnotes (except, apparently, for classified information). The Acts do not, on their face, purport to provide the Executive Branch with any authority to redact particularly sensitive information even on a case-by-case basis. And the Acts require the Executive Branch to make these public disclosures within two business days of each apportionment.

Thus, in every respect, the Acts violate the principles articulated by the Supreme Court. They do not reflect the sort of targeted disclosure that might be "no broader than reasonably necessary to support Congress's legislative objective[s]." *Mazars USA*, 591 U.S. at 870. Nor do they take

account of the "burdens" that the compelled, 48-hour disclosure requirement imposes on the Executive Branch. *Id.* at 871.

The Acts instead reflect the sort of "overbroad" obligation requiring the Executive Branch to disclose "everything under the sky," *Cheney*, 542 U.S. at 383, 387, whose impingement on the President's Article II authority has not been properly justified by any "overriding need to promote objectives within the constitutional authority of Congress," *Nixon*, 433 U.S. at 443. And that impingement is only made worse to the extent that, as the district court concluded, Congress has validly provided any private party who wishes to use the covered information with the right to "compel compliance" with the statute "in court"—rather than remitting any dispute over the statute's burdens to resolution through the political process or traditional interbranch negotiations. *Mazars USA*, 591 U.S. at 866-67.

To be clear, the government's constitutional objection in this respect is not premised on the claim that any particular information in apportionments and footnotes is privileged—a claim that the government disavows for purposes of this appeal. Instead, the fundamental problem with the disclosure requirement is that Congress has interfered with the President's control over the Executive Branch in an extremely broad fashion, requiring

the categorical disclosure of all apportionment information within days. The result of that blunderbuss approach from Congress has been to unduly undermine OMB's ability to use the apportionment process to effectively and efficiently supervise agencies' execution of the relevant laws, including by deterring OMB from including sensitive information in apportionments that would not be appropriate for public disclosure (regardless whether the information is privileged).

In fact, the record in this case reflects the ways in which the Acts' overbroad disclosure requirements impair in practical terms the President's ability to effectively and efficiently carry out his Article II responsibilities through the apportionment process. As the record reflects, when OMB exercises the President's delegated apportionment authority, it undertakes a complex process laden with policy considerations. JA 133-34. And as part of that process, OMB often includes sensitive information in the footnotes within the apportionments, revealing "OMB's current policy deliberations" and underlying assumptions; seeking to "gather[] information from agencies"; reflecting OMB's concerns about its inability to fully "understand how the agency intends" to spend funds; and reflecting sensitive information regarding, for example, "apportionments for funding intended to assist an

industry," "details regarding the timing for" certain projects, or the intended recipients of specific funds. JA 134-37 (quotation omitted). As the long-time "senior-most career official responsible for supporting the OMB Director in developing all aspects of the President's Budget" explained in district court, JA 131, OMB believes that these sorts of details are "key information" to include in apportionments to ensure that OMB is able to effectively administer its delegated apportionment authority, JA 133-35.

The 2022 and 2023 Acts' disclosure provisions—which seek to require disclosure not merely of the apportionment numbers but also of the footnotes, and which afford OMB only two business days to make those disclosures—thereby put OMB to the untenable choice of either publicly revealing sensitive information or omitting such information from its apportionments, undermining its ability to effectively execute the law. The record reflects—with specific examples—circumstances where OMB was required "to change its process to protect sensitive information" or was "reluctant to include" footnotes with sensitive information, "which has impeded OMB's ability to most efficiently provide direction to and receive information from agencies." JA 135. And the record reflects more broadly that the OMB Director has determined that the required disclosure of

apportionment information and footnotes has "a chilling effect on the deliberations within the Executive Branch," has "already adversely impacted the candor contained in OMB's communications with agencies," and has "undermined OMB's effectiveness in supervising agency spending." JA 152. These are precisely the sorts of harms to the Executive Branch's ability to carry out its Article II responsibilities that the constitutional principles described above are intended to guard against.

The impermissible intrusion into the Executive Branch's functioning that the 2022 and 2023 Acts work is underscored by the district court's recent construction of its injunction to require that OMB disclose not only the apportionments and footnotes but also certain "spend plans." *See* JA 94-95. As explained, *see supra* pp. 18-20, such "spend plans"—which reflect the agency's expenditure plans "at a more granular level"—have not been traditionally disclosed, in part because "they routinely contain sensitive" information "not intended for public dissemination." JA 166-69. This highly sensitive information includes, for example, information about an agency's planned projects and priorities and instructions from OMB to agencies. If OMB is required to release spend plans, it may effectively be precluded from including such sensitive information in the plans in the first place—an

outcome that would indisputably undermine the Executive Office of the President's ability to direct and control the President's subordinates. By construing its injunction to encompass these sensitive spend plans, the district court has meaningfully worsened the separation-of-powers problems occasioned by the disclosure requirements.

3. In reaching a contrary conclusion, the district court did not meaningfully engage with the government's explanation of the Article II concerns occasioned by the disclosure requirement. At the outset, the court concluded that OMB's explanation of the ways in which the requirements impaired the agency's ability to effectively carry out its responsibilities reflected merely "a policy disagreement" without "a constitutional foundation." JA 56. But the court misunderstood the nature of the relevant objection, caricaturing it (for example) as simply a preference for the longer FOIA response deadlines or "the accommodation process for congressional requests for information." *Id.* The Executive Branch's objection is not simply that it would find different mechanisms "preferable," *id.*; it is instead, that the categorical two-day disclosure required by the statute does not purport to provide OMB any right to redact sensitive information or provide a meaningful time to review apportionments for such information and thereby

intolerably intrudes into OMB's ability to exercise the President's delegated Article II authority to effectively and efficiently direct agencies in their execution of the laws. In misunderstanding that and the Executive Branch's other objections to the burdens imposed by the 2022 and 2023 Acts, the court gave short shrift to the well-established principles discussed above making clear that the constitution is implicated when one branch "impair[s] another in the performance of its constitutional duties," as is happening here. *Clinton*, 520 U.S. at 701 (quotation omitted).

Moreover, the district court's rejection (at JA 58-68) of the notion that the information at issue here falls within the deliberative process privilege provides no firm support for its ultimate conclusion. The question whether the information is privileged is irrelevant—and the Court thus need not and should not consider that issue—because the government has disclaimed any reliance on privilege in this appeal. Instead, the relevant point is that disclosure of the information would impermissibly impair agency officials' ability to effectively carry out delegated Presidential authority, even assuming that the information in question is not privileged. *See supra* pp. 50-55.

4. Finally, the district court's brief analysis of the Paperwork Reduction Act does not provide any independent basis to affirm the judgment. *See* JA 63-64. The provision of that statute cited by the court provides only that agencies are required to make certain "public information"—that is, information "that an agency discloses, disseminates, or makes available to the public"—available in a "timely and equitable" manner. 44 U.S.C. §§ 3502(12), 3506(d)(1). That provision thus governs only the manner in which an agency must make information available; it has nothing to say about which information the agency must make available in the first place.

Thus, any substantive requirement to make apportionment information available must stem from the 2022 and 2023 Acts. To the extent that those Acts' disclosure requirement unconstitutionally infringes on the separation of powers, the Paperwork Reduction Act cannot form the basis of any independent obligation to disclose the information. And indeed, consistent with that understanding of the relationship between the relevant statutes, the district court rejected the government's arguments regarding the Paperwork Reduction Act for the same reasons that the court rejected the government's arguments regarding the 2022 and 2023 Acts. *See* JA 63-64.

## B. The District Court's Follow-the-Law Injunctions Were Independently Improper

Even setting aside the merits of the Executive Branch's facial constitutional objection to the 2022 and 2023 Acts' disclosure requirement, the district court independently erred in entering injunctions that broadly incorporate the terms of those statutes by requiring—without limitation—that defendants "post apportionment information on a publicly available website in the time and manner required by the 2022 and 2023 Acts." JA 78; *see also* JA 81. Those injunctions extend far beyond what was necessary to resolve the particular issues presented by this case and do not comport with the proper scope of relief on plaintiffs' APA challenges.

*First*, the district court's injunctions reflect impermissible follow-the-law injunctions. Rather than simply prohibiting OMB from categorically refusing to comply with the 2022 and 2023 Acts—the agency action challenged by plaintiffs—the court went further and affirmatively required OMB to generally follow forevermore those Acts (or, at least, the district court's interpretation of them). But the "judicial contempt power is a potent weapon." *International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). And the "mere fact that a court has found that" OMB officials previously violated the 2023 and 2023 Acts in

one way does not permit a broad injunction that subjects agency officials "to contempt proceedings if [they] shall at any time in the future commit some new violation unlike and unrelated to that" which was at issue in this case. *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941).

The district court's injunction permits plaintiffs to bring all manner of future disputes about the government's compliance with the 2022 and 2023 Acts to that court through motions to enforce the injunctions or for contempt, rather than requiring plaintiffs to bring any future disputes as independent suits. And there may be many such disputes. In this case, the government has raised—and the court has resolved—only a facial constitutional objection to the 2022 and 2023 Acts' disclosure requirements. Even if the court's resolution of that facial objection were to ultimately be affirmed, that affirmance would likely leave unresolved all other questions regarding the appropriate application of the statute. For example, the government may determine that the Acts' requirements do not by their terms extend to particular information.

By entering a broad injunction requiring general compliance with the 2022 and 2023 Acts—rather than limiting any declaratory or injunctive relief to the specific facial objection that the government has raised in this case—

the district court has overstepped. In so doing, the court has improperly arrogated to itself the power to generally superintend the Executive Branch's execution of the 2022 and 2023 Acts. *See Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025) ("[T]he Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law."); *Waite v. Macy*, 246 U.S. 606, 609 (1918) ("Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law.").

Indeed, the problems with this approach are not theoretical. As explained, the district court has already entered an order enforcing its injunction and requiring that defendants disclose certain "spend plans" along with the apportionments and footnotes originally sought by plaintiffs. *See supra* pp. 18-20, 54-55. But plaintiffs' claims had nothing to do with such spend plans, and the district court's original opinion rightly had nothing to say about the distinct question whether the statute's disclosure obligations apply by their own terms to such plans. In nonetheless interpreting the original injunctions to extend to spend plans, the court made plain the error in the injunctions' scope. The court explained that, in its view (and for reasons entirely unexplored previously), "the spend plans are subject to the

2022 and 2023 Acts"—and, thus, their disclosure is "required by the Court's earlier order." JA 92-93 (quotation omitted). That understanding of the court's own authority is incorrect.

*Second*, and relatedly, the district court's broad injunction is impossible to square with ordinary principles of APA review. In general, the APA "insist[s] upon an 'agency action,' either as the action complained of" or "as the action to be compelled." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Such agency action must be "circumscribed" and "discrete." *Id.* And relief under the APA is concomitantly limited to that agency action.

In large part, the district court's orders properly reflect these foundational APA principles. Thus, the court identified as a discrete agency action OMB's "removal of the Public Apportionment Database," which contained past apportionment information, and (consistent with this Court's precedent) "vacated and set aside" that removal. JA 78 (formatting altered); *see also* JA 80-81. Moreover, at least Protect Democracy appeared to challenge, as "agency action unlawfully withheld," 5 U.S.C. § 706(1), OMB's failure to post discrete apportionments. *See* JA 186-87. Again, generally consistent with APA principles, the court ordered defendants to disclose the

discrete apportionments that were finalized between the removal of the database in March 2025 and the entry of the court's injunction. *See* JA 81 (ordering defendants to "make publicly available" the "apportionment information from the time the database was taken offline" through "the time the database is restored"); *see also Norton*, 542 U.S. at 64 (explaining that, under § 706(1), a court may "compel an agency" to "take a *discrete* agency action that it is *required to take*").

Where the district court overstepped the bounds of APA review, however, was in additionally ordering defendants to continue to post all future apportionment decisions. *See* JA 78; *see also* JA 81. For any apportionments that had not yet been finalized, plaintiffs could not plausibly identify any discrete, final agency action subject to the court's review under the APA at the time that the court entered its injunctions. The court thus had no warrant under the APA to issue prospective relief requiring OMB officials to act in particular ways with respect to future agency actions, and that portion of its injunctions should be vacated.

## CONCLUSION

For the foregoing reasons, the district court's final judgments should be reversed or vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB

/s/ Sean R. Janda
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

February 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,432 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
Sean R. Janda

# ADDENDUM

# TABLE OF CONTENTS

31 U.S.C. § 1512 ..................................................................................A1

31 U.S.C. § 1513(b)............................................................................A2

Consolidated Appropriations Act, 2022, § 204....................................A3

Consolidated Appropriations Act, 2023, § 204....................................A4

**31 U.S.C. § 1512**

### § 1512. Apportionment and reserves

(a) Except as provided in this subchapter, an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period. An appropriation for an indefinite period and authority to make obligations by contract before appropriations shall be apportioned to achieve the most effective and economical use. An apportionment may be reapportioned under this section.

(b) (1) An appropriation subject to apportionment is apportioned by—

    (A) months, calendar quarters, operating seasons, or other time periods;

    (B) activities, functions, projects, or objects; or

    (C) a combination of the ways referred to in clauses (A) and (B) of this paragraph.

    (2) The official designated in section 1513 of this title to make apportionments shall apportion an appropriation under paragraph (1) of this subsection as the official considers appropriate. Except as specified by the official, an amount apportioned is available for obligation under the terms of the appropriation on a cumulative basis unless reapportioned.

(c) (1) In apportioning or reapportioning an appropriation, a reserve may be established only—

    (A) to provide for contingencies;

    (B) to achieve savings made possible by or through changes in requirements or grater efficient of operations; or

    (C) as specifically provided by law.

    (2) A reserve established under this subsection may be changed as necessary to carry out the scope and objectives of the appropriation concerned. When an official designated in section 1513 of this title to make apportionments decides that an amount reserved will not be required to carry out the objectives and scope of the appropriation concerned, the official shall recommend the rescission of the amount in the way provided in chapter 11 of this title for appropriation requests.

Reserves established under this section shall be reported to Congress as provided in the Impoundment Control Act of 1974.

(d) An apportionment or a reapportionment shall be reviewed at least 4 times a year by the official designated in section 1513 of this title to make apportionments.

**31 U.S.C. § 1513(b)**

**§ 1513. Officials controlling apportionments**

. . .

(b) (1) The President shall apportion in writing an appropriation available to an executive agency (except the Commission) that is required to be apportioned under section 1512 of this title. The head of each executive agency to which the appropriation is available shall submit to the President information required for the apportionment in the form and the way and at the time specified by the President. The information shall be submitted not later than the later of the following:

(A) 40 days before the beginning of the fiscal year for which the appropriation is available; or

(B) 15 days after the date of enactment of the law by which the appropriation is made available.

(2) The President shall notify the head of the executive agency of the action taken in apportioning the appropriation under paragraph (1) of this subsection not later than the later of the following:

(A) 20 days before the beginning of the fiscal year for which the appropriation is available; or

(B) 30 days after the date of enactment of the law by which the appropriation is made available.

. . .

**Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. E, tit. II, § 204, 136 Stat. 49, 257**

Sec. 204. (a) Beginning not later than 10 days after the date of enactment of this Act and until the requirements of subsection (b) are completed, the Office of Management and Budget shall provide to the Committees on Appropriations and the Budget of the House of Representatives and the Senate each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, approved by the Office of Management and Budget, including any associated footnotes, not later than 2 business days after the date of approval of such apportionment by the Office of Management and Budget.

(b) Not later than 120 days after the date of enactment of this Act, the Office of Management and Budget shall complete implementation of an automated system to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset (as defined in section 3502 of title 44, United States Code), not later than 2 business days after the date of approval of such apportionment, and shall place on such website each document apportioning an appropriation, pursuant to such section 1513(b), including any associated footnotes, already approved the current fiscal year, and shall report the date of completion of such requirements to the Committees on Appropriations and the Budget of the House of Representatives and Senate.

(c) Each document apportioning an appropriation pursuant to section 1513(b) of title 31, United States Code, that is posted on a publicly accessible website pursuant to such section shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts: *Provided*, That the Office of Management and Budget or the applicable department or agency shall make available classified documentation referenced in any apportionment at the request of the chair or ranking member of any appropriate congressional committee or subcommittee.

(d) (1) Not later than 15 days after the date of enactment of this Act, any delegation of apportionment authority pursuant to section 1513(b) of title 31, United States Code, that is in effect as of such date shall be submitted for publication in the Federal Register: *Provided*, That any delegation of such

apportionment authority after the date of enactment of this section shall, on the date of such delegation, be submitted for publication in the Federal Register: *Provided further*, That the Office of Management and Budget shall publish such delegations in a format that qualifies such publications as an Open Government Data Asset (as defined in section 3502 of title 44, United States Code) on a public Internet website, which shall be continuously updated with the position of each Federal officer or employee to whom apportionment authority has been delegated.

(2) Not later than 5 days after any change in the position of the approving official with respect to such delegated apportionment authority for any account is made, the Office shall submit a report to the appropriate congressional committees explaining why such change was made.

## Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (2022)

SEC. 204. In fiscal year 2023 and each fiscal year thereafter— (1) the Office of Management and Budget shall operate and maintain the automated system required to be implemented by section 204 of the Financial Services and General Government Appropriations Act, 2022 (division E of Public Law 117–103) and shall continue to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an open Government data asset (as that term is defined in section 3502 of title 44, United States Code); and (2) the requirements specified in subsection (c), the first and second provisos of subsection (d)(1), and subsection (d)(2) of such section 204 shall continue to apply.