NOT YET SCHEDULED FOR ORAL ARGUMENT
Nos. 25-5266, 25-5267 (consol.)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee,*

*v.*

OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

PROTECT DEMOCRACY PROJECT,
*Plaintiff-Appellee,*

*v.*

U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLEES

| | |
|---|---|
| Daniel F. Jacobson | Wendy Liu |
| Stephen K. Wirth | Adina H. Rosenbaum |
| Kyla M. Snow | Allison M. Zieve |
| JACOBSON LAWYERS GROUP PLLC | PUBLIC CITIZEN LITIGATION GROUP |
| 5100 Wisconsin Ave NW | 1600 20th Street NW |
| Suite 301 | Washington, DC 20009 |
| Washington, DC 20016 | (202) 588-1000 |
| (301) 823-1148 | |
| | Nikhel S. Sus |
| *Counsel for Appellee Protect* | CITIZENS FOR RESPONSIBILITY AND |
| *Democracy Project* | ETHICS IN WASHINGTON |
| | P.O. Box 14596 |
| | Washington, DC 20004 |
| | (202) 408-5565 |
| | *Counsel for Appellee Citizens for* |
| | *Responsibility and Ethics in* |
| April 27, 2026 | *Washington* |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**Parties and amici.** All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants.

In addition, pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Plaintiffs-Appellees state as follows:

Citizens for Responsibility and Ethics in Washington is a nonprofit corporation that is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies and to ensuring transparency, ethics, and integrity in government. It has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

Protect Democracy is a nonpartisan, nonprofit corporation whose mission is to prevent American democracy from declining into a more authoritarian form of government. It has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

i

**Rulings Under Review.** References to the rulings at issue appear in the Brief for Appellants.

**Related Cases.** This case consists of two appeals that were consolidated in this Court: *Citizens for Responsibility and Ethics in Washington v. Office of Management and Budget*, No. 25-5266, and *Protect Democracy Project v. U.S. Office of Management and Budget*, No. 25-5267. Undersigned counsel is unaware of any other related cases currently pending in this Court or any other court. This case was not previously before this Court.

| | |
|---|---|
| /s/ *Daniel F. Jacobson* | /s/ *Wendy Liu* |
| Daniel F. Jacobson | Wendy Liu |
| | |
| *Counsel for Appellee Protect Democracy Project* | *Counsel for Appellee Citizens for Responsibility and Ethics in Washington* |

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..................................................................................................i

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY ........................................................................................xii

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 3

STATEMENT OF THE ISSUES ........................................................... 3

STATUTES ........................................................................................... 4

STATEMENT OF THE CASE ............................................................... 4

    Apportionment of Appropriated Funds .......................................... 4

    The 2022 Act and 2023 Act ............................................................ 6

    The Public Apportionments Database ............................................ 9

    OMB's Removal of the Public Apportionments Database ............. 10

    Protect Democracy's Apportionment Website ............................... 11

    Proceedings Below ........................................................................ 12

    OMB's Noncompliance with the District Court Decision .............. 21

SUMMARY OF ARGUMENT ............................................................ 22

STANDARD OF REVIEW .................................................................. 27

ARGUMENT ..................................................................................... 28

I.  Appellees have standing. ............................................................. 28

A. CREW and Protect Democracy have suffered quintessential informational injury. .............................................................. 28

B. Protect Democracy has suffered economic injury. .................... 41

II.   OMB's noncompliance with the disclosure requirements of the 2022 and 2023 Acts is unlawful. ................................................. 46

A. The disclosure requirements of the 2022 and 2023 Acts do not unconstitutionally infringe on Executive authority. ............... 46

1. Congress has the power to enact laws requiring the Executive to disclose government spending .................... 47

2. The statutory disclosure requirements do not impose an unconstitutional burden on the Executive Branch..... 53

B. The Paperwork Reduction Act requires timely disclosure of the apportionment information. ................................................... 60

III.  The district court's injunction was properly tailored to OMB's violation of law. ......................................................................... 60

CONCLUSION ................................................................................. 69

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Anderson Group, LLC v. City of Saratoga Springs,*
 805 F.3d 34 (2d Cir. 2015) ...................................................................44

*Bahlul v. United States,*
 77 F.4th 918 (D.C. Cir. 2023)...............................................................32

*Byrd v. EPA,*
 174 F.3d 239 (D.C. Cir. 1999) ..............................................................38

*Califano v. Yamasaki,*
 442 U.S. 682 (1979)..............................................................................65

*Campaign for Accountability v. DOJ,*
 155 F.4th 724 (D.C. Cir. 2025).......................................................33, 39

*Campaign Legal Center & Democracy 21 v. FEC,*
 952 F.3d 352 (D.C. Cir. 2020) .......................................................28, 32

*Campaign Legal Center v. FEC,*
 31 F.4th 781 (D.C. Cir. 2022).................................... 14, 28, 30, 33, 37

*Center for Biological Diversity v. U.S. International Development
  Finance Corp.,*
 77 F.4th 679 (D.C. Cir. 2023)................................................29, 37, 38

*Cheney v. U.S. District Court for District of Columbia,*
 542 U.S. 367 (2004)..............................................................................55

*Cincinnati Soap Co. v. United States,*
 301 U.S. 308 (1937)..............................................................................48

*Citizens for Responsibility and Ethics in Washington v. DOJ,*
 164 F. Supp. 3d 145 (D.D.C. 2016) .....................................................39

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ................................................................66

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) ............................................................................45

*Clinton v. City of New York*,
524 U.S. 417 (1998) ............................................................................46

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ............................................................................61

*Environmental Defense Fund v. EPA*,
922 F.3d 446 (D.C. Cir. 2019) ...............................................29, 37, 38

*Ethyl Corp. v. EPA*,
306 F.3d 1144 (D.C. Cir. 2002) ..........................................................29

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) .....................................................................45, 46

*FEC v. Akins*,
524 U.S. 11 (1998) ..................................... 23, 29, 30, 32, 33, 34, 35, 36

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016) ....................................................29, 37

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ..................................... 15, 20, 29, 31, 33

*Gonzaga University v. Doe*,
536 U.S. 273 (2002) ............................................................................40

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977) ......................................................49, 51

*Hawaii v. Trump*,
871 F.3d 646 (9th Cir. 2017) ..............................................................44

vi

*Humane Society of the United States v. Vilsack*,
    797 F.3d 4 (D.C. Cir. 2015) ..................................................................41

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) .............................................................56

*In re Federal Bureau of Prisons' Execution Protocol Cases*,
    980 F.3d 123 (D.C. Cir. 2020) .............................................................68

*Judicial Watch, Inc. v. U.S. Department of Commerce*,
    583 F.3d 871 (D.C. Cir. 2009) .............................................................59

*Medina v. Planned Parenthood South Atlantic*,
    606 U.S. 357 (2025)......................................................................39, 40

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..............................................................................68

*Morton v. Mancari*,
    417 U.S. 535 (1974)..............................................................................54

*National Archives & Records Administration v. Favish*,
    541 U.S. 157 (2004)..............................................................................59

*National Mining Ass'n v. U.S. Army Corps of Engineers*,
    145 F.3d 1399 (D.C. Cir. 1998) ...........................................................69

*National Security Archive v. CIA*,
    104 F.4th 267 (D.C. Cir. 2024)......................................................33, 38

*National Treasury Employees Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) .............................................................54

*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977)..............................................................................55

*NLRB v. Express Publishing Co.*,
  312 U.S. 426 (1941) ................................................................64, 65

*Noel Canning v. NLRB*,
  705 F.3d 490 (D.C. Cir. 2013) ...........................................................48

*Prisology, Inc. v. Federal Bureau of Prisons*,
  852 F.3d 1114 (D.C. Cir. 2017) ....................................................38, 39

*Public Citizen v. DOJ*,
  491 U.S. 440 (1989).............................................. 29, 30, 33, 35, 36, 37

*Public Citizen v. NHTSA*,
  489 F.3d 1279 (D.C. Cir. 2007) ........................................................34

*Ramirez v. ICE*,
  568 F. Supp. 3d 10 (D.D.C. 2021) ....................................................68

*Ridgely v. Lew*,
  55 F. Supp. 3d 89 (D.D.C. 2014) ......................................................69

*Saad v. SEC*,
  873 F.3d 297 (D.C. Cir. 2017) ..........................................................32

*Schmidt v. Lessard*,
  414 U.S. 473 (1974)........................................................................62

*SEC v. Savoy Industries, Inc.*,
  665 F.2d 1310 (D.C. Cir. 1981) .........................................................63

*Spaulding v. Douglas Aircraft Co.*,
  60 F. Supp. 985 (S.D. Cal. 1945),
  *aff'd*, 154 F.2d 419 (9th Cir. 1946).....................................................48

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)........................................................................28

*T-Mobile Ne. LLC v. Loudoun County Board of Supervisors,*
748 F.3d 185 (4th Cir. 2014) ................................................................45

*Trump v. Mazars USA, LLP,*
591 U.S. 866 (2020) ...............................................................................55

*U.S. Department of Navy v. Federal Labor Relations Authority,*
665 F.3d 1339 (D.C. Cir. 2012) .................................................4, 47, 48

*United States v. Oregon State Medical Society,*
343 U.S. 326 (1952) ...............................................................................66

*United States v. Philip Morris USA Inc.,*
566 F.3d 1095 (D.C. Cir. 2009) ......................................................62, 63

*United States v. Regenerative Sciences,*
741 F.3d 1314 (D.C. Cir. 2014) ............................................................27

*United States v. Richardson,*
418 U.S. 166 (1974) ................................. 17, 25, 32, 35, 49, 51

*Village of Arlington Heights v. Metropolitan Housing Development
Corp.,*
429 U.S. 252 (1977) ................................................................24, 43, 44

*VoteVets Action Fund v. Department of Veterans Affairs,*
992 F.3d 1097 (D.C. Cir. 2021) ............................................................37

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ...............................................................................52

**Constitutional Provisions**

U.S. Const. art I., § 8, cl. 18 ...................................................................49

U.S. Const., art. I, § 9, cl. 7 ....................................... 4, 25, 48, 49, 50, 51

U.S. Const. art. II, § 3 .............................................................................54

**Statutes and Rules**

2 U.S.C. § 681 et seq.................................................................5

5 U.S.C. § 552 ........................................................................38

5 U.S.C. § 706 ........................................................................61

31 U.S.C. § 1341 ......................................................................5

31 U.S.C. § 1512 ......................................................................5

31 U.S.C. § 1513 ......................................................................5

31 U.S.C. § 1513 note ....................................... 1, 30, 54, 63, 68

31 U.S.C. § 1517 ......................................................................6

31 U.S.C. § 1518 ......................................................................6

31 U.S.C. § 1519 ......................................................................6

42 U.S.C. § 1983 ................................................................39, 40

44 U.S.C. § 3502(12) ...............................................................60

44 U.S.C. § 3502(20) .................................................................8

44 U.S.C. § 3506 .........................................................18, 30, 60

An Act to Establish the Treasury Department,
  ch. XII, 1 Stat. 65 (1789)......................................................49

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat.
  49 (Mar. 15, 2022), *at* 31 U.S.C. § 1513 note..........................8

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat.
  4459 (Dec. 29, 2022), *at* 31 U.S.C. § 1513 note .......................9

x

Federal Rule of Civil Procedure 65 ...........................................27, 62, 63

**Other Authorities**

Annals of Congress (1790)....................................................................50

Exec. Order No. 6166 (June 10, 1933), *reprinted in* 5 U.S.C. § 901,
  *as amended by* Exec. Order No. 12608, 52 Fed. Reg. 34617
  (Sept. 9, 1987) ............................................................................... 5

*The Federalist* No. 58 (Clinton Rossiter ed., 2003)................................48

*The Federalist* No. 72 (Clinton Rossiter ed., 1961)................................53

Katherine Clark Harris, *The Statement and Account Clause: A
  Forgotten Constitutional Mandate for Federal Reporting,*
  32 Yale L. & Pol'y Rev. 505 (2014) .......................................................50

OMB, Circular No. A-11, *Preparation, Submission, and Execution of the
  Budget* (2025) ..............................................................................6, 10

*The Records of the Federal Convention of 1787*
  (Max Farrand ed., 1911) ..............................................................32, 50

S. Rep. No. 89-813 (1965) ....................................................................59

U.S. Gov't Accountability Off., Decision, File No. B-331564, Office of
  Management and Budget—Withholding of Ukraine Security
  Assistance (Jan. 16, 2020) ................................................................7

Charles Alan Wright & Arthur R. Miller, *Federal Practice and
  Procedure* (3d ed. 2026 update) ....................................................62, 66

## GLOSSARY

**2022 Act**       Consolidated Appropriations Act, 2022

**2023 Act**       Consolidated Appropriations Act, 2023

**CREW**           Citizens for Responsibility and Ethics in Washington

**FACA**           Federal Advisory Committee Act

**FOIA**           Freedom of Information Act

**JA**             Corrected Joint Appendix, filed on April 13, 2026

**OMB**            Office of Management and Budget

## INTRODUCTION

In the Consolidated Appropriations Acts of 2022 and 2023, Congress required the Office of Management and Budget (OMB) to post, on a publicly accessible website, a database with documents reflecting "apportionments," which are legally binding actions that authorize agencies to use congressionally appropriated funds. *See* 31 U.S.C. § 1513 note. For nearly three years after Congress's enactment of these disclosure requirements, OMB followed the law, posting to a public database (the Public Apportionments Database) the apportionment information that Congress required it to make public. In March 2025, however, OMB took down the database and informed Congress that it would no longer comply with the statutory disclosure requirements. The district court correctly held that OMB's actions were unlawful and required it to comply with the statutory disclosure requirements going forward.

In seeking reversal, OMB asks this Court to abandon decades of precedent on standing and adopt a constitutional theory that defies settled constitutional principles and logic. On standing, Plaintiff-Appellees Citizens for Responsibility and Ethics in Washington (CREW)

1

and Protect Democracy have standing under this Court's established two-part test for informational injury. OMB does not contest that Appellees meet this test. Instead, it asks the Court to abandon its precedent applying this test, without citing any intervening authority that would justify doing so. OMB also ignores Supreme Court precedent making clear that Protect Democracy independently has economic standing from lost investments in its website that is dependent on OMB's database.

On the merits, Congress's constitutional power of the purse gives it ample authority to require disclosure of how OMB is apportioning appropriations. Instead of addressing Congress's constitutional powers, OMB advances the unprecedented theory that requiring the Executive to carry out a statutory duty unconstitutionally interferes with the Executive's responsibility under the Take Care Clause to carry out its statutory duties. The disclosure requirement, however, is a law that the Executive must faithfully execute; indeed, it is part of the same statutory apportionment scheme that OMB claims it is being hindered from carrying out.

This Court should affirm the decisions below.

2

## JURISDICTIONAL STATEMENT

On April 8, 2025, and April 14, 2025, respectively, Plaintiffs-Appellees CREW and Protect Democracy filed the underlying lawsuits in the U.S. District Court for the District of Columbia. JA96, 170. The district court had jurisdiction over the cases under 28 U.S.C. §§ 1331 and 1346(a)(2). On July 21, 2025, the district court entered final orders in both cases that disposed of all parties' claims. JA77, 80. On July 22, 2025, Defendants-Appellants filed timely notices of appeal. JA156, 427. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that CREW and Protect Democracy have standing to challenge Defendants-Appellants' violation of the requirements in the Consolidated Appropriations Act, 2022 and Consolidated Appropriations Act, 2023 to make each document apportioning an appropriation available on a publicly accessible website.

2. Whether the district court correctly held that Congress acted within its constitutional authority in requiring that Defendants-Appellants make each document apportioning an appropriation publicly available.

3

3. Whether, upon finding that Defendants-Appellants had violated the 2022 and 2023 Acts, the district court abused its discretion in issuing an injunction requiring Defendants-Appellants to make apportionment information publicly available in the time and manner specified in the 2022 and 2023 Acts.

## STATUTES

Except for the statutes reproduced in the addendum to this brief, pertinent statutes are contained in the Brief for Appellants.

## STATEMENT OF THE CASE

### Apportionment of Appropriated Funds

Under the Constitution, Congress has exclusive power over federal government spending, including the power to enact laws requiring disclosure of Executive spending of public money. *See* U.S. Const. art. I, § 9, cl. 7. Congress's "power over the federal purse … was one of the most important authorities allocated to Congress in the Constitution's necessary partition of power among the several departments." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,* 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted). "With its power over the purse, Congress's control over federal expenditures is 'absolute.'" *Id.* at 1348. Executive agencies may

4

neither exceed nor decline to spend appropriated amounts. *See* 31 U.S.C. § 1341 (Anti-Deficiency Act); 2 U.S.C. § 681 et seq. (Impoundment Control Act).

The Anti-Deficiency Act provides that "[t]he President shall apportion in writing" the appropriations that Congress has provided for executive agencies to spend. 31 U.S.C. § 1513(b)(1). An "apportionment" thus allocates to agencies portions of an appropriation that the agency may spend at a given time. *See* JA132 (citing 31 U.S.C. § 1513(b)). For appropriations that have a limited duration, like annual appropriations, money is apportioned in installments to prevent agencies from spending their funds too quickly, which would result in "a deficiency or [need for a] supplemental appropriation for the period." 31 U.S.C. § 1512(a). For funds that do not expire, the money must be apportioned to ensure "the most effective and economical use" of appropriated funds. *Id.* Appropriated funds are apportioned by "time period[]" or "activities, functions, projects, or objects," or a combination of both. *Id.* § 1512(b)(1).

The President has delegated this "apportionment" authority to OMB. *See* Exec. Order No. 6166 (June 10, 1933), *reprinted in* 5 U.S.C. § 901, *as amended by* Exec. Order No. 12608, 52 Fed. Reg. 34617 (Sept.

9, 1987). An apportionment is a "legally binding" "OMB-approved" budget decision. OMB, Circular No. A-11, *Preparation, Submission, and Execution of the Budget* § 120.1 (2025). That decision serves as both an authorization and prohibition: It authorizes the agency to spend the apportioned amounts, and it prohibits the agency from spending more than those amounts. *See id.* § 120.10. An agency official who exceeds an apportioned amount is subject to administrative penalties and criminal liability. *See* 31 U.S.C. §§ 1517–1519.

OMB's apportionment decisions may be set forth in footnotes that "appear as textual descriptions … in the apportionment file." OMB, Circular No. A-11 § 120.34. OMB sometimes uses footnotes to provide "direction" to the agency on how the agency may use the apportioned funds. *Id.* Footnotes for apportioned amounts are "part of the apportionment," legally binding, and "subject to the Antideficiency Act." *Id.* § 120.36.

**The 2022 Act and 2023 Act**

Prior to 2022, "apportionment decisions—and OMB's guidance— were not ordinarily communicated outside the executive branch, hindering Congress's ability to track and monitor its appropriations."

6

Statement respecting the denial of a stay pending appeal 3 (D.C. Cir. Aug. 9, 2025) (Henderson, J.) (hereafter, Henderson Statement). Because of this apportionment secrecy, Congress and the public generally had to rely on either whistleblowers or an agency's noncompliance with an apportionment to discover an abuse of the apportionment process. For example, in 2019, following a whistleblower complaint, the U.S. Government Accountability Office found that OMB had, through apportionments, unlawfully prevented the Department of Defense from using approximately $214 million that Congress had appropriated for U.S. security assistance to Ukraine. *See* Government Accountability Office, File No. B-331564, Office of Management and Budget— Withholding of Ukraine Security Assistance 1 (Jan. 16, 2020).[1]

In 2022, Congress passed and the President signed into law provisions requiring public disclosure of OMB's apportionment of appropriations. The Consolidated Appropriations Act, 2022 required OMB to post on a public website a database with documents and associated footnotes apportioning appropriated funds. Specifically, the statute required OMB to "implement[] … an automated system to post

---

[1] https://www.gao.gov/assets/b-331564.pdf.

each document apportioning an appropriation … including any associated footnotes … not later than 2 business days after the date of approval of such apportionment" and to "place on such website each document apportioning an appropriation … including any associated footnotes[] already approved [for] the current fiscal year." Pub. L. No. 117-103, § 204(b), 136 Stat. 49, 257 (Mar. 15, 2022), *at* 31 U.S.C. § 1513 note. The Act further required that "[e]ach document apportioning an appropriation … that is posted on a publicly accessible website … shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *Id.* § 204(c). Moreover, each apportionment document must be posted "in a format that qualifies [it] as an Open Government Data Asset (as defined in [44 U.S.C. § 3502])," *id.* § 204(b)—that is, a format that is open, machine-readable, and does not prevent reuse by others, 44 U.S.C. § 3502(20). Finally, until OMB implemented the "automated system" on the public website, OMB was required to disclose to Congress "each document apportioning an appropriation … including any associated footnotes, not later than 2 business days after the date of approval of such apportionment by [OMB]." 2022 Act § 204(a).

8

The following fiscal year, Congress made the public disclosure requirements permanent. The Consolidated Appropriations Act, 2023 requires that "[i]n fiscal year 2023 and each fiscal year thereafter," OMB "shall operate and maintain the automated system required to be implemented" by the 2022 Act and "shall continue to post each document apportioning an appropriation … including any associated footnotes" within two business days after the apportionment's approval. Pub. L. No. 117-328, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022), *at* 31 U.S.C. § 1513 note. The 2023 Act further provides that, for each document posted on the publicly accessible website, the requirement of posting a written explanation of the rationale for footnotes for apportioned amounts "shall continue to apply." *Id.* § 204(2).

**The Public Apportionments Database**

In July 2022, OMB implemented the disclosure requirements of the 2022 Act by posting the Public Apportionments Database on a public website at https://apportionment-public.max.gov/. JA134.

From July 2022 until March 2025, OMB maintained and operated, "without hiccup or objection," the Public Apportionments Database. Henderson Statement 4. During that time, OMB posted apportionments,

9

including footnotes and written explanations, within two business days of the approval date as required by the 2022 and 2023 Acts. *See* JA134, 211; *see also* JA26 (citing OMB, Circular No. A-11 § 120.4).

**OMB's Removal of the Public Apportionments Database**

On March 24, 2025, OMB removed the Public Apportionments Database from the publicly available website. JA26, 114. The website instead displayed a "Page Not Found" error message. JA114.

Five days later, Director Vought informed Congress that OMB "will no longer operate and maintain the publicly available system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023." JA152, 153, 154, 155. Director Vought asserted that maintaining the system "requires the disclosure of sensitive, predecisional, and deliberative information," and that disclosing the required information "may pose a danger to national security and foreign policy." JA152, 153, 154, 155.

On April 8, 2025, the U.S. Government Accountability Office sent a letter to Director Vought, requesting that OMB restore the Public Apportionments Database. JA421. It stated that it "disagree[d]" with his assertions to Congress and that OMB's removal of the database was "very

10

concerning because of the potential implications for review of such records for federal audits, congressional oversight, specifically with regard to Congress's power of the purse." JA421.

**Protect Democracy's Apportionment Website**

After Congress made the disclosure requirements permanent in 2023, Protect Democracy decided to build its own website to publish and make searchable OMB's apportionment data, after independent experts commented that OMB's database was cumbersome and not user friendly. JA199. Protect Democracy's site, named OpenOMB, took 10 months to build and launched in October 2024. JA199–200. A Protect Democracy employee submitted declarations below attesting that the organization invested substantial money, resources, and time into building, maintaining, and improving OpenOMB, devoting hundreds of hours in total to the site. JA200, 425–26.

OpenOMB depends entirely on OMB's operation and maintenance of the Public Apportionments Database. OpenOMB pulls the primary source data from OMB's site and stores the files in a manner that allows them to be searched, filtered, and indexed. JA200. Because Protect Democracy's website is more user-friendly and searchable than OMB's

11

database, the site has been widely used by Congress, journalists, and others, receiving approximately 41,000 page views between October 2, 2024, and March 24, 2025. JA201–02. At the time OMB stopped posting apportionments, Protect Democracy was preparing to launch a new "notification" feature that it had spent months developing. JA203–04.

Once OMB stopped complying with the 2022 and 2023 Acts, Protect Democracy's site became a static archive and of considerably less value, for it could no longer serve the core function for which Protect Democracy had made significant investments: making it easier to track OMB's ongoing apportionment actions. JA425–26.

**Proceedings Below**

**A.** In the two lawsuits consolidated here, plaintiffs CREW and Protect Democracy, two nonprofit organizations, challenged the removal of the Public Apportionments Database by defendants OMB and Director Vought (hereafter, OMB).

CREW is a nonpartisan, nonprofit government watchdog organization that is committed to monitoring and informing the public about key government activities, protecting the rights of citizens to be informed about the activities of government officials and agencies; and

12

ensuring transparency, ethics, and integrity in government. JA108. Monitoring the Executive Branch's spending of congressionally appropriated funds is a core focus of CREW's work. *See* JA108–12. To accomplish that work, CREW routinely relies on the Public Apportionments Database and information within it. *Id.*

Protect Democracy is a nonpartisan, nonprofit organization dedicated to preventing the decline of American democracy into more authoritarian forms of government, including through efforts to defend Congress's power of the purse. JA197. As mentioned, Protect Democracy developed its own website, OpenOMB.org, that makes searchable the data from OMB's Public Apportionments Database. Protect Democracy uses OpenOMB not only to disseminate information to the public, but also in furtherance of Protect Democracy's own work scrutinizing the Executive Branch's funding actions for potential impoundments or other improper uses of the apportionment process. JA204–05.

Both CREW and Protect Democracy sued OMB and its Director, challenging the removal of the Public Apportionments Database. JA96, 170. Among other claims, CREW and Protect Democracy each claimed that OMB's action was contrary to the 2022 and 2023 Acts. CREW and

Protect Democracy each moved for partial summary judgment on that claim or, in the alternative, for preliminary injunctive relief. *See* JA3, 12.

**B.** On July 21, 2025, the district court granted partial summary judgment to CREW and Protect Democracy, holding that OMB's removal of the database violated the 2022 and 2023 Acts. JA75–76. The court also granted summary judgment to CREW on its claim that OMB's removal of the database violated the Paperwork Reduction Act's requirement to provide timely and equitable access to public information. JA75.[2]

**1.** The district court held that both CREW and Protect Democracy had standing based on the informational injury caused by OMB's action. The court began with this Court's case law: "The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimant's reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." JA38 (quoting *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022)). Reiterating this Court's

---

[2] The district court denied summary judgment on CREW's claim that OMB violated the Paperwork Reduction Act's requirement to provide adequate notice before removing the information, and it dismissed other claims alleged by CREW and Protect Democracy as prudentially moot. JA77, 81.

14

longstanding two-part test for informational standing, the court explained that "a plaintiff must show: '(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." JA38 (quoting *Friends of Animals v. Jewell (Friends of Animals I)*, 828 F.3d 989, 992 (D.C. Cir. 2016)). The court held that Appellees meet the first prong, because the 2022 and 2023 Acts, and the Paperwork Reduction Act, require public disclosure of the apportionment information, and OMB's removal of the Public Apportionments Database deprived CREW and Protect Democracy of that information. JA40–42. The court held that CREW and Protect Democracy also met the second prong, because "CREW and Protect Democracy's use of the apportionment information fits squarely within Congress's goal of providing increased transparency into the Executive Branch's apportionment decisions." JA45; *see* JA42–46.

The district court also concluded that CREW and Protect Democracy "have established that they have a particularized injury sufficient for Article III standing." JA48. It explained that, without the

15

apportionment information, CREW cannot effectively monitor and inform the public about potential misuses of government spending, and Protect Democracy cannot populate its website that "it spent ten months building … as part of Protect Democracy's core mission." JA47. The court rejected OMB's position that a plaintiff has informational standing only if "a public disclosure statute … include[s] a private right of action." JA 48–49 (collecting cases).

In addition, the court held that Protect Democracy is suffering economic injury based on the diminution of the value of its investment in developing OpenOMB. JA52. The court explained that OpenOMB was "now only an archive of apportionments from a fixed period of time in the past" and could not "serv[e] the purpose for which Protect Democracy invested substantial money and resources"—making ongoing oversight of OMB's apportionments easier for Congress, the news media, and other members of the public. *Id.* (quoting Protect Democracy declaration).

**2.** Turning to the merits, the court stated that "the law is clear" and held that OMB's removal of the database violated the 2022 and 2023 Acts. JA18. Indeed, the court noted that OMB did not argue otherwise. Rather, OMB argued that the statutory requirement to post the

apportionment information is unconstitutional because it: (1) amounts to Congress having an active role in executing the laws, representing an impermissible intrusion into the President's responsibility to execute the laws; and (2) requires the disclosure of privileged information. JA54. The court rejected both arguments.

First, the court stated that OMB's argument reflected a "policy disagreement" with Congress "without a constitutional foundation." JA56. The court explained that "Congress has plenary power to exact any reporting and accounting" of Executive spending that Congress "considers appropriate." JA57 (quoting *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974)). And it explained that "[t]he Acts do not dictate how OMB should apportion funds, nor do they establish a congressional management role in the administration of apportionments," but rather "merely require that the final apportionment decisions be made publicly available to provide transparency to Congress and the public." JA57. The court stated: "There is nothing unconstitutional about Congress requiring the Executive Branch to inform the public of how it is apportioning the public's money." JA19.

17

Second, the court explained that the apportionment information is not covered by the deliberative process privilege. Rather, because the apportionment documents are final decisions that are legally binding, they are neither predecisional nor deliberative. *See* JA58–61.

In addition, the district court held that OMB's removal of the Public Apportionments Database violated the Paperwork Reduction Act, which requires agencies to "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1). The court noted that OMB did not dispute that the apportionment information was "public information" within the meaning of the statute and that OMB's removal of that information deprived the public of timely access. JA63.

The district court entered a declaratory judgment that OMB's removal of the Public Apportionments Database was unlawful. JA77, 80. The court vacated and set aside the unlawful removal of the database, ordering OMB to restore the Public Apportionments Database and make publicly available the apportionment information required to be disclosed by the 2022 and 2023 Acts. JA78, 80–81. Finally, the court permanently enjoined OMB from removing the database or otherwise ceasing to post

18

apportionment information on a publicly available website as required by law without statutory authorization. JA78, 81. In granting these remedies, the court determined that OMB's removal of the database caused CREW and Protect Democracy to "suffer[] irreparable harms," JA68, and that requiring OMB to maintain the Public Apportionments Database as required by law serves the public interest, JA71.

**C.** OMB appealed and moved for a stay pending appeal. OMB argued that, regardless of whether the deliberative process privilege "strictly applies," the disclosure requirements were unconstitutional because they "would impermissibly chill agency officials' ability to communicate frankly." OMB Stay Mot. 22–23. This Court denied the motion. Order 2 (Aug. 9, 2025).

Judge Henderson, joined by Judge Wilkins, issued a statement respecting the denial of a stay. First, she explained that CREW and Protect Democracy were likely to succeed in showing standing based on their informational injury, stating that "[t]here is no dispute that the Government has a statutory duty to disclose apportionment data" and explaining that, because "Appellees use the withheld information to track the Executive's expenditures of public funds and to alert the public to a

19

potential violation of the Impoundment Control Act," they suffer "precisely 'the type of harm Congress sought to prevent by requiring disclosure.'" Henderson Statement 7 (quoting *Friends of Animals I*, 828 F.3d at 992). Further, she explained, Protect Democracy "invested substantial time and resources in building a customized website that relies on OMB's disclosures to function." *Id.* at 8. "[B]y removing the foundation" on which that website relies, OMB "injured [Protect Democracy's] investment," causing it to suffer a "pocketbook harm" that is "a quintessential Article III injury." *Id.* That injury was "enough to establish standing." *Id.*

Second, Judge Henderson explained that OMB is not likely to succeed on the merits because "the Government['s] claim[] that the [2022 and 2023 Acts] 'impermissibly intrude on the Executive Branch's Article II authorities' by requiring public disclosure of 'sensitive information contained in apportionments' … fails on constitutional first principles." *Id.* at 12–13. After tracing the history and purpose of Article I, section 8, clause 7, and precedent, Judge Henderson concluded that the disclosure requirements in the 2022 and 2023 Acts reflect valid exercises of Congress's plenary power over public money. *See id.* at 13–22. "The

20

Constitution's text, structure and history uniformly cut against declaring the [Acts] unconstitutional," she concluded. *Id.* at 19.

**OMB's Noncompliance with the District Court Decision**

On August 15, 2025, OMB restored the Public Apportionments Database. OMB did not, however, make publicly available all the information that the 2022 and 2023 Acts require it to disclose. JA85. Instead, the restored database showed that OMB was often making apportionments through documents referred to as "spend plans"— "plan[s] setting forth how the agency intends to use its appropriated funds." JA85 (citation omitted). Specifically, OMB incorporated by reference the contents of spend plans into some apportionment footnotes, legally prohibiting the agency from using the apportioned funds except in conformity with a spend plan that OMB had approved. Although these spend plans "contain the terms of OMB's decisions about how to apportion the appropriated funds," OMB did not make them public. JA90.

CREW and Protect Democracy each moved to enforce the district court's summary judgment decision, and the district court granted the motions. "[W]hen OMB conditions the ability of an agency to obligate funds upon OMB's agreement with the contents of a spend plan in a

21

legally-binding footnote," the court explained, "OMB has incorporated-by-reference the terms of the spend plan into the apportionment and therefore the spend plan is a 'document apportioning an appropriation' that must be disclosed under the 2022 and 2023 Acts." JA89.

## SUMMARY OF ARGUMENT

Under our constitutional system, the Executive Branch must follow laws enacted by Congress. OMB, however, has refused to comply with the disclosure requirements in the 2022 and 2023 Acts, which require it to post documents apportioning appropriations on an online database. The district court correctly held that Appellees have standing, correctly determined that OMB's refusal to comply with the disclosure requirements was unlawful, and correctly required the agency to comply with the law by posting apportionment documents to the Public Apportionments Database—which it had previously done without incident for nearly three years.

**I.A.** CREW and Protect Democracy have standing to challenge OMB's violation of the statutory disclosure requirements. Under this Circuit's longstanding precedents, a plaintiff suffers an injury in fact where (1) a statute requires the information to be publicly disclosed and

(2) there is no reason to doubt the plaintiff's claim that the information would help it. The 2022 and 2023 Acts indisputably require the apportionment information to be publicly disclosed, and that information is vital to Appellees' core work in monitoring government spending.

OMB does not dispute that Appellees meet this Court's well-established two-part test. Instead, it asks this Court to abandon that precedent. OMB, however, points to no intervening Supreme Court precedent that would satisfy this Court's stringent standards for abandoning circuit precedent. Moreover, the Court's test follows directly from the Supreme Court's decision in *FEC v. Akins*, 524 U.S. 11 (1998). And *Akins* and decisions of this Court *reject* the argument, made by OMB here, that an informational injury is a generalized grievance if that injury is widely shared. Similarly, OMB's contention that Appellees do not have standing because the 2022 and 2023 Acts do not give them a "personal right" to the information flies in the face of abundant precedent from both this Court and the Supreme Court finding informational injury based on statutes that require disclosure to the public, and do not confer a "personal right" to the information in the plaintiffs in the litigation.

**B.** Protect Democracy independently has standing from the economic injury it suffered when OMB shut down the Public Apportionment Database. Protect Democracy invested substantial money, time, and resources into building its custom website, OpenOMB, which incorporates the information from the Database and presents it in a searchable and user-friendly format. When OMB took down the Database, Protect Democracy's site ceased to function, rendering Protect Democracy's financial and other investment essentially worthless. This economic harm is a "quintessential Article III injury." Henderson Statement 8. Indeed, the Supreme Court has expressly held that when a nonprofit's investments are rendered "worthless" by a defendant's action, the nonprofit suffers "economic injury" and has standing to challenge the action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977).

**II.** On the merits, the district court correctly held that OMB's removal of the Public Apportionment Database violated the 2022 and 2023 Acts as well as the Paperwork Reduction Act. The disclosure requirements comfortably fall within Congress's constitutional power of the purse, which gives Congress plenary authority to control and monitor

24

federal spending. In appropriating funds, Congress may condition the Executive Branch's use of the appropriated funds. Congress has long made apportioning funds a condition of appropriations, and has now made disclosing those apportionments another condition. Moreover, Congress has authority to require a "Statement and Account of the Receipts and Expenditures" of federal funds, U.S. Const. art. I, § 9, cl. 7, pursuant to which "Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest." *Richardson*, 418 U.S. at 178 n.11. Here, Congress reasonably determined that it is in the public interest for the Executive Branch to report how it is apportioning public funds.

Rather than directly addressing Congress's constitutional authority to require the disclosure of apportionments, OMB advances a novel theory as to why the 2022 and 2023 Acts are unconstitutional: because executing these laws interferes with the Executive's ability under the Take Care Clause to faithfully execute the laws. More specifically, OMB contends that Congress has given the President the responsibility to carry out the statutory scheme for apportionments, and that the disclosure requirements (which are part of the same statutory

scheme) interfere with the President's execution of that responsibility. OMB cites no legal precedent for the notion that a statutory scheme may unconstitutionally interfere with itself, and for good reason: The President must faithfully execute all laws. He cannot pick and choose which provisions of a statute he prefers to follow.

OMB's complaints about the disclosure requirements are ultimately policy disagreements and are unfounded in any event. The 2022 and 2023 Acts do not stop OMB from confidentially communicating guidance to agencies regarding the use of apportioned funds. Nor do the Acts prevent OMB from monitoring how agencies use the funds. The Acts require disclosure only where OMB makes its directives to agencies *legally binding* under the Anti-Deficiency Act, by including them in apportionments. OMB is not unconstitutionally burdened by having to disclose legally binding terms that it chooses to impose on agencies.

**III.** Finally, the district court issued a declaration that OMB had violated the law, an order vacating OMB's unlawful action by requiring it to repost the Public Apportionments Database, and a permanent injunction against OMB ceasing to post the apportionments information in the time and manner specified in the 2022 and 2023 Acts. The court's

26

order was well within its discretion to provide redress for OMB's unlawful action.

OMB challenges the portion of the order permanently enjoining OMB from ceasing to post the apportionment information as required by the Acts. The injunction, however, satisfies this Court's standard for a permanent injunction—a standard that OMB's brief does not mention. The injunction also specifies the prohibited acts, as required by Federal Rule of Civil Procedure 65. Accordingly, it is not an impermissible "obey-the-law" injunction. Rather, the order permanently enjoining OMB from denying public access in the future is properly tailored to OMB's violation of the law and properly crafted to prevent Appellees and the public from again being denied access to the apportionment information that Congress required the agency to disclose.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See* Appellants Br. 25.

With respect to the remedy ordered, "[t]his Court reviews the district court's entry of a permanent injunction for abuse of discretion." *United States v. Regenerative Scis.*, 741 F.3d 1314, 1318 (D.C. Cir. 2014).

27

## ARGUMENT

### I.    Appellees have standing.

To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). OMB contests only the first element: whether Appellees suffered injury in fact. As the district court held, they did. Under this Court's longstanding precedents, CREW and Protect Democracy have suffered quintessential informational injury. In addition, Protect Democracy has suffered economic injury from the lost value of the significant investments it made in its custom website.

### A.    CREW and Protect Democracy have suffered quintessential informational injury.

**1.** As this Court has explained, "[t]he law is settled that a denial of access to information qualifies as injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Campaign Legal Ctr.*, 31 F.4th at 783 (quoting *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020)

(per curiam)); *see also, e.g., Envtl Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019); *Friends of Animals v. Jewell* (*Friends of Animals II*), 824 F.3d 1033, 1040–41 (D.C. Cir. 2016); *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002). "A plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals I*, 828 F.3d at 992; *see Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023).

This two-part test derives from *FEC v. Akins*, 524 U.S. 11 (1998). There, the Supreme Court held that the plaintiffs had suffered a "concrete and particular" injury based on their "inability to obtain" campaign contribution and expenditure information that the statute required a political committee to disclose. *Id.* at 21. The Court explained that, on plaintiffs' view of the law, the statute required the information to be made public, and there was "no reason to doubt [plaintiffs'] claim that the information would help them." *Id.* Similarly, in *Public Citizen v.*

29

*DOJ*, 491 U.S. 440 (1989), the Court held that the plaintiff suffered "a sufficiently distinct injury to provide standing to sue" when the agency defendant failed to disclose information that the Federal Advisory Committee Act (FACA) requires to be disclosed to the entire public. *Id.* at 449.

As the district court correctly held, and as OMB does not dispute, CREW and Protect Democracy satisfy both prongs of the informational injury test. *See* JA38–46; *see also* Appellants Br. 35–36. First, the 2022 and 2023 Acts and the Paperwork Reduction Act indisputably require public disclosure of the information that CREW and Protect Democracy seek. *See* 31 U.S.C. § 1513 note; 44 U.S.C. § 3506(d)(1).

Second, there is "no reason to doubt," *Campaign Legal Ctr.*, 31 F.4th at 783, that the Public Apportionments Database helps both Appellees. For its part, CREW uses the Database to monitor and evaluate the Executive Branch's use of congressionally appropriated funds—a core part of CREW's public education, legislative policy, and litigation work. JA108–14. CREW routinely accesses apportionment information as soon as it is posted and uses it to analyze and inform the public about potential misuses of taxpayer funds, including potential violations of the

30

Impoundment Control Act. JA108–10, 112–14. Similarly, Protect Democracy uses the information in the Database to scrutinize whether OMB is using apportionments to effectuate impoundments of federal funds, which have long been a central focus of Protect Democracy's work in guarding against infringement by the Executive on Congress's powers, including its power of the purse. JA197, 204. To this end, where Protect Democracy does identify in the disclosed data potential misuses of OMB apportionment authority, it "update[s] Congress, the press, and the public." JA204.

Accordingly, when OMB stopped disclosing apportionment information as required by law, Appellees "suffer[ed] … the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals I*, 828 F.3d at 992. By depriving Appellees of the ability to "use the withheld information to track the Executive's expenditures of public funds and to alert the public to a potential violation of the Impoundment Control Act," Appellees suffered "precisely 'the type of harm Congress sought to prevent by requiring disclosure.'" Henderson Statement 7; *cf. id.* (noting the view of "many Framers[] that it is of central 'importance that the people should know who had disposed of their money, & how it

31

had been disposed of'" (quoting 1 *The Records of the Federal Convention of 1787*, p.546 (Max Farrand ed., 1911)). That CREW and Protect Democracy each disseminate information to the public as part of their core work monitoring government spending reinforces the concrete and particularized nature of the harm they face. *See, e.g., Campaign Legal Ctr.*, 952 F.3d at 356 (in holding that the plaintiff nonprofit organizations had standing, stating that the information they sought would "further their efforts to defend and implement campaign finance reform").

**2.** OMB asks this Court to jettison its settled two-part test for informational standing. Yet OMB does not even attempt to argue that the stringent conditions for "abandoning law of the circuit" are met. *Saad v. SEC*, 873 F.3d 297, 311 (D.C. Cir. 2017). It does not point to "an intervening Supreme Court decision … [that] 'effectively overrule[s], *i.e.*, eviscerate[s]'" this Court's many precedents applying the two-part test. *Bahlul v. United States*, 77 F.4th 918, 925 (D.C. Cir. 2023). Indeed, this Court's test is derived from *Akins*, which post-dates *Richardson*, the case on which OMB primarily relies.

OMB is wrong to assert that this Court's many cases setting forth the two-part test are not binding precedent because they "did not

32

specifically consider" whether the plaintiff's injury was a generalized grievance. Appellants Br. 32. This Court has specifically stated that a plaintiff that satisfies that test "demonstrate[s] a 'sufficiently concrete *and particularized* informational injury.'" *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 (D.C. Cir. 2024) (emphasis added); *see Friends of Animals I*, 828 F.3d at 992 (citing *Akins*, 524 U.S. at 21–22). And *Akins* rejected the argument that a plaintiff's informational injury is a generalized grievance, even if that injury is "widely shared." *Akins*, 524 U.S. at 24; *see id.* at 23–25.

Accordingly, relying on *Akins*, this Court has explained that "[t]he fact that many people could be similarly injured does not render the claim an impermissible generalized grievance: 'Where a harm is concrete, though widely shared, the Court has found injury in fact.'" *Campaign for Accountability v. DOJ*, 155 F.4th 724, 735 (D.C. Cir. 2025) (quoting *Akins*, 524 U.S. at 11); *see Campaign Legal Ctr.*, 31 F.4th at 789 (similar); *Public Citizen*, 491 U.S. at 449–50 (stating that "[t]he fact that other citizens or groups of citizens" are also deprived of the information "does not lessen [the plaintiffs'] asserted injury, any more than the fact that numerous citizens might request the same information under the

33

Freedom of Information Act entails that those who have been denied access do not possess a sufficient basis to sue"). Instead, "the rule against generalized grievances comes into play, the Supreme Court has stated, 'where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature—for example, harm to the common concern for obedience to law.'" *Public Citizen v. NHTSA*, 489 F.3d 1279, 1293 n.1 (D.C. Cir. 2007) (quoting *Akins*, 524 U.S. at 23).

Here, the harm to CREW and Protect Democracy from the deprivation of the statutorily required apportionment information is neither abstract nor indefinite. OMB's removal of the Public Apportionments Database deprived CREW and Protect Democracy of specific information, causing each concrete harm. And those injuries are particular to them: Without the information, each cannot do their work to effectively monitor and educate the public about government spending; and without the information, Protect Democracy cannot operate its custom website, OpenOMB, which depends on apportionment information that OMB is statutorily required to post. *See* JA108–10, 112 (CREW); JA203–04, 425–26 (Protect Democracy). Both Appellees

34

accordingly "bring far more to the table" than "a bare interest that the Government follow the law." Henderson Statement 10.

In this regard, OMB's reliance on *United States v. Richardson*, 418 U.S. 166 (1974), to argue that a plaintiff's informational injury is an impermissible generalized grievance is misplaced. *Richardson* "predates modern standing doctrine"—including *Akins* and *Public Citizen*—and is "limited … to 'taxpayer standing' cases." Henderson Statement 10 n.4. In *Richardson*, the Supreme Court considered the "narrow[]" question whether a plaintiff had "taxpayer standing" to claim that a statute permitting an agency's expenditures to be nonpublic violated the Constitution's Statement and Account Clause. 418 U.S. at 175. In holding that he did not, the Court stated that "in ruling on taxpayer standing … [the court must] determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated," *id.* at 174—there, Congress's "failure … to require the Executive to supply a more detailed report of the expenditures of [the] agency," *id.* at 175. In *Akins*, however, the Supreme Court rejected the applicability of *Richardson* to informational standing cases, stating that *Richardson*'s "'logical nexus' inquiry is not relevant" where "there is a statute which … seek[s] to

protect individuals such as [the plaintiffs] from the kind of harm they say they have suffered, *i.e.*, failing to receive particular information …." *Akins*, 524 U.S. at 22.

**3.** OMB also contends that Appellees lack standing because the 2022 and 2023 Acts do not give them a "personal right" to the apportionment information. Appellants Br. 36; *see id.* at 32. That position is contrary to the many precedents of the Supreme Court and this Court finding injury in fact where a statute requires information to be disclosed to the public generally, rather than specifically to the plaintiff. For example, in *Akins*, the Supreme Court held that the plaintiffs' "'injury in fact' … consists of their inability to obtain" information that the Federal Election Campaign Act required political committees like the defendant to make public. 524 U.S. at 21. And in *Public Citizen*, the Court held that the plaintiff had informational standing to bring a claim under FACA, 491 U.S. at 449–51, where FACA provides the public at large—and not any specific party—the right to attend advisory committee meetings and obtain advisory committee records, *id.* at 446–47.

This Court, too, has repeatedly found informational injury where a statute required disclosure to the public, rather than to a specific person.

36

*See, e.g., Ctr. for Biological Diversity*, 77 F.4th at 685–86 (Government in the Sunshine Act requiring agencies "to provide robust public information"); *Campaign Legal Ctr.*, 31 F.4th at 790 (Federal Election Campaign Act requiring public disclosure of campaign expenditures and contributions); *VoteVets Action Fund v. Dep't of Veterans Affs.*, 992 F.3d 1097, 1103 (D.C. Cir. 2021) (FACA requiring open meetings and public access to materials); *Envtl Def. Fund*, 922 F.3d at 452 (Toxic Substances Control Act requiring public disclosure of certain information); *Friends of Animals II*, 824 F.3d at 1041 (Endangered Species Act requiring that "[i]nformation received by the Secretary as part of any application shall be available to the public").

OMB further suggests that, in a disclosure statute with no "individual right" to information, the absence of a private right of action is "relevant" to injury in fact. Appellants Br. 39. That suggestion is likewise inconsistent with Supreme Court precedent finding standing where the underlying disclosure statute did not have a private right of action. *See Public Citizen*, 491 U.S. at 449–50 (FACA); *see also* Henderson Statement 11 (explaining that "the standing inquiry turns on whether Appellees have suffered an injury as a matter of fact; not whether the

37

Congress has vested them with a means to vindicate their injury as a matter of law").

To be sure, as OMB does not dispute, *see* Appellants Br. 36–37, plaintiffs that have requested and been denied information under the Freedom of Information Act (FOIA) and FACA have standing. *See, e.g.*, *Nat'l Sec. Archive*, 104 F.4th at 272 (FOIA); *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) (FACA). A plaintiff, however, "need not receive a specific denial to sustain an informational injury," *Ctr. for Biological Diversity*, 77 F.4th at 686, so long as the plaintiff establishes both prongs of the two-part test. *See, e.g.*, *id.* at 685–86; *Envtl Def. Fund*, 922 F.3d at 452.

*Prisology, Inc. v. Federal Bureau of Prisons*, 852 F.3d 1114 (D.C. Cir. 2017), on which OMB relies, is not to the contrary. *Prisology* held that a plaintiff lacked standing to challenge a violation of FOIA's reading-room requirement, 5 U.S.C. § 552(a)(2). There, the plaintiff could not rely on FOIA cases recognizing that the denial of a request constitutes "particularized injury" because it had made no request. 852 F.3d at 1117. And the plaintiff made no other "allegation of harm." *Id.* Instead, the plaintiff argued that the agency's failure to make information public as

required by the statute—the first prong of this Court's test—sufficed to establish injury. *See id.* (citing Br. for Appellant 11 (No. 15-5003)).

Thus, the plaintiff in *Prisology* failed to meet the second prong of this Court's informational standing test: that it suffered harm by being denied access to the information. *See id.* (contrasting plaintiff's complaint with the harm to "'core programmatic activities,' which included research from public government records" alleged in *CREW v. DOJ*, 164 F. Supp. 3d 145 (D.D.C. 2016)). Neither *Prisology* nor *Campaign for Accountability*, which discusses *Prisology*, provides that a plaintiff who meets this Court's two-part test suffers "particularized injury" only if the "information-disclosure law … confers a particular right on the plaintiff." Appellants Br. 32; *see id.* at 36–37.

OMB's analogy to laws enacted pursuant to Congress's Spending Clause power is also inapt. Whether such a law uses "rights-creating terms," Appellants Br. 32 (quoting *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025)), does not concern standing, but whether that law is enforceable through the private right of action supplied by 42 U.S.C. § 1983. *See* Henderson Statement 11–12. "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities

39

secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (quoting § 1983). Thus, "statutory provisions must 'unambiguously confer individual federal rights,'" *Medina*, 660 U.S. at 359 (citation omitted), for those "rights [to be] … secured by the … laws" within the meaning of section 1983. That point is not pertinent here, where the cause of action is the APA, not section 1983.

Finally, that subsection (c) of the 2022 Act provides a separate mechanism to disclose classified information to Congress, and subsection (a) required disclosure to Congress until the Public Apportionments Database was established, *see* Appellants Br. 33 (citing 136 Stat. 257), does not diminish the public's right of access to the information under subsection (b) of the 2022 Act and the 2023 Act, *see* 2022 Act § 204(b); 2023 Act § 204, 136 Stat. 4667. Congress's decision to make the public disclosure requirements permanent in the 2023 Act, without extending the provision on disclosure to Congress, *see* 2022 Act § 204(a), leaves no doubt on this score.

The question for informational injury is whether the plaintiffs satisfy both parts of this Court's longstanding two-part test. Appellees here do. Accordingly, they have standing.

**B.    Protect Democracy has suffered economic injury.**

OMB's decision not to comply with the disclosure laws caused Protect Democracy economic injury, which is "a classic form of concrete and particularized harm." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 9 (D.C. Cir. 2015).

Protect Democracy's declarations established that after Congress enacted the apportionment disclosure laws, Protect Democracy invested substantial money, time, and other resources into building its customized website, OpenOMB. JA199–200, 203. Simply building the website was a ten-month endeavor, and the website's creation and post-launch expansion consumed hundreds of hours of staff's time. *Id.* Protect Democracy's post-launch investments included months of costs and manpower building a new website feature that would allow users to sign up to receive notifications when specific apportionments were posted. JA203–04. Protect Democracy was on the verge of releasing this feature

41

when OMB suddenly stopped complying with the law and posting apportionment data. *Id.*

OMB's actions effectively destroyed Protect Democracy's financial and other investments in OpenOMB, a fact that OMB has not disputed. Protect Democracy's website "relies on OMB's disclosures to function." Henderson Statement 8. As Protect Democracy's declarant detailed below, without access to OMB's apportionments, "OpenOMB is … of considerably less value because it cannot serve its core function of making it easier to track OMB's apportionments." JA425–26.

Indeed, because the website depends entirely on data from OMB's Public Apportionment Database, OpenOMB essentially went dark when OMB took down the Database. "OpenOMB [became] only an archive of apportionments from a fixed period of time" in the past, *id.*, rather than serving the purpose of Protect Democracy's investments—to "make oversight of OMB's apportionments easier for Congress, the press, and the public" on an ongoing basis. *See About OpenOMB*, OpenOMB.org/about (last visited May 4, 2025). Protect Democracy's planned new subscription notification tool, for instance, could not be completed or launched while the Database was down. JA204.

42

"By removing the foundation on which [Protect Democracy's] design relies, the Government has injured [Protect Democracy's] investment." Henderson Statement 8. That injury is not marginal or ambiguous: OMB's cessation in posting apportionment information completely destroyed the value of Protect Democracy's website and all the work that went into it. The "pocketbook harm" from the severe diminution in value of Protect Democracy's website "is a quintessential Article III injury." *Id.*

The Supreme Court has explicitly recognized this form of economic injury, and in the context of a nonprofit organization like here. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Court found that a nonprofit suffered "economic injury" where it had "expended thousands of dollars" on plans and studies to support a rezoning request that was denied. *Id.* at 262. The Court found the nonprofit had standing because the "plans and studies" for which the nonprofit had invested money would be "worthless" unless the zoning request were granted. *Id.* "It is inaccurate," the Court held, that the nonprofit "suffer[ed] no economic injury" because it was not guaranteed the project would continue even if the zoning request were

granted. *Id.* The near-total loss in value of the non-profit's investments itself was "economic injury." *Id.*

The same is true here. OMB remarkably does not address *Arlington Heights*, even though the district court and Judge Henderson relied upon it in finding Protect Democracy has economic standing. Henderson Statement 9; JA52–53. And there simply is no basis to distinguish *Arlington Heights*' standing holding.

It is not just *Arlington Heights* that has found economic injury in circumstances like these. Numerous other cases have found injury-in-fact where the plaintiff invested time, money, or resources in a project that was rendered of little value because of the defendant's action. For instance, in *Hawaii v. Trump*, 871 F.3d 646 (9th Cir. 2017) (per curiam), the Ninth Circuit held that a refugee resettlement agency had economic standing to challenge an Executive Order barring admission of certain refugees, where it would "lose the money and resources it ha[d] already expended in preparing for arrival" of those refugees. *Id.* at 661; *see also, e.g., Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015) (plaintiff's "actual expenditures made to develop" a proposal "which became worthless" due to defendant's action "are economic losses

44

that constitute concrete and particularized injuries"); *T-Mobile Ne. LLC v. Loudoun Cty. Bd. of Supervisors*, 748 F.3d 185, 197 (4th Cir. 2014) (similar).

OMB asserts that Protect Democracy nevertheless lacks economic injury because its pocketbook harm is "manufacture[d]." Appellants Br. 40. But the relevant cases on self-inflicted injury are "inapposite" here. Henderson Statement 8. Protect Democracy "did not incur 'costs as a *reaction to*' what the Government *might* do." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)). Rather, Protect Democracy "incurred costs *in reliance* on what the Government *did* do: disseminate information on which [Protect Democracy] built a website." *Id.* at 8–9.

Moreover, unlike the plaintiffs in *Alliance for Hippocratic Medicine*, Protect Democracy did not attempt to "spend its way into standing simply by expending money" in response to the challenged action. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Protect Democracy's investments "predated" that challenged conduct. Henderson Statement 9. For about one year before OMB abruptly reversed course—during which time OMB was complying with the law and releasing the required information—Protect Democracy invested in developing a website that

45

relied upon OMB's ongoing apportionment disclosures. Protect Democracy had no idea at that point that OMB would suddenly stop complying with the law a year later, destroying the value of those investments. "The Supreme Court has routinely found standing in comparable circumstances." *Id.* (citing, *e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 426–27, 432 (1998)).

Thus, as Judge Henderson put it, Protect Democracy "does not allege a *Havens Realty* divergence of resources theory in response to Government action, but a direct economic blow to a central 'business activity' that predated the challenged action." *Id.* Unlike in *Alliance for Hippocratic Medicine,* it was OMB's conduct—not Protect Democracy's response to it—that caused Protect Democracy's harm.

## II.    OMB's noncompliance with the disclosure requirements of the 2022 and 2023 Acts is unlawful.

### A.    The disclosure requirements of the 2022 and 2023 Acts do not unconstitutionally infringe on Executive authority.

OMB agrees that its removal of information is contrary to the disclosure requirements of the 2022 and 2023 Appropriations Acts. The government's sole defense is that the Acts are unconstitutional. But OMB now "disavows" the claim that the apportionment information is

46

privileged, Appellants Br. 51—the theory that Director Vought asserted when OMB stopped complying with the law, JA417. And OMB no longer argues, as it did below, that the Acts violate the principle that Congress cannot assign itself a role in implementing federal statutes. *See* JA39.

Instead, OMB now argues only that the statutory apportionment-disclosure requirements unconstitutionally interfere with the President's ability under the Take Care Clause to "faithfully execute the laws" regarding apportionments and spending. Appellants Br. 41. The disclosure requirements, however, are among the laws that the President must faithfully execute regarding apportionments and spending. Congress had the power to impose these requirements, and the President has no authority to defy them.

**1.    Congress has the power to enact laws requiring the Executive to disclose government spending.**

**a.** The Constitution assigns Congress the "exclusive power over the federal purse." *Dep't of Navy*, 665 F.3d at 1346 (citation omitted). "Congress's control over federal expenditures is 'absolute,'" *id.* at 1348, and "was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments,'" *id.* at 1346. "The Framers placed the power of the purse

47

in the Congress in large part because the British experience taught that the appropriations power was a tool with which the legislature could resist 'the overgrown prerogatives of the other branches of government.'" *Noel Canning v. NLRB*, 705 F.3d 490, 510 (D.C. Cir. 2013) (quoting *The Federalist* No. 58 at 357 (Clinton Rossiter ed., 2003)); *see Dep't of Navy*, 665 F.3d at 1347 (stating that "the [Appropriations] Clause 'was intended as a restriction upon the disbursing authority of the Executive department" (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

Article I, section 9, clause 7 contains two provisions for Congress's control and oversight of Executive spending. First, the Executive may not spend any money except "in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "[I]n making appropriations," "Congress … has the power and authority not only to designate the purpose of [an] appropriation, but also the terms and conditions under which the executive department of the government may expend such appropriations." *Spaulding v. Douglas Aircraft Co.*, 60 F. Supp. 985, 988 (S.D. Cal. 1945), *aff'd*, 154 F.2d 419 (9th Cir. 1946); *see Dep't of Navy*, 665 F.3d at 1347.

Second, in the same clause, the Constitution mandates that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published." U.S. Const. art. I, § 9, cl. 7. In discussing this Clause, "the Supreme Court has … recognized that 'Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest.'" *Harrington v. Bush*, 553 F.2d 190, 194 n.7 (D.C. Cir. 1977) (quoting *Richardson*, 418 U.S. at 178 n.11). The Court has explained that there "are nearly two centuries of acceptance of a reading of cl. 7 as vesting in Congress plenary power to spell out the details of precisely when and with what specificity Executive agencies must report the expenditure of appropriated funds." *Richardson*, 418 U.S. at 178 n.11; *see* U.S. Const. art I., § 8, cl. 18.

Indeed, from the outset, Congress exercised its power to require the Executive to report on its use of public money: "The First Congress inserted a mandatory disclosure" regarding expenditures "in the legislation creating the Treasury Department." Henderson Statement 17 (citing An Act to Establish the Treasury Department, ch. XII, § 2, 1 Stat. 65, 65–66 (1789)). And "[w]ithin months, the Treasury was providing the Congress with quarterly accounting statements of the sort the

49

Government now deems unconstitutional." *Id.* (citing 1 Annals of Congress 17, 1061 (1790)).

Congress's immediate implementation of the Statement and Account Clause reflects the importance the Framers placed on the public disclosure of appropriations. "[T]he Journal of the Convention notes that it was proposed 'nem. con.'—with no one contradicting." Katherine Clark Harris, *The Statement and Account Clause: A Forgotten Constitutional Mandate for Federal Reporting*, 32 Yale L. & Pol'y Rev. 505, 510 (2014) (citing 3 *The Records of the Federal Convention of 1787* at 610 n.2); *see also* 2 *The Records of the Federal Convention of 1787* at 619. As Judge Henderson documented, the "Antifederalists and Federalists agreed that the citizenry had a right to know how the Government manages its money, not a privilege contingent upon the whims of the Executive." Henderson Statement 18. Though they disagreed as to Congress's role in regulating these disclosures, "Congressional power won out." *Id.* at 19.

The Ratification history of the Statement and Account Clause generally reveals three principles: "the centrality of public disclosure regarding appropriations," "Congress's broad discretion to regulate those

50

disclosures," and "the danger of Executive overreach absent public scrutiny." *Id.* at 16.

**b.** The apportionment disclosure requirements of the 2022 and 2023 Acts reflect a straightforward exercise of Congress's authority under these constitutional provisions. Congress determined that "reporting and accounting" of OMB's apportionments—which enable and restrict agencies in spending appropriations—is "appropriate in the public interest." *Harrington*, 553 F.2d at 194 n.7 (quoting *Richardson*, 418 U.S. at 178 n.11). By requiring disclosure of apportionments, it "chose to remedy" the troubling lack of transparency regarding apportionments. Henderson Statement 3. "Congress, as is its right, has opted to keep the citizenry informed by shedding more light on the appropriations process." *Id.* at 19.

The disclosure requirements also are an exercise of its authority to set the terms and conditions for appropriated funds. *See* U.S. Const. art I, § 9, cl. 7 (Appropriations Clause). Just as apportioning funds is a term and condition of Congress's appropriation of those funds, so too is disclosing those apportionments.

51

**c.** Because Congress exercised its Article I powers to require disclosure of apportionments, the President's power to act otherwise "is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). To justify action "incompatible with the expressed … will of Congress," the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* "Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject." *Id.* at 637–38. "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 638. With respect to apportionments, however, the President can claim no such power: "The Chief Magistrate's role in appropriations is ministerial; he is an agent bound to faithfully execute the legislature's command." Henderson Statement 14. "The President lacks the inherent power to apportion money among agencies." *Id.* at 13. Rather, "when the President exercises his duty to 'apply and disburse … the public moneys,' he must do so 'in conformity to the general appropriations of the

legislatures.'" *Id.* at 14–15 (quoting *The Federalist* No. 72, at 435–36 (A. Hamilton) (Clinton Rossiter ed., 1961)).

Although OMB is correct that appropriations statutes provide the Executive limited "discretion" with respect to allocating some funds, Appellants Br. 22, the Executive lacks discretion to choose *whether* to comply with the apportionment process directed by Congress. *See* Henderson Statement 2 (stating that "[W]hen it comes to appropriations, our Constitution has made plain that congressional power is at its zenith"). Where Congress requires that the Executive's decisions apportioning appropriations be released to the public, the Executive lacks discretion to refuse to carry out that statutory mandate.

### 2. The statutory disclosure requirements do not impose an unconstitutional burden on the Executive Branch.

**a.** OMB advances the theory that the disclosure requirements in the 2022 and 2023 Acts unconstitutionally infringe upon the Executive's responsibility under the Take Care Clause to faithfully execute the laws. Appellants Br. 41. Specifically, OMB contends that the statutory disclosure requirements impede its ability to carry out its statutory duty to administer congressional appropriations, including determining when

53

and how to permit agencies to spend appropriations through apportionments under the Anti-Deficiency Act. *See id.* at 41–46.

OMB points to no precedent or historical underpinning for such a theory of a statute's unconstitutionality. The Take Care Clause requires the President to execute *all* "the laws" of the United States. U.S. Const. art. II, § 3. It "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974). Just as "courts are not at liberty to pick and choose among congressional enactments," *Morton v. Mancari*, 417 U.S. 535, 551 (1974), so too the Executive.

Moreover, OMB's theory is particularly audacious here, where the statutes purportedly interfered with (regarding apportioning funds) are part of the same statutory scheme as the statute purportedly doing the interfering (the disclosure requirement for apportioning funds). Indeed, the disclosure requirements are a note to the very provision that OMB claims it is being hindered in implementing. *See* 31 U.S.C. § 1513 note. OMB's theory thus boils down to a nonsensical claim that the statutory apportionment scheme unconstitutionally interferes with itself.

54

The cases cited by OMB are inapposite. *Cheney v. U.S. District Court for District of Columbia*, 542 U.S. 367 (2004), concerned discovery requested by a private litigant and approved by a district court. *See id.* at 387. *Trump v. Mazars USA, LLP*, 591 U.S. 866 (2020), involved "subpoenas for the President's personal information" issued by Congress in performing oversight, *id.* at 869—not an exercise of Congress's appropriations power (or even a law duly enacted by Congress and signed by the President). And in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), the Supreme Court *upheld* a statute requiring the Executive Branch to preserve and publish presidential records. The Court considered whether that statute broadly "prevent[ed] the Executive Branch from accomplishing its constitutional functions." 433 U.S. at 443. It did not suggest that one statutory duty could be unconstitutional because it would interfere with the President's execution of other, related statutory duties. And the Court *rejected* the argument that the statute there disrupted the Executive's functioning. Noting the "abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive," the Court explained that "[s]uch regulation of material generated in the

Executive Branch has never been considered invalid as an invasion of its autonomy." *Id.* at 445. The Court also concluded that the statute did not violate presidential privilege. *Id.* at 455.

**b.** Because Congress holds plenary authority over appropriations and public disclosure of Executive spending, and because the disclosure requirements are laws that the Executive must faithfully execute, the alleged burdens that OMB cites are not ones of constitutional significance. OMB's argument is essentially just "a policy disagreement with the 2022 and 2023 Acts." JA56. OMB, however, "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). In any event, OMB's objection is unjustified.

Notably, OMB does not contend that it is not possible to comply with the statutory disclosure requirements and OMB's other statutory responsibilities. Nor could it, because OMB complied with the requirements "without hiccup or objection" for nearly three years, Henderson Statement 4, until unilaterally declaring in March 2025 that it would no longer do so. *See* JA26. Further, OMB now "disavows" any claim "that apportionment information is privileged." Appellants Br. 2.

56

And it no longer claims national security or foreign policy concerns, as it previously did. *See* JA417.

Instead, OMB's argument is that disclosing apportionments interferes with "OMB's communications with agencies," Appellants Br. 54 (citation omitted), and leads OMB to omit "sensitive information in apportionments" that OMB believes "would not be appropriate for public disclosure," *id.* at 52. As the district court correctly found, these claims do not withstand scrutiny. *See* JA55–58.

Nothing in the 2022 and 2023 Acts, or in the injunction issued by the district court, prohibits OMB from confidentially communicating with agencies or supervising how agencies are spending their funds. OMB may communicate its views on how agencies should spend apportioned funds—with no disclosure required—through other modes of communication that are not a legally binding apportionment. OMB may also request that agencies keep OMB informed on how they intend to spend apportioned funds or have spent those funds. OMB "never explains why [it] cannot communicate" any purportedly sensitive information "outside the apportionment document itself." Henderson Statement 21. The Acts simply require that if OMB wishes to make its communications

57

*legally binding* components of an apportionment, they must be made public.

OMB's complaints about disclosing spend plans incorporated by reference into documents in the Database fail for this reason. OMB must disclose such spend plans only because it chose to make the contents of the spend plans "legally binding limits on the agencies' ability to obligate funds," by incorporating the contents of the spend plans into apportionment footnotes. JA94. OMB is not required to take that approach; it almost never did so prior to March 2025. JA162. Thus, OMB's objection to disclosing spend plans is a problem of its own making.

Moreover, even putting aside the question whether the 2022 and 2023 Acts call for disclosure of "sensitive" information, OMB cites no case supporting the argument that a statutory disclosure requirement that could encompass some "sensitive" (but non-privileged) information is unconstitutional. And adopting OMB's argument that "chilling" non-privileged communications imposes an unconstitutional burden on agencies would call into question Congress's authority to enact other public disclosure statutes that for decades have advanced the "informed

electorate" so "vital to the proper operation of a democracy." S. Rep. No. 89-813, at 3 (1965) (FOIA).

FOIA, for example, imposes an enormous burden on agencies, and FACA requires disclosure even of "materials manifesting an agency's deliberative processes." *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 583 F.3d 871, 874 (D.C. Cir. 2009). Indeed, because apportionment documents are not classified or privileged, OMB would be required to disclose them in response to a FOIA request, which provides no exemption for "sensitive" information. That the 2022 and 2023 Acts require proactive disclosure of disclosable material on a faster timeline than FOIA does not render those Acts unconstitutional.

As the Supreme Court has stated, the notion that citizens have a right to know "what their Government is up to" is not "a convenient formalism," but rather "defines a structural necessity in a real democracy." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation omitted). This Court should reject OMB's argument that maintaining an informed electorate constitutes a burden that justifies OMB's refusal to comply with statutory requirements.

**B.  The  Paperwork  Reduction  Act  requires  timely disclosure of the apportionment information.**

The district court also correctly held that OMB's removal of the Public Apportionments Database is contrary to the Paperwork Reduction Act's requirement that agencies "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1); *see id.* § 3502(12) (defining "public information"); *see also* JA63. OMB has not contested that the apportionment information is "public information" that must be disclosed within two business days for the agency to provide "timely" access to it. And its suggestion that the disclosure required by this statute unconstitutionally infringes on Executive authority, *see* Appellants Br. 57, fails for the same reasons as above.

**III.  The district court's injunction was properly tailored to OMB's violation of law.**

Having held that OMB violated the unambiguous language of the 2022 and 2023 Acts, and the Paperwork Reduction Act, the district court issued appropriate relief.

To start, the district court entered a declaratory judgment, and vacated OMB's unlawful action by ordering OMB to "restore the Public

Apportionments Database and make publicly available the apportionment information" that the statutes require OMB to disclose, including the information "from the time the database was taken offline … through the time the database is restored." JA78; *see* JA64–67 (citing 5 U.S.C. § 706(2)(A)). OMB concedes that these aspects of the court's order "properly reflect" APA remedies for unlawful agency action. Appellants Br. 61.

In addition, after applying the four-factor test for a permanent injunction—irreparable harm, inadequate remedy at law, public interest, and balance of hardships, JA67 (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006))—the district court issued a permanent injunction enjoining OMB "from removing the Public Apportionments Database or otherwise ceasing to post apportionment information on a publicly available website in the time and manner required by the 2022 and 2023 Acts without statutory authorization." JA78. This injunction, crafted to address OMB's violation of law and prevent it from recurring, was well within the court's discretion.

**A.** OMB contends that the injunction is an improper "follow-the-law injunction[]." Appellants Br. 58. As this Court has explained, the concern

with such injunctions is a lack of the specificity required by Federal Rule of Civil Procedure 65(d). *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). Rule 65(d)(1) requires every injunction to "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." The specificity requirement is "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders," *Philip Morris*, 566 F.3d at 1137 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)), so they are "inform[ed] … of what they are called upon to do or refrain from doing in order to comply with the injunction," 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2955 (3d ed. 2026 update). Thus, injunctions may be improper where they "enjoin all violations of a statute in the abstract without any further specification" or "include, as a necessary descriptor of the forbidden conduct, an undefined term that the circumstances of the case do not clarify." *Philip Morris*, 566 F.3d at 1137 (collecting examples). Conversely, "[e]ven if it tracks statutory language, a general injunction is not too vague if it relates the enjoined violations

62

to the context of the case." *Id.*; *see SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1317 (D.C. Cir. 1981).

There is no Rule 65 problem here. The injunction "is not a generalized injunction to obey the law, especially when read in the context of the district court's legal conclusions and … findings of fact." *Philip Morris*, 566 F.3d at 1137. Rather, the injunction specifies the prohibited act: OMB may not "remov[e] the Public Apportionments Database or otherwise ceas[e] to post apportionment information on a publicly available website in the time and manner required by the 2022 and 2023 Acts without statutory authorization." JA78. And the Acts describe with specificity the "information required to be disclosed" and "the time and manner" of its disclosure: "each document apportioning an appropriation, including associated footnotes, in a format qualifying each document as an Open Government Data Asset …, not later than 2 business days after the date of approval of such apportionment." JA25 (quoting 31 U.S.C. § 1513 note). The permanent injunction thus specifies and provides "fair notice" of the required acts. *Philip Morris*, 566 F.3d at 1137. Indeed, OMB does not claim that it lacks notice or sufficient clarity regarding its obligations pursuant to the injunction. Nor could OMB

63

reasonably make any such claim, having posted the required information with that required timing and manner for nearly three years.

Moreover, OMB could not reasonably dispute that the injunction requiring OMB to comply with the disclosure requirements of the 2022 and 2023 Acts "relates the enjoined violations to the context of the case." *Id.* The action challenged here was OMB's decision to stop "post[ing] apportionments and related required information on a public website." JA186 (Protect Democracy complaint); *accord* JA104 (CREW complaint challenging OMB's removal and "failure to operate and maintain the Public Apportionments Database, and failure to make publicly accessible the information required"). The enjoined unlawful acts—OMB removing the information "or otherwise ceasing" to publish it, JA78—are the same unlawful acts that OMB committed and Appellees successfully challenged.

The injunction therefore is nothing like the injunction in *NLRB v. Express Publishing Co.*, 312 U.S. 426 (1941), the primary case on which OMB relies. There, after finding that the defendant had violated a provision of the National Labor Relations Act requiring it to bargain in good faith, the Board enjoined the defendant from engaging in a broad

range of other unfair labor practices. *See id*. at 429–30. Because the injunction impermissibly encompassed practices "unlike and unrelated to" those alleged in the case, the Supreme Court struck from the injunction "restraints upon the commission of unlawful acts which are thus dissociated from those which [the] defendant has committed." *Id*. at 436. Here, the injunction includes no such "dissociated" restraints.

**B.** OMB argues that the permanent injunction should have been "limited … to the specific facial objection that the government raised in this case." Appellants Br. 59. In OMB's view, because it argued that it did not need to post the Public Apportionments Database at all, the district court should have enjoined OMB only from having no public database at all. "[T]he scope of injunctive relief," however, "is dictated by the extent of the violation established …," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)—not the particular defense that OMB chose to assert.

Moreover, OMB's theory would have absurd results. Under that theory, OMB, after losing in court, would then be free to comply with a court order by posting, for example, a database that included 1 percent of the apportionments. And CREW and Protect Democracy would then have to file a new suit and seek a new injunction against OMB's failure to post

65

the other 99 percent of the documents. Further, under OMB's theory, because the district court would be required to issue only a narrow injunction in response to that second suit as well, this process could continue indefinitely.

The district court acted well within its discretion in issuing an injunction avoiding that result. "The sole function of an action for injunction is to forestall future violations," *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952), so that plaintiffs do not have to repeatedly file new lawsuits challenging essentially the same action. As the Seventh Circuit has explained, "[i]njunctive relief is forward-looking, and a plaintiff injured by an unconstitutional or unlawful action in one year does not need to suffer injuries repeatedly in each ensuing year— and separately sue after each injury—to obtain relief from the unlawful actions." *City of Chicago v. Barr*, 961 F.3d 882, 910 (7th Cir. 2020); *see* Wright & Miller § 2942 (stating that "injunctive relief looks to the future").

OMB nonetheless purports to worry that the injunction could lead to "all manner of future disputes about the government's compliance with the 2022 and 2023 Acts." Appellants Br. 59. Seeking to identify an

66

example of how the injunction is overly broad, OMB points to the district court's order enforcing the judgment by requiring OMB to disclose certain spend plans. As explained above, *supra* pp.21–22, after the district court's decision, when OMB restored the Public Apportionments Database, the Database showed that OMB had, in the months prior, often been incorporating by reference in apportionment footnotes spend plans that "contain[ed] the terms of OMB's decisions about how to apportion the appropriated funds." JA90. Yet OMB did not post those spend plans in the reposted database. By declining to post the spend plans in the Database, OMB failed to comply with the court's order to fully restore access to documents apportioning an appropriation, including footnotes. JA94.

OMB does not argue that the district court's enforcement order was incorrect with respect to the spend plans in question. Instead, OMB complains that Appellees' "claims had nothing to do with spend plans" and that the summary judgment decision did not mention them. Appellants Br. 60. But OMB's frequent incorporation by reference of spend plans was not known until *after* the decision, when OMB restored the Database that showed the apportionments it had failed to post in the

67

prior months**.** The lawsuits, however, certainly covered such spend plans; the cases challenged the refusal to post in a public database "each document apportioning an appropriation … including any associated footnotes," JA25 (quoting 31 U.S.C. § 1513 note), and through its spend-plan gambit, OMB was not posting them. If OMB had restored the Public Apportionments Database and it showed apportionments written in Sanskrit, OMB could not rightly complain that a motion to enforce by CREW and Protect Democracy was improper on the ground that their complaints had not specifically mentioned ancient Indo-European languages. OMB's action would plainly be an attempt to circumvent the court's order.

Finally, this Court can easily reject OMB's contention that the injunction "overstepped the bounds of APA review." *See* Appellants Br. 62. It is well-settled that, after finding that a final agency action is contrary to law, a district court may enter a permanent injunction to prevent future violations if the four-factor test for injunctive relief is satisfied. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010)); *see also, e.g., Ramirez v. ICE*, 568

F. Supp. 3d 10, 22 (D.D.C. 2021) (collecting cases); *Ridgely v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014); *National Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). OMB does not argue that the test is not satisfied here, and, as the district court held, it is. *See* JA67.

## CONCLUSION

The Court should affirm.

Respectfully Submitted,

/s/ *Daniel F. Jacobson*

Daniel F. Jacobson
Stephen K. Wirth
Kyla M. Snow
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
(301) 823-1148
Dan@jacobsonlawyersgroup.com

*Counsel for Appellee Protect Democracy Project*

April 27, 2026

/s/ *Wendy Liu*

Wendy Liu
Adina H. Rosenbaum
Allison M. Zieve
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
wliu@citizen.org

Nikhel S. Sus
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20004
(202) 408-5565

*Counsel for Appellee Citizens for Responsibility and Ethics in Washington*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Federal Rules of Appellate Procedure and this Court's rules, this document contains 12,993 words, as calculated by my word processing software.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 365.

*/s/ Wendy Liu*
Wendy Liu

**ADDENDUM**

# TABLE OF CONTENTS

31 U.S.C. § 1513 note ........................................................................... A1

44 U.S.C. § 3502(12) ............................................................................ A2

44 U.S.C. § 3506(d) .............................................................................. A2

**31 U.S.C. § 1513 note**

**Statutory Notes**

**Automated System**

Pub. L. 117-328, Div. E, Title II, § 204, Dec. 29, 2022, 136 Stat. 4667, provided that: "In fiscal year 2023 and each fiscal year thereafter—(1) the Office of Management and Budget shall operate and maintain the automated system required to be implemented by section 204 of the Financial Services and General Government Appropriations Act, 2022 (division E of Public Law 117-103) and shall continue to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an open Government data asset (as that term is defined in section 3502 of title 44, United States Code); and (2) the requirements specified in subsection (c), the first and second provisos of subsection (d)(1), and subsection (d)(2) of such section 204 shall continue to apply."

Pub. L. 117-103, Div. E, Title II, § 204(b), Mar. 15, 2022, 136 Stat. 257, provided that: "Not later than 120 days after the date of enactment of this Act [Mar. 15, 2022], the Office of Management and Budget shall complete implementation of an automated system to post each document apportioning an appropriation, pursuant to section 1513(b) of title 31, United States Code, including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset (as defined in section 3502 of title 44, United States Code), not later than 2 business days after the date of approval of such apportionment, and shall place on such website each document apportioning an appropriation, pursuant to such section 1513(b), including any associated footnotes, already approved the current fiscal year, and shall report the date of completion of such requirements to the Committees on Appropriations and the Budget of the House of Representatives and Senate."

## 44 U.S.C. § 3502. Definitions

As used in this subchapter—

. . .

(12) the term "public information" means any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public;

## 44 U.S.C. § 3506.  Federal agency responsibilities

(d) With respect to information dissemination, each agency shall—

(1) ensure that the public has timely and equitable access to the agency's public information, including ensuring such access through—

(A) encouraging a diversity of public and private sources for information based on government public information;

(B) in cases in which the agency provides public information maintained in electronic format, providing timely and equitable access to the underlying data (in whole or in part); and

(C) agency dissemination of public information in an efficient, effective, and economical manner;