[ORAL ARGUMENT NOT YET SCHEDULED]

Nos. 25-5266, 25-5267

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee*,

v.

OFFICE OF MANAGEMENT AND BUDGET, et al.,
*Defendants-Appellants*.

_____

PROTECT DEMOCRACY PROJECT,
*Plaintiff-Appellee*,

v.

U.S. OFFICE OF MANAGEMENT AND BUDGET, et al.,
*Defendants-Appellants*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

---

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina G. Henry
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus curiae* certifies that a separate brief is necessary.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees.  CAC has filed *amicus* briefs in multiple cases about the Constitution's separation of powers and Congress's plenary power of the purse, and has accordingly developed expertise in the relevant constitutional text and history.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.     PARTIES AND *AMICI*

Except for *amicus* Constitutional Accountability Center and any other *amici* who had not yet entered an appearance in this case as of the filing of Appellees' brief, all parties, intervenors, and *amici* appearing in this Court are listed in Appellees' brief.

II.     RULINGS UNDER REVIEW

Reference to the ruling under review appears in Appellees' brief.

III.     RELATED CASES

Reference to any related cases pending before this Court appears in Appellees' brief.

Dated: May 4, 2026                                          /s/ Brianne J. Gorod
                                                            Brianne J. Gorod

                                                            *Counsel for Amicus Curiae*

iii

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... v

GLOSSARY ......................................................................................................... x

INTEREST OF *AMICUS CURIAE* ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ...................................................................................................... 7

I.    To Guard Against the Risk of a Tyrannical President, the Framers Vested the Power of the Purse in Congress While Ensuring Public Disclosure of Spending Decisions ........................................................... 7

    A. In Seventeenth-Century England, Parliament Vied with the Crown for Control of the Purse Strings ..................................... 7

    B. Keenly Aware of the English Experience, Our Constitution's Framers Gave Congress Plenary Control Over the Public Fisc ....................................................................................... 9

    C. The Founders Also Adopted Early Transparency Measures and Public Disclosure Requirements to Ensure Accountability for the Government's Spending Decisions ...... 15

II.    Because the President's Apportionment Authority Derives from Congress—Not the Constitution—the Disclosure Requirements of the 2022 and 2023 Acts Do Not and Cannot Run Afoul of Article II ............................................................................................... 18

    A. Congress Created the Apportionment Process by Statute and Thus Has Plenary Power Over Its Terms and Conditions ........ 18

    B. The President Has No Inherent Constitutional Apportionment Authority or Discretion ............................................................ 20

CONCLUSION .................................................................................................. 24

iv

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ................................................................... 2, 10

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977) ..................................................... 18

*Immigr. & Naturalization Serv. v. Chadha*,
462 U.S. 919 (1983) ..................................................................... 14

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ................................................. 20, 22

*Kendall v. United States*,
37 U.S. (12 Pet.) 524 (1838) ...................................................... 6, 22

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026) .................................................................... 23

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ...................................................................... 22

*Rochester Pure Waters Dist. v. U.S. Env't Prot. Agency*,
960 F.2d 180 (D.C. Cir. 1992) ................................................. 10, 14

*United States v. MacCollom*,
426 U.S. 317 (1976) ...................................................................... 14

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) ................................................. 6, 10

*U.S. House of Representatives v. Mnuchin*,
976 F.3d 1 (D.C. Cir. 2020) .......................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ...................................................................... 23

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

STATUTES AND LEGISLATIVE MATERIALS

An Act Declaring the Rights and Liberties of the Subject and Settling the
    Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2 (Eng.)...... 9

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 ............................................................. 5, 17

Act of July 12, 1870, ch. 251, 16 Stat. 251 ...................................................... 19

Act of Mar. 3, 1905, ch. 1484, 33 Stat. 1257 ................................................... 19

Act of Feb. 27, 1906, ch. 510, 34 Stat. 48 ....................................................... 19

1 Annals of Congress (1790) ............................................................................. 17

Financial Services and General Government Appropriations Act, 2022,
    Pub. L. No. 117-103, div. E, 136 Stat. 239 (2022) ....................................... 2, 19

Financial Services and General Government Appropriations Act, 2023,
    Pub. L. No. 117-328, 136 Stat. 4650 (2022)................................................. 2, 19

H.R. Rep. No. 117-79 (2022)............................................................................. 20

H.R. Rep. No. 117-393 (2022)........................................................................... 20

31 U.S.C. § 1512................................................................................................ 5, 19, 21

31 U.S.C. § 1512(a) ........................................................................................... 19

31 U.S.C. § 1513................................................................................................ 21

31 U.S.C. § 1513(b) ........................................................................................... 19

31 U.S.C. § 1513 note........................................................................................ 5

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

U.S. Gov't Accountability Off., GAO-21-538T, *Testimony Before the House Committee on the Budget—Proposals to Reinforce Congress's Constitutional Power of the Purse* (2021) ................................. 20

CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 5 ............................................ 10

Del. Const. of 1776, art. VII .................................................................. 9

Mass. Const. of 1780, ch. 2, § 1, art. XI ...................................................... 9

U.S. Const. art. I, § 8, cl. 1 ................................................................. 3, 10

U.S. Const. art. I, § 9, cl. 7 ............................................................. 4, 5, 12, 13, 15

U.S. Const. art. II, § 3 ....................................................................... 14, 19

BOOKS, ARTICLES, AND OTHER AUTHORITIES

Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1 (1999) .................................................................... 11

William Blackstone, *Commentaries on the Laws of England* (1791) .............. 7, 8

Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* (John P. Kaminski et al. eds., 1988) ........................................................................ 13

Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1 (1990) ............................................................. 7

Gerhard Casper, *An Essay in Separations of Powers: Some Early Versions and Practices*, 30 Wm. & Mary L. Rev. 211 (1989) ............................................................. 17

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* (2017) ................................................................. 7, 12, 17

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) ........................ 1, 4, 12, 15-17

Exec. Order No. 6,166 (June 10, 1933) ................................................................ 19

Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987) .......................... 19

*The Federalist No. 30* (Clinton Rossiter ed., 1961) ........................................ 3, 11

*The Federalist No. 31* (Clinton Rossiter ed., 1961) .......................................... 11

*The Federalist No. 58* (Clinton Rossiter ed., 1961) .......................................... 11

*The Federalist No. 78* (Clinton Rossiter ed., 1961) .......................................... 12

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207 (2009) ................................................................... 9

Alexander Hamilton, *Report on the Subject of Manufactures* (1791) .............. 12

An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* (John P. Kaminski et al. eds., 1988) .......................... 13

David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485* (9th ed. 1966) .......................................................................... 8

Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George Washington from the Original Manuscript Sources 1745-1799* (John C. Fitzpatrick ed., 1931) ................................................................... 11

F.W. Maitland, *The Constitutional History of England* (1908) ........................ 7, 8

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Records of the Federal Convention of 1787*
  (Max Farrand ed., 1911) ........................................................ 3, 5, 10, 11, 15, 16

Robert J. Reinstein, *The Limits of Executive Power*,
  59 Am. U. L. Rev. 259 (2009) ........................................................................ 9

Joseph Story, *Commentaries on the Constitution of the United States*
  (1833) ................................................................................................ 13

St. George Tucker, *Blackstone's Commentaries* (1803) ............................ 5, 15, 18

**GLOSSARY**

CAC        Constitutional Accountability Center

OMB        Office of Management and Budget

x

**INTEREST OF *AMICUS CURIAE***

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

**INTRODUCTION AND
SUMMARY OF ARGUMENT**

To the Framers of our Constitution, perhaps no tenet was more central to the preservation of liberty than the need to separate the powers of the sword and the purse.  As Alexander Hamilton put it, "neither one nor the other shall have both, because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny."  2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 348-49 (Jonathan Elliot ed., 1836) ["*Elliot's Debates*"].  Accordingly, while the President is empowered to execute the laws, our Constitution vests Congress with exclusive control over the federal purse through the Spending Clause and the Appropriations Clause.

Since the Founding, Congress has used its power of the purse to pass laws designed to ensure transparency regarding the government's spending decisions.

1

One such law was passed in 2022: Congress for the first time required the Office of Management and Budget (OMB) to disclose publicly on a website its decisions about how to apportion funds appropriated by Congress among the various agencies. *See* Financial Services and General Government Appropriations Act, 2022, Pub. L. No. 117-103, div. E, § 204(b), 136 Stat. 239, 257 (2022) ["2022 Act"]. Later that same year, Congress made this requirement permanent beginning in fiscal year 2023. *See* Financial Services and General Government Appropriations Act, 2023, Pub. L. No. 117-328, § 204, 136 Stat. 4650, 4667 (2022) ["2023 Act"].

Appellants refuse to comply with this congressional mandate, claiming that its transparency requirements infringe on the President's Article II powers. But that is wrong. The President possesses no inherent constitutional power to apportion federal funds, no less to do so on his own terms. Rather, the President has the authority to apportion funds only because Congress has given him that authority, and the President thus must comply with Congress's directives regarding how he exercises it. Nothing in Article II so much as suggests otherwise.

**I.** While the choice to vest Congress and not the President with control over appropriations and spending was "uncontroversial" by the time of the Founding, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 431 (2024), that consensus marked the culmination of centuries of struggle in England for parliamentary supremacy. Historically, British kings had used their

royal prerogatives both to legislate and to tax and spend without the approval of Parliament. The result was a blurring of the lines between the monarch's pocket money and the national treasury, leading kings to spend public funds however they pleased, including to finance petty military advances unsanctioned by the people. Only after the Glorious Revolution were royal attempts to seize the purse finally squelched once and for all.

In "defining the . . . powers" of the new nation, the American Founders firmly rejected the historic "Prerogatives of the British Monarch." 1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) ["*Farrand's Records*"] (James Wilson). Almost every post-Revolution state constitution vested the spending and appropriations authorities in a multimember legislative body. Even the Articles of Confederation, despite leaving the federal government without the critical power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.

Against that backdrop, when the Framers drafted the new Constitution, there was no question that Congress would be granted the powers to tax, spend, and appropriate funds. The authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the ability of the federal government to do its job, *The Federalist No. 30*, at 188 (Clinton Rossiter ed., 1961) (Alexander Hamilton). At the

3

same time, the choice to vest this sweeping power in Congress—the people's representatives—was designed to check executive power by giving the legislature complete control over payments from the Treasury. That is why, as Edmund Randolph explained at the Virginia ratifying convention, the new office of the President need not be feared: "He can handle no part of the public money except what is given him by law." 3 *Elliot's Debates*, *supra*, at 201.

While the Spending Clause affirmatively empowers Congress, the text of the Appropriations Clause is a clear limitation on executive authority. Phrased in the negative, it declares that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Because appropriations must be made "by Law," *id.*, and the President's role in lawmaking is highly circumscribed, he has no authority to designate or spend funds without Congress's approval. Similarly, because the Constitution gives Congress exclusive control over appropriations, any role in that process that the executive enjoys is a product of congressional delegation. Congress has complete control over the scope of such delegations, including the power to impose new requirements or limitations on the executive's delegated authority.

Consistent with these principles, the Founders adopted myriad transparency measures to ensure the people would "know the expenditures of their money," 3 *Elliot's Debates*, *supra*, at 459 (George Mason), and to guard "against any

4

misappropriation, which a rapacious, ambitious, or otherwise unfaithful executive might be disposed to make," 1 St. George Tucker, *Blackstone's Commentaries* 362 (1803). Most prominently, they enshrined in the Constitution the Statement and Account Clause, requiring "a regular Statement and Account of the Receipts and Expenditures of all public Money" to be "published from time to time," U.S. Const. art. I, § 9, cl. 7, with intervals and the details of such disclosures to be left to "the discretion of the Legislature," 2 *Farrand's Records*, *supra*, at 619 (James Madison). And when the First Congress established the Treasury Department, it directed the Department's officials to provide detailed reports to Congress on the Treasury's accounts. Act of Sept. 2, 1789, ch. 12, §§ 2, 4, 1 Stat. 65, 65-66.

**II.** Years later, Congress passed the Anti-Deficiency Act, requiring the executive to apportion appropriations—that is, divide the appropriated funds by timing and program—so that the funds are not spent too quickly. *See* 31 U.S.C. § 1512. But that process largely took place in the shadows until Congress passed the 2022 and 2023 Acts, which require OMB to "implement[] . . . an automated system to post each document apportioning an appropriation" and "place on such website each document apportioning an appropriation . . . already approved the current fiscal year." *Id.* § 1513 note. The Acts thus help curb executive efforts to spend or withhold funds in contravention of congressional mandates, as well as

reinforce Congress's power of the purse by ensuring Congress has the information it needs to craft appropriations legislation.

Contrary to Appellants' assertions, the 2022 and 2023 Acts do not and cannot run afoul of the President's Article II authority because he enjoys no constitutional authority to engage in the apportionment process free from constraints like these transparency measures.  Indeed, the President possesses no constitutional authority to apportion funds at all.  The apportionment "authority" is not so much a *power* as a *requirement* imposed on the President by Congress—one that Congress could eliminate entirely if it so chose.

At bottom, Appellants' quarrel with the 2022 and 2023 Acts is a policy one, and nothing more.  The Supreme Court held long ago that Congress may "impose upon any executive officer any duty they may think proper . . . and in such cases, the duty and responsibility grow out of and are subject to the control of the law, and not to the direction of the President." *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838).  This Court should thus reject Appellants' effort to claim the congressionally imposed apportionment duty as a facet of the President's Article II authority.  Indulging Appellants' claim would impair Congress's exclusive power of the purse, eviscerating a vital "bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).

6

**ARGUMENT**

I.     **To Guard Against the Risk of a Tyrannical President, the Framers Vested the Power of the Purse in Congress While Ensuring Public Disclosure of Spending Decisions.**

   A.     **In Seventeenth-Century England, Parliament Vied with the Crown for Control of the Purse Strings.**

When the Framers wrote the Constitution more than two centuries ago, they strove to deny the President the kind of sweeping powers the King of England had enjoyed.  In the seventeenth century, British Kings had used their royal prerogatives both to legislate, and to tax and spend, without the approval of Parliament. Historically, the British monarch was entitled to various sources of "ordinary revenue," such as rents from crown lands and fines imposed in royal courts. 1 William Blackstone, *Commentaries on the Laws of England* *286, *289 (1791). Parliament had no say in how "the king's revenue" was spent, and there was no firm distinction "between the national revenue and the king's private pocket money." F.W. Maitland, *The Constitutional History of England* 309, 433 (1908). "[U]nconstrained by the need to consult the representatives of the people," English kings generally spent revenue on whatever they pleased.    Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1, 4 (1990) (internal quotation marks omitted).

   For many kings, that meant war with other European nations.  But because the crown's "ordinary revenue" often fell short when funding these endeavors, *see* Josh

7

Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 46 (2017), there developed a second stream of "*extraordinary* revenue," financed by taxes specially levied for the king's use, 1 Blackstone, *supra*, at \*306-07. These grants of "extraordinary" tax revenue required authorization by Parliament, David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485*, at 38 (9th ed. 1966), and, increasingly, Parliament also "claimed the power to appropriate the supplies granted to the king, to say that they shall be spent in this or that manner," Maitland, *supra*, at 183-84. Parliament asserted that authority only sporadically until its struggle with the Stuart kings led to a reconfiguration of the British constitution around the principle of parliamentary supremacy.

After a century of struggle "marked by civil war [and] regicide," Parliament finally succeeded in curtailing the king's abuses of power attendant to his sweeping authority over the purse. Statement respecting the denial of stay pending appeal 1 (D.C. Cir. Aug. 9, 2025) (statement of Henderson, J.) (hereinafter "Henderson Statement"). Following the Glorious Revolution, "in granting money to the crown," Parliament always "appropriated the supply to particular purposes more or less narrowly defined." Maitland, *supra*, at 433. At the same time, the Bill of Rights of 1689 prohibited the various devices the King had used to raise money on his own, providing that "levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the

8

same is or shall be granted, is illegal." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.). Finally, in 1782, Parliament further eliminated the King's prerogative to determine how the "civil list"—the domestic budget—would be spent. Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009).

**B.     Keenly Aware of the English Experience, Our Constitution's Framers Gave Congress Plenary Control Over the Public Fisc.**

In drafting the Constitution, "the prerogatives that had been discredited in England were naturally rejected by the Framers." Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 308 (2009). After the American Revolution, the vast majority of state governments required legislative authorization for the withdrawal of any funds from a state treasury. *See, e.g.*, Del. Const. of 1776, art. VII (requiring funds be "appropriated by the general assembly"); Mass. Const. of 1780, ch. 2, § 1, art. XI ("No monies shall be issued out of the treasury of this Commonwealth, and disposed of . . . but by warrant under the hand of the Governor for the time being, with the advice and consent of the Council . . . ."). The Articles of Confederation similarly granted the Confederation Congress exclusive authority to "ascertain the necessary sums of money to be raised for the service of the united states, and to appropriate and apply the same for defraying the public expenses," although they failed to give the central government the critical power to levy taxes,

9

instead relying on the states for raising revenue.  Articles of Confederation of 1781, art. IX, para. 5.

Still, "[b]y the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement."  *Consumer Fin. Prot. Bureau*, 601 U.S. at 431.  It was "uncontroversial" that the authority to raise and disburse public funds should "reside in the Legislative Branch" rather than with the chief executive.  *Id.*; *see* 2 *Farrand's Records*, *supra*, at 131, 274 (debate limited to whether authority over the purse should be further confined to the direct representatives of the people in the House of Representatives).  The Framers thus gave Congress, not the President, the lawmaking power, including "exclusive power over the federal purse."  *U.S. Dep't of Navy*, 665 F.3d at 1346 (quoting *Rochester Pure Waters Dist. v. U.S. Env't Prot. Agency*, 960 F.2d 180, 185 (D.C. Cir. 1992)).

In the Taxing and Spending Clause, the Framers granted Congress the affirmative power to raise revenue and to spend funds. The Clause is the first and one of the most sweeping enumerated powers the Constitution confers upon the legislature, providing the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  It was a response to the failure of the Articles of Confederation to grant the federal government the authority to tax

10

and spend for the defense and general interests of the union, creating such an ineffectual central government that, according to George Washington, it nearly cost Americans victory in the Revolutionary War. *See* Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George Washington from the Original Manuscript Sources 1745-1799*, at 453 (John C. Fitzpatrick ed., 1931).

Indeed, it was the need "to provide adequate fiscal powers for the national government" that motivated the Framers to write a new Constitution. Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 6 (1999). Alexander Hamilton called the power to raise and spend funds "an indispensable ingredient in every constitution," *The Federalist No. 30*, *supra*, at 188, deeming "revenue" "the essential engine by which the means of answering the national exigencies must be procured," *The Federalist No. 31*, *supra*, at 195. James Madison similarly explained that "[t]his power over the purse may, in fact, be regarded as the most complete and effectual weapon . . . for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." *The Federalist No. 58*, *supra*, at 359.

The Framers thus adopted Governor Randolph's recommendation that the federal government should have the power to "provide for the common defence and general welfare of the United States" in the Taxing and Spending Clause, 2 *Farrand's Records*, *supra*, at 493, 497, choosing a phrase that was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on*

*the Subject of Manufactures* 55 (1791).  There was no question that such sweeping power should be granted to Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

While the Framers crafted the Taxing and Spending Clause as a sweeping grant of authority to Congress, they framed the Appropriations Clause as a *limitation* on the executive: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  The Clause's simple, uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president."  Chafetz, *supra*, at 57.  Alexander Hamilton explained that "where the purse is lodged in one branch, and the sword in another, there can be no danger."  2 *Elliot's Debates*, *supra*, at 349.  George Nicholas similarly emphasized that "[a]ny branch of government that depends on the will of another for supplies of money, must be in a state of subordinate dependence, let it have what other powers it may."  3 *id.* at 17; *see, e.g.*, 3 *id.* at 393 (James Madison) (responding to allegations that the President would be king by explaining that "[t]he purse is in the hands of the representatives of the people"); 4 *id.* at 330 (Charles Pinckney) ("With this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments.").

12

Popular writings and treatises similarly conveyed that because the President could not "appropriate the public money to any use, but what is expressly provided by law," the President's powers would leave "dignity enough for the execution" of the office "without the possibility of making a bad use of it."  An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 295 (John P. Kaminski et al. eds., 1988) ["*Documentary History*"]; *see, e.g.*, Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *Documentary History*, *supra*, at 215 (Appropriations Clause mandates that "any evils which may arise from an improper application of the public money must either originate with, or have the assent of the immediate Representatives of the people").  As Joseph Story put it, the Appropriations Clause prevents the executive from "apply[ing] all [the United States'] monied resources at his pleasure."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833).

These historical sources align with the text and syntactical structure of the Appropriations Clause.  Because appropriations must be "made by Law," U.S. Const. art. I, § 9, cl. 7, the Clause demands that spending be authorized by the "single, finely wrought and exhaustively considered, procedure" for enacting legislation set forth in the Constitution, in which the President's role is limited to recommendation and veto.  *Clinton*, 524 U.S. at 439-40 (quoting *Immigr. &*

13

*Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983)).  Similarly, the Clause's phrasing as a "limitation . . . means that 'the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.'"  *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020) (quoting *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion)).

At the same time, because the Take Care Clause requires the President to "faithfully execute" federal laws, U.S. Const. art. II, § 3, the Executive may "neither spend unappropriated money nor refuse to spend money appropriated by the Congress." Henderson Statement 14.  Rather, the President's "role in appropriations is ministerial; he is an agent bound to faithfully execute the legislature's command." *Id.*  He enjoys the power to apportion money among programs only because Congress has given it to him—indeed, has imposed it on him as a statutory duty.  No "inherent" presidential apportionment authority exists.  *Id.* at 13.  As this Court has said, "the Constitution vests Congress with exclusive power over the federal purse." *Rochester Pure Waters*, 960 F.2d at 185.

C. **The Founders Also Adopted Early Transparency Measures and Public Disclosure Requirements to Ensure Accountability for the Government's Spending Decisions.**

Because the Framers believed that "there can be no regulation more consistent with the Spirit of Economy and free Government [than] that it shall only be drawn forth under appropriation by Law," 3 *Farrand's Records*, *supra*, at 149 (James McHenry), they took pains to ensure adequate public disclosure regarding appropriations and spending decisions. The Framers believed that the people "had a right to know the expenditures of their money," 3 *Elliot's Debates*, *supra*, at 459 (George Mason), "reason[ing] that public disclosure was the ultimate 'check' against 'the extravagance, and profusion, in which the executive department might otherwise indulge itself,'" Henderson Statement 17 (quoting 1 St. George Tucker, *supra*, at 362).

To serve these interests, the Founders devised multiple transparency requirements with respect to our nation's spending. Most prominently, through the Statement and Account Clause, they required that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." U.S. Const. art. I, § 9, cl. 7.

Some of the Framers feared that Clause did not go far enough. George Mason preferred that an "Account of the public expenditures" be published "annually," as opposed to "from time to time." *See* 2 *Farrand's Records*, *supra*, at 618. He and

15

fellow Anti-Federalists feared that the Clause's capacious language would allow "the national wealth . . . to be disposed of under the veil of secrecy." 3 *Elliot's Debates*, *supra*, at 462 (Patrick Henry); *see, e.g.*, 3 *id.* at 459 (George Mason) ("[T]his expression was so loose" that it "might afford opportunities of misapplying the public money."). Madison and his comrades assured the skeptics that this would not come to pass—to the contrary, leaving the publication frequency "to the discretion of the Legislature" would ensure that the Clause would not "beget a habit of doing nothing." *See* 2 *Farrand's Records*, *supra*, at 619 (James Madison).

Indeed, "by giving [Congress] an opportunity of publishing them from time to time," the records would "be more full and satisfactory to the public." 3 *Elliot's Debates*, *supra*, at 460 (James Madison); *see, e.g.*, 3 *id.* at 459 (Richard Henry Lee) (the requirement was "sufficiently explicit and satisfactory"). Madison explained that disclosures of public expenditures would be "sufficiently frequent" under the Clause such that "the provision went farther than the constitution of any state in the Union, or perhaps in the world." 3 *id.* at 460 (Madison); *see, e.g.*, *id.* (George Nicholas) (describing the Clause as "a cautious provision," which "merited applause" and "which few constitutions, or none, had ever adopted"). Thus, the Statement and Account Clause was a powerful and sweeping transparency measure, and to the extent it left room for discretion with respect to the disclosure of spending decisions, that discretion was vested exclusively in Congress.

16

Consistent with the spirit of disclosure embodied in the Statement and Account Clause, one of Congress's very first statutes—the organic statute of the Treasury Department—required the Treasury Secretary, who was responsible for "all services relative to . . . finances," "to make report, and give information to either branch of the legislature . . . respecting all matters referred to him by the Senate or the House of Representatives." Act of Sept. 2, 1789, § 2, 1 Stat. at 66. Congress also required the Treasurer to "lay before the Senate and House of Representatives, fair and accurate copies of all accounts by him from time [to time] rendered to . . . a true and perfect account of the state of the Treasury." *Id.* § 4, 1 Stat. at 66.

Within months of the Treasury statute's enactment, Treasury officials were "providing the Congress with quarterly accounting statements of the sort [Appellants] now deem[] unconstitutional." Henderson Statement 18 (citing 1 Annals of Congress 17, 1061 (1790)). To be sure, the Founders acknowledged that the government might occasionally need to "withhold from the public knowledge what in their judgment may require secrecy." 3 *Elliot's Debates*, *supra*, at 331 (James Madison). But the implicit withholding power resided "squarely with the Congress." Henderson Statement 18. By specifically assigning Treasury officers the duty to report to Congress, "[t]he First Congress . . . seems to have viewed [them] as 'an indispensable, direct arm of the House in regard to its responsibilities for revenues and appropriations.'" Chafetz, *supra*, at 58 (quoting Gerhard Casper, *An*

17

*Essay in Separations of Powers: Some Early Versions and Practices*, 30 Wm. & Mary L. Rev. 211, 241 (1989)).

Put simply, the Founding generation treated executive officials as agents of Congress when it came to appropriations and spending. Any duty delegated to such officials was subject to congressional control and oversight to ensure that the people's "money [w]as actually expended only, in pursuance of [their interests]." 1 St. George Tucker, *supra*, at 362.

## II. Because the President's Apportionment Authority Derives from Congress—Not the Constitution—the Disclosure Requirements of the 2022 and 2023 Acts Do Not and Cannot Run Afoul of Article II.

### A. Congress Created the Apportionment Process by Statute and Thus Has Plenary Power Over Its Terms and Conditions.

Consistent with this history, Congress has repeatedly passed laws to effectuate its "plenary power" over the nation's spending and give meaning to the Appropriations Clause. *Harrington v. Bush*, 553 F.2d 190, 194-95 (D.C. Cir. 1977); *see id.* (noting that "[t]he Congressionally chosen method of implementing the requirements of Article I, section 9, clause 7 is to be found in various statutory provisions"). These laws help prevent executive efforts to spend or withhold funds in contravention of appropriations statutes, as well as ensure Congress has the information it needs to craft those statutes.

The apportionment process was created by such a law. The Constitution does not grant the President any authority to apportion funds appropriated by Congress or

to determine how the apportionment process functions. Rather, *Congress* imposed a duty on the President to apportion funds through the Anti-Deficiency Act. *See* 31 U.S.C. § 1513(b).[2] Originally enacted in 1870, that statute made it unlawful "for any department of the government to expend . . . any sum in excess of appropriations made by Congress for that fiscal year." Act of July 12, 1870, ch. 251, § 7, 16 Stat. 251, 251. As amended in 1905 and 1906, the Anti-Deficiency Act created the apportionment process for the first time. *See* Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1257; Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 48. Codified today at 31 U.S.C. § 1512, the Act's core requirement is that "an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." *Id.* § 1512(a).

Congress supplemented this requirement through the 2022 Act, which for the first time required OMB to promptly report apportionment decisions "already approved" for the current fiscal year on a public website. 2022 Act §§ 204(a)-(d), 136 Stat. at 256-57. Congress then made this requirement permanent through the 2023 Act. 2023 Act § 204, 136 Stat. at 4667. Congress passed these laws to "greatly increase visibility into OMB's use of its apportionment authority, enhancing

---

[2] The President in turn has delegated the apportionment authority to OMB. *See* Exec. Order No. 6,166 (June 10, 1933), *as amended by* Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987).

19

Congress's ability to conduct oversight of OMB's operations."  H.R. Rep. No. 117-79, at 11 (2022) (quoting U.S. Gov't Accountability Off., GAO-21-538T, *Testimony Before the House Committee on the Budget—Proposals to Reinforce Congress's Constitutional Power of the Purse* 13 (2021)).  The laws have, on the whole, been immensely successful in this regard.  *See* H.R. Rep. No. 117-393, at 11 (2022) (describing how since the 2022 Act's public disclosure requirements were implemented, "the provision of [apportionment] documents . . . has proven critical to the Congress's timely oversight of the executive branch's management of appropriated funds").

### B.    The President Has No Inherent Constitutional Apportionment Authority or Discretion.

Because the President does not have any freestanding constitutional power to apportion funds appropriated by Congress or to determine how the apportionment process functions, Appellants' charge that the 2022 and 2023 Acts are "facially unconstitutional" necessarily fails.  Appellants Br. 21.  Congress created the apportionment process, and Congress has the exclusive power to prescribe how the apportionment process works, including by imposing the 2022 and 2023 Acts' transparency measures.  As with other appropriations laws, the President has no power to ignore these statutory requirements.  *See In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.) (the President "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress").

20

Rather, the Constitution obligates the President to execute congressional spending mandates consistent with foundational principles of the separation of powers.

Through a sleight of hand, Appellants try to reason that because the President has a duty "to faithfully execute [appropriations] laws" under the Take Care Clause, he is entitled to some inherent "discretion" in his execution of those laws. Appellants Br. 41. On their telling, because the 2022 and 2023 Acts impose serious burdens on the President's discretion with respect to the apportionment process, they impermissibly "interfere[] with the President's control over the Executive Branch," running afoul of Article II. *Id.* at 51.

That makes no sense. Both the apportionment requirement and the transparency requirements of the 2022 and 2023 Acts are statutory duties—indeed, they are a part of the *same statutory scheme*. *See* 31 U.S.C. §§ 1512, 1513, 1513 note. Thus, the President's duty under the Take Care Clause to faithfully execute the transparency requirement is no less than his duty to execute the apportionment requirement; he cannot simply execute those statutory requirements that he likes best.

Relatedly, although the President generally is entitled to a degree of discretion in his execution of the laws, Congress is equally entitled to cabin that discretion when the President is merely exercising a power or fulfilling a duty given to him by Congress in the first place. As this Court has explained, the President "is not free

21

simply to disregard statutory responsibilities: Congress may always circumscribe [executive] discretion . . . by putting restrictions in the operative statutes." *Aiken County*, 725 F.3d at 260 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)).

Moreover, under Appellants' rule, executive "discretion" would extend so far as to permit the President to simply ignore statutes (or portions of statutes) that he thinks unwise as a matter of policy—because, perhaps, they require disclosure of "sensitive information in apportionments that would not be appropriate for public disclosure," in the President's view, Appellants Br. 52.  The Supreme Court long ago rejected that limitless theory of executive power: "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and entirely inadmissible." *Kendall*, 37 U.S. (12 Pet.) at 613.  Sanctioning such a theory would be, according to the Court, "vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution." *Id.*

Further, the idea that "the President's actions in the apportionment process, through the OMB Director, reflect the exercise of his core Article II authorities," Appellants Br. 46, is completely irrelevant to the question whether Congress can control the apportionment process.  Of course, whenever the President executes any statute, he is exercising his Article II authority to do so.  But that does not transform any power delegated by statute into an inherent Article II power.  The requirement

22

that the President apportion funds among agencies is no more an Article II power than the requirement that he publicly disclose those apportionment decisions as prescribed by the 2022 and 2023 Acts themselves.

Tellingly, Appellants point to no constitutional provision vesting the President with apportionment authority.  None exists.  The President engages in apportionment only because Congress has required him to do so.  Congress could eliminate the *entire* apportionment process without running afoul of Article II.

At bottom, Appellants seek to convert a legislative gift into a sword through this litigation.  The 2022 and 2023 Acts do not and cannot prevent the Executive Branch "from accomplishing its constitutionally assigned functions" because apportionment is not a "constitutionally assigned function[]," Appellants Br. 47. The President's power to act may come from one of two places: "an act of Congress or . . . the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  When Congress delegates a power to the President, it does not encroach on Article II if it later chooses to limit that delegated power—or take it away entirely.  This principle "appl[ies] with particular force where, as here, the . . . delegation involves the core congressional power of the purse."  *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Dated: May 4, 2026

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina G. Henry
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,543 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 4th day of May, 2026.

/s/ Brianne J. Gorod
Brianne J. Gorod

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of May, 2026, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: May 4, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod