ORAL ARGUMENT NOT YET SCHEDULED

**Nos. 25-5266 (L), 25-5267**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
*Plaintiff-Appellee*,

v.

OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants*.

PROTECT DEMOCRACY PROJECT, INC.,
*Plaintiff-Appellee*,

v.

OFFICE OF MANAGEMENT AND BUDGET, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia,
Nos. 1:25-cv-01111-EGS, 1:25-cv-01051-EGS

**BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER IN SUPPORT
OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Tara Malloy
 tmalloy@campaignlegalcenter.org
David Kolker
Erin Chlopak
CAMPAIGN LEGAL CENTER
1101 14 St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200

*Attorneys for Amicus Curiae*

May 4, 2026

# CORPORATE DISCLOSURE STATEMENT

Campaign Legal Center is a nonpartisan, nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Code. Campaign Legal Center works to protect and strengthen the U.S. democratic process across all levels of government, including by supporting voting rights, redistricting, campaign finance, and ethics reform through litigation, policy analysis, and public education. No publicly held corporation has any form of ownership interest in Campaign Legal Center, which has no parent corporation and does not issue stock.

## CERTIFICATE REGARDING PARTIES, RULINGS, AND RELATED CASES

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for the Appellants. References to rulings at issue and related cases also appear in the Brief for the Appellants.

## CERTIFICATE OF COUNSEL AS TO SEPARATE BRIEF

Undersigned counsel certifies under D.C. Cir. R. 29(d) that a separate brief is necessary because this brief presents a distinct perspective from amici supporting appellees in these consolidated cases regarding the impact of this decision on elections and voting rights.

*/s/ Tara Malloy*
Tara Malloy

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... iii

GLOSSARY ...................................................................................... vii

INTERESTS OF THE AMICUS CURIAE ............................................1

SUMMARY OF ARGUMENT............................................................2

ARGUMENT ....................................................................................5

    I.    The District Court Correctly Held that the CREW Plaintiffs Had Demonstrated Article III Standing ............................................5

        A. CREW and Protect Democracy established standing based on informational injury....................................................5

        B. OMB misconstrues the requirements for demonstrating particularized Article III injury ................................................9

    II.   OMB Improperly Conflates the Question of Whether the CREW Plaintiffs Have a Valid Cause of Action with the Analysis of Article III Injury-In-Fact..............................................................14

    III.  OMB's Arguments Conflict with a Longstanding Line of Informational Standing and Procedural Injury Precedents .............................................17

    IV.  Narrowing the Scope of Informational Standing as Appellants Demand Would Diminish Government Transparency and Reduce Public Accountability for Agency Action..........................................21

CONCLUSION ................................................................................25

CERTIFICATE OF COMPLIANCE ...................................................27

CERTIFICATE OF SERVICE .........................................................28

**TABLE OF AUTHORITIES**

**Cases**                                                              **Pages**

*Air Alliance Houston v. U.S. Chemical & Safety Hazard Investigation Board*,
365 F. Supp. 3d 118 (D.D.C. 2019) ....................................................................25

*America First Legal Foundation v. Cardona*,
630 F. Supp. 3d 170 (D.D.C. 2022) ....................................................................18

*American Oversight v. United States Dep't of Health & Human Services*,
101 F.4th 909 (D.C. Cir. 2024) ..........................................................................22

*American Society for the Prevention of Cruelty to Animals v. Feld Entertainment*,
659 F.3d 1 (D.C. Cir. 2011) ................................................................................13

*Animal Legal Defense Fund v. United States Dep't of Agriculture*,
935 F.3d 858 (9th Cir. 2019) ..............................................................................19

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................................................20

*Campaign Legal Center v. FEC*,
31 F.4th 781 (D.C. Cir. 2022) ("*CLC II*") .......................................................3, 6

*Campaign Legal Center v. FEC*,
245 F. Supp. 3d 119 (D.D.C. 2017) .....................................................................7

*Campaign Legal Center & Democracy 21 v. FEC*,
952 F.3d 352 (D.C. Cir. 2020) ("*CLC I*") ...................................................6, 7, 17

*Center for Biological Diversity v. United States Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ............................................................................12

*Center for Biological Diversity v. United States Int'l Development Finance Corporation*, 77 F.4th 679 (D.C. Cir. 2023) ........................................13, 19, 20

*Citizens United v. FEC*,
558 U.S. 310 (2010) ............................................................................................25

*Common Cause v. FEC*,
108 F.3d 413 (1997) ............................................................................................15

*CSL Plasma Inc. v. U.S. Customs and Border Protection*,
   33 F.4th 584 (D.C. Cir. 2022)..................................................................16

*Democratic Congressional Campaign Committee v. Federal Election Commission*,
   831 F.2d 1131 (D.C. Cir. 1987)..............................................................23

*Electronic Privacy Information Center v. Internal Revenue Service*,
   261 F. Supp. 3d 1 (D.D.C. 2017).......................................................... 21-22

*Environmental Defense Fund v. Environmental Protection Agency*,
   922 F.3d 446 (D.C. Cir. 2019) ...........................................................20, 25

*Environmental Defense Fund v. Regan*,
   No. 20-cv-762, 2024 WL 3887383 (D.D.C. Aug. 20, 2024) ..............................25

*Environmental Integrity Project v. McCarthy*,
   139 F. Supp. 3d 25 (D.D.C. 2015) ...........................................................25

*Ethyl Corporation v. Environmental Protection Agency*,
   306 F.3d 1144 (D.C. Cir. 2002)...........................................................7, 25

*Federal Election Commission v. Akins*,
   524 U.S. 11 (1998)....................................................................5, 10, 13, 19

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024)............................................................................3

*Food and Drug Administration v. R. J. Reynolds Vapor Co.*,
   145 S. Ct. 1984 (2025).......................................................................16

*Friends of Animals v. Jewell*,
   824 F.3d 1033 (D.C. Cir. 2016) ("*Jewell I*")........................................7, 11, 25

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ("*Jewell II*")........................................6, 17, 20

*Friends of Animals v. Salazar*,
   626 F. Supp. 2d 102 (D.D.C. 2009) ..........................................................25

*Florida Audubon Society v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996)................................................................12

*LaCedra v. Executive Office for United States Attorneys,*
  317 F.3d 345 (D.C. Cir. 2003) ......................................................22

*Laufer v. Naranda Hotels, LLC,*
  60 F.4th 156 (4th Cir. 2023)........................................................18

*Lexmark International, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014)....................................................................16

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992).......................................................5, 6, 11, 12

*Medina v. Planned Parenthood South Atlantic,*
  145 S. Ct. 2219 (2025).................................................................14

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ...................................................20

*National Archives and Records Admin. v. Favish,*
  541 U.S. 157 (2004).......................................................................5

*National Council of Agricultural Employees v. United States Department of Labor,*
  143 F.4th 395 (D.C. Cir. 2025) ....................................................20

*National Labor Relations Board v. Robbins Tire & Rubber Co.,*
  437 U.S. 214 (1978)....................................................................23

*Public Citizen v. United States Department of Justice,*
  491 U.S. 440 (1989)..................................................................4, 10

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016).......................................................5, 6, 15, 18, 20

*Thole v. U.S. Bank N.A.,*
  590 U.S. 538 (2020)....................................................................14

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021)................................................................14, 18

*United to Protect Democracy v. Presidential Adv. Comm'n on Election Integrity,*
  288 F. Supp. 3d 99 (D.D.C. 2017) ...............................................23

*United States v. Richardson*,
  418 U.S. 166 (1974) ................................................................12

*Washington Post Company v. United States Department of State*,
  840 F.2d 26 (D.C. Cir. 1988) ..................................................22

*Waterkeeper Alliance v. Environmental Protection Agency*,
  853 F.3d 527 (D.C. Cir. 2017) ................................................25

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) ............11

*Zivotofsky ex rel. Ari Z. v. Secretary of State*,
  444 F.3d 614 (D.C. Cir. 2006) ................................................23

**Statutes**

5 U.S.C. § 552 ................................................................................18

5 U.S.C. § 552b(a)(1) .....................................................................23

5 U.S.C. § 702 ................................................................................15

5 U.S.C. Appendix, 86 Stat. 770 (1972) ........................................18

52 U.S.C. § 30109(a)(8) ...................................................................1

**Other Authorities**

Annie Brett, *Rethinking Environmental Disclosure*, 112 Cal. L. Rev. 1535
  (2024) ....................................................................................24

David C. Vladeck, *Information Access-Surveying the Current Legal Landscape of
  Federal Right-to-Know Laws*, 86 Tex. L. Rev. 1787 (2008) ...............24

H.R. Rep. No. 89-1497 (1966) .......................................................21

Jennifer Shkabatur, *Transparency with(out) Accountability: Open Government in
  the United States*, 31 Yale L. & Pol'y Rev. 79 (2012) ....................22

Margaret B. Kwoka, *FOIA, Inc.*, 65 Duke L.J. 1361 (2016) .................21

Opinion, *CREW v. OMB*, No. 1:25-cv-01111 (D.D.C. July 21, 2025),
  ECF No. 34 ...............................................................................2

Pub. L. No. 117-103, 136 Stat. 49 (Mar. 15, 2022) .........................2

Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2022) ...............................................2

Statement on Signing the Federal Election Campaign Act of 1971, 1 Pub. Papers 165 (Feb. 7, 1972)...................................................................................21

**GLOSSARY**

| | |
|---|---|
| CLC | Campaign Legal Center |
| CREW | Citizens for Responsibility and Ethics in Washington |
| FACA | Federal Advisory Committee Act |
| FECA | Federal Election Campaign Act |
| FOIA | Freedom of Information Act |
| JA | Corrected Joint Appendix, filed on April 13, 2026 |

# INTERESTS OF THE AMICUS CURIAE[1]

Amicus Curiae Campaign Legal Center ("CLC") is a nonprofit, nonpartisan organization that works in the areas of campaign finance, ethics, voting rights, and redistricting law to ensure that the democratic process is fair, transparent, and accessible to all Americans.

Since CLC's founding, a central organizational activity has been the enactment, implementation, and defense of effective campaign finance and disclosure laws. To this end, CLC regularly litigates the constitutionality and implementation of the Federal Election Campaign Act ("FECA"), including by challenging the Federal Election Commission ("FEC")'s dismissal of, or failure to act on, administrative complaints filed under 52 U.S.C. § 30109(a)(8). In these "(a)(8) actions," CLC often establishes standing on the basis of informational injury, and several of the decisions upon which the district court relied in its jurisdictional analysis below were actions litigated by CLC on this basis.

Amicus has an interest in this case and in particular, the interpretation and application of this Court's precedents concerning informational standing. The jurisdictional arguments asserted by appellants Office of Management and Budget, et al. (collectively, "OMB"), if accepted, would constrain private enforcement of

---

[1] This brief is filed with the written consent of all parties. This brief was not authored in whole or in part by counsel for any party. No person or entity other than *amicus* or its counsel made a monetary contribution to this brief's preparation or submission.

federal laws requiring the disclosure of government information, including the disclosure provisions of the Consolidated Appropriations Acts of 2022 and 2023 (collectively, the "Acts") here, and thereby diminish government transparency and impede public accountability. *See* Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 49, 257 (Mar. 15, 2022); Pub. L. No. 117-328, div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022).

### SUMMARY OF ARGUMENT

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW") and Protect Democracy Project (collectively, the "CREW plaintiffs") challenge OMB's decision to remove from its website a database of information about the apportionment of appropriated funds (the "Database") that OMB is required to maintain and make public under the 2022 and 2023 Acts. OMB, in turn, challenges the CREW plaintiffs' standing to bring this case, and argues that the Acts are unconstitutional because they intrude upon the Executive Branch's constitutional role. OMB is wrong on both accounts.

CLC addresses only OMB's jurisdictional arguments in this submission. But CLC agrees with both the district court and the stay motion panel that OMB's constitutional challenge to the Acts is meritless and urges this Court to affirm the lower court's decision. *See* Op., *CREW v. OMB*, No. 1:25-cv-01111 (D.D.C. July

21, 2025); Stay Order (Aug. 9, 2025) (statement by Henderson, J., joined by Wilkins, J.).

The gravamen of OMB's jurisdictional argument is its claim that the CREW plaintiffs' informational injuries represent merely a "generalized grievance" common to all members of the public and consequently are insufficiently "particular" to confer Article III standing. OMB Br. at 1-2. This claim, however, is entirely incompatible with both the applicable legal standards and the facts of this case. This Circuit's test for informational standing demands that an organization show both that it is statutorily entitled to the disclosure of certain information, *and* that there is no reason to doubt that the information would help them. *See CLC v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022) ("*CLC II*"). Here, both CREW and Protect Democracy demonstrated that their respective organizations rely on the Database's information and that their operations would suffer by reason of its loss.

OMB did not contest the CREW plaintiffs' factual allegations of injury, nor that they met this Circuit's test for informational injury. Instead, it simply manufactured a new prong for standing which it added to the latter. OMB contends that an individual plaintiff must demonstrate that the statute in question not only "requires [] the disseminat[ion of] information," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395-96 (2024), but also "evinces [a] desire by Congress to create private, enforceable rights" to this information by including

"rights-creating language," OMB Br. at 32. As both the lower court and stay motion panel held, however, there is no support for this newly invented "test" in the applicable precedent.

Quite the opposite: OMB essentially is grafting the question of whether the CREW plaintiffs have a valid cause of action onto the analysis of injury-in-fact. But CREW and Protect Democracy brought suit pursuant to the Administrative Procedure Act ("APA"), not the Acts. Neither the Supreme Court nor this Circuit has conditioned standing on the informational statute's inclusion of an express cause of action. *See Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449-50 (1989). OMB offers no meritorious challenge to either the CREW plaintiffs' standing or their cause of action under the APA, and their conflation of these two arguments saves neither.

Finally, OMB's new test for injury-in-fact would destabilize decades of precedents resting on procedural or informational injury and require a novel and amorphous inquiry into whether a statute contains sufficient "rights-creating language" to support Article III standing. But the informational standing cases that OMB attempts to overturn represent a crucial mechanism to ensure that the public has the information necessary to monitor agency action and hold agencies accountable for unlawful or arbitrary decision-making. As the Supreme Court has explained, the right of citizens "to know what their Government is up to . . . should

4

not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (citation modified).

ARGUMENT

## I. The District Court Correctly Held that the CREW Plaintiffs Had Demonstrated Article III Standing.

### A. CREW and Protect Democracy established standing based on informational injury.

The district court found that CREW and Protect Democracy had each shown a concrete, particularized injury that is both fairly traceable to OMB's actions and likely to be redressed by a favorable judicial decision. JA 45, 53. OMB disputes only the first element of standing: whether the CREW plaintiffs had demonstrated injury-in-fact.

To establish a cognizable injury, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation modified) (collecting cases).

In *FEC v. Akins*, 524 U.S. 11, 20-25 (1998), the Supreme Court held that the "inability to obtain information" that a statute requires to be publicly disclosed could

5

constitute an Article III injury. Implementing this decision, this Court has explained the injury-in-fact element of informational standing is satisfied if a plaintiff shows: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure. *Friends of Animals v. Jewell*, 828 F.3d 989, 992-94 (D.C. Cir. 2016) ("*Jewell II*"). *See also CLC II*, 31 F.4th at 783 ("denial of access to information qualifies as an injury in fact where a statute . . . requires that the information be publicly disclosed and there is no reason to doubt [plaintiffs'] claim that the information would help them") (quoting *CLC & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) ("*CLC I*")). This Circuit thus requires an informational plaintiff to demonstrate both that a statute grants it a "legally protected interest" in information, *Lujan*, 504 U.S. at 560, and that deprivation of such information "affect[ed] the plaintiff in a personal and individual way," *Spokeo*, 578 U.S. at 339 (citation omitted).

OMB did not focus on the first prong of this test, *see* JA 40-42, so the district court principally analyzed whether CREW and Protect Democracy had met the second prong by showing a concrete, particularized injury due to the loss of apportionment information in the Database, JA 42-49.

Typically, an organizational plaintiff seeking to demonstrate informational injury will submit testimony and other evidence to establish both how it uses the information at issue and how the absence of this information will impede its organizational activities. So, for instance, in *CLC v. FEC*, 245 F. Supp. 3d 119 (D.D.C. 2017), amicus CLC submitted declarations from its staff describing how it had relied upon the FECA reporting it sought to engage in public education and other organizational activities, and how it was forced to divert resources to compensate for its unavailability. *See id.* at 127 (noting that plaintiffs "are engaged in a number of campaign-finance related activities—including public education, litigation, administrative proceedings, and legislative reform efforts—where the sought-after information would likely prove useful"); *CLC I*, 952 F.3d at 356 (D.C. Cir. 2020). *See also Ethyl Corp. v. Env't Prot. Agency*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (discussing "Ethyl's fairly detailed description of how the information that open rulemaking proceedings provide would prove useful" to securing EPA approval for its own fuel additive products); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) ("*Jewell I*") (noting that plaintiff group alleged it relied on the information provided by Section 10(c) of the Endangered Species Act to "meaningfully participate in the Act's permitting process, as well as engage in related advocacy efforts to protect the three antelope species").

Accordingly, the lower court required CREW and Protect Democracy to show that they "suffered . . . [the] harm Congress sought to prevent by requiring disclosure," and that "the information would help" their organizations specifically. JA 42, 45 n.7.

First, the district court found CREW had demonstrated that it uses the Database to monitor and evaluate the Executive Branch's use of congressionally-appropriated funds, which is integral to CREW's public education, legislative policy, and litigation work. JA 45 n.7. In particular, CREW "uses it to analyze and inform the public about potential misuses of taxpayer funds, including potential violations of the Impoundment Control Act," Appellees' Br. at 30-31, "disseminat[ing] the information as part of its advocacy work," JA 44.

Protect Democracy also demonstrated that it used the Database to conduct organizational activities, including educating the public about democratic norms and conducting research and analysis. In 2024, Protect Democracy launched OpenOMB.org—a public website based on the information in the Database—aiming to provide easier access to apportionment files and make oversight of OMB's apportionments easier for the press and public. Appellees' Br. at 11-12. Given these activities, the district court found that the elimination of the Public Apportionment Database caused Protect Democracy to suffer both informational injury and

economic injury due to the diminution of the value Protect Democracy invested in creating OpenOMB. JA 51-52.

As the district court found, both CREW and Protect Democracy detailed their use of the Database information, JA 43-45, explained how their use "fits squarely within Congress's goal of providing increased transparency into the Executive Branch's apportionment decisions," JA45, and demonstrated the harm their organizations suffered by reason of the loss of the Database, JA 46-47, 51-52. *See also* Henderson Statement at 7 (noting that appellees likely able to "show[] downstream consequences from the Government's denial of . . . information") (internal quotation marks omitted). Indeed, OMB does not contest the CREW plaintiffs' factual allegations of injury and virtually ignores the lower court's analysis of the record evidence of organizational harm. It is thus untenable to claim that the district court did not require, and CREW and Protect Democracy did not demonstrate, the particular, concrete effects that the elimination of the Database had on their respective organizations.

### B. OMB misconstrues the requirements for demonstrating particularized Article III injury.

OMB primarily challenges the CREW plaintiffs' standing on legal, not factual grounds. It theorizes that where "Congress has purported to create a general [disclosure] obligation to which the Executive Branch must adhere," it does not provide an individual plaintiff "any particularized right to the information in

question." OMB Br. at 26. According to OMB, because the 2022 and 2023 Acts made information about appropriations widely available, without including any attendant private right of action or "rights-creating language," OMB Br. 32, 39, the CREW plaintiffs cannot, as a matter of law, allege a particularized injury-in-fact sufficient to satisfy Article III.

But both the Supreme Court and this Court have consistently held the opposite: the fact that a number of people could be affected by the deprivation of statutorily-mandated information does not preclude the possibility that an individual plaintiff suffers a particularized, concrete injury due to this deprivation. So, for instance, in *Akins*, the Supreme Court found informational injury where the plaintiffs complained that a political committee had failed to provide the campaign finance disclosures required by FECA. The statute required this information to be made public, and thus, theoretically at least, the entire population suffered a similar informational deprivation, but this was no bar to finding Article III injury. 524 U.S. at 24 (noting that "where a harm is concrete, though widely shared, the Court has found 'injury in fact'"). *See also Public Citizen*, 491 U.S. at 449-50 (noting that "[t]he fact that other citizens or groups of citizens" are also deprived of the information a plaintiff seeks "does not lessen [the plaintiff's] asserted injury"). Indeed, most statutes under which litigants have demonstrated Article III informational standing are not targeted at a particular class of individuals, but rather

provide for disclosure to the public with governmental transparency as the goal. *See, e.g.*, *Jewell I*, 824 F.3d at 1041 (finding that organization had standing based on Endangered Species Act provision that required agency to publish certain information in the Federal Register); *see also infra* Part III.

OMB's argument not only contradicts controlling precedents on informational injury, but also runs contrary to standing doctrine in other contexts—and in particular, would undermine the line of cases wherein standing is based on a "procedural injury." In the environmental context, for instance, a plaintiff can establish standing to challenge an agency's failure to issue an environmental impact statement or satisfy some other statutory requirement for reasoned decision-making by showing that this failure injures them in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, by, for example, impairing their enjoyment of a geographic area. The fact that the agency's procedural failure constitutes a "general" injury—and, indeed, an injury *universally*-shared by American citizens—does not prevent individual plaintiffs from demonstrating that this agency failure has also concretely affected their particular interests.[2] So, for example, in *WildEarth Guardians v.*

---

[2] For instance, the Supreme Court in *Lujan* explained that just "anyone who goes to see Asian elephants in the Bronx Zoo" would not have standing to sue a defendant whose actions harmed that species in a different part of the world, 504 U.S. at 566; they shared only a generalized interest in seeing an endangered species. But a person whose vocation included the study of Asian elephants in that part of the world might "plausib[ly]" suffer a perceptible injury due to the defendant's actions, and "certainly" would do so if the particular animals they studied were harmed. *Id. See*

11

*Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013), plaintiff organizations had standing to challenge the Bureau of Land Management's allegedly deficient environmental impact statement based on testimony from several of their members attesting to their recreational interest in visiting the area in question—which, they alleged, would be impacted by increased pollution due to the agency's deficient decision-making process. Although there was thus a "general interest [in the alleged procedural violation] common to all members of the public," such litigants could nonetheless establish standing by showing a "distinct risk to a particularized interest." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (internal quotation marks omitted). *See also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009) (finding that organizations had standing to challenge the Department of Interior's process for approving expanded drilling off the Alaskan coast by showing that this procedural failure risked injuring their members' enjoyment of the indigenous animals of the area).

Attempting to escape this dispositive precedent, OMB analogizes this case to *United States v. Richardson*, 418 U.S. 166 (1974). There, the Supreme Court found that Richardson could not rely on "taxpayer standing" to bring a challenge to a

---

*also id.* at 581 (Kennedy, J., concurring in part and concurring in judgment) (noting that "it does not matter how many persons have been injured by the challenged action" if the "the party bringing suit . . . show[s] that the action injures him in a concrete and personal way").

statute permitting the CIA to keep its expenditures nonpublic on grounds that it violated the Constitution's Statements and Accounts Clause. But Richardson did not assert informational standing. Nor could he, because he could point to no statute—such as FOIA or the Acts here—that required the government to disclose information and would thus protect him from "the kind of harm" he claimed to suffer, *i.e.*, "failing to receive particular information" about CIA expenditures. *Akins*, 524 U.S. at 22. Indeed, *Akins* specifically distinguished *Richardson* on this basis, noting that FECA clearly created statutory disclosure requirements that individual litigants could enforce, whereas it was doubtful that the "the Framers" likewise "imagined that general directives [of the Constitution] . . . would be subject to enforcement by an individual citizen." *Id.* (quoting *Richardson*, 418 U.S. at 178 n.11).

Thus, *Richardson* simply stands for the proposition that "when a plaintiff claims an informational injury with no statutory support, standing will be in jeopardy." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023). This Circuit frequently rejects assertions of informational injury when statutory support is lacking. *See, e.g.*, *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent.*, 659 F.3d 13, 23 (D.C. Cir. 2011) ("[N]othing in section 9 gives [plaintiff] a right to any information"). But here, as the district court found and OMB does not contest, the Acts expressly impose extensive informational requirements on OMB. JA 40.

**II.** **OMB Improperly Conflates the Question of Whether the CREW Plaintiffs Have a Valid Cause of Action with the Analysis of Article III Injury-In-Fact.**

OMB urges this Court to determine whether the 2022 and 2023 Acts include "rights-creating language" or "provide [a] mechanism for any private party to seek information," OMB Br. at 32-33,[3] but these issues are relevant only to whether the Acts create a statutory cause of action, not to whether the CREW plaintiffs have demonstrated injury-in-fact under Article III. Both the Supreme Court and this Circuit distinguish between the question whether a plaintiff has "a statutory cause of action to sue a defendant over the defendant's violation of federal law" and whether plaintiff is "suffering concrete harm because of the defendant's violation of federal law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). The existence of a "cause of action does not affect the Article III standing analysis." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544 (2020). *See also* Henderson Statement at 10 ("Whether Appellees have a right under the relevant statute goes to their cause of action—a merits inquiry—not their standing, a jurisdictional requisite.").

---

[3] OMB cites *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219 (2025), for this proposition although that case did not turn on informational injury—or even consider standing. As the stay motion panel explained, *Medina* reviewed whether the plaintiff there had a cause of action under 42 U.S.C. § 1983 to enforce a provision of a Medicaid spending law—and this particular inquiry, specific to § 1983 actions, looks to whether the Medicaid law vested the plaintiffs with "rights, privileges, or immunities." Henderson Statement at 11-12 (quoting *Medina*, 145 S. Ct. at 2229). OMB's reliance on *Medina* therefore only reinforces its mistaken conflation of Article III injury and the availability of a cause of action.

CREW and Protect Democracy did not file suit under the 2022 and 2023 Acts, but rather properly alleged a cause of action under the APA. JA 103-04. *See* 5 U.S.C. § 702 (providing cause of action to anyone "adversely affected or aggrieved by agency action within the meaning of a relevant statute"). Thus, the degree to which the Acts explicitly or implicitly create an "enforceable, individual right" is unrelated to the validity of CREW plaintiffs' cause of action under the APA, which OMB has not challenged, CREW Opp. to Mot. to Stay, Doc. No. 2127379, at 17 n.5.

By conflating the requirements for a valid cause of action and Article III standing, OMB turns standing doctrine on its head.[4] Far from requiring "rights-creating language" in a statute to find standing, the Supreme Court and this Circuit have held that the existence of a valid statutory cause of action alone is *insufficient* to show Article III injury. *Spokeo*, 578 U.S. at 341 (rejecting claim that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right"); *Common Cause v. FEC*, 108 F.3d 413, 419 (1997) (noting that FECA's

---

[4] To be sure, on appeal, OMB now acknowledges that "plaintiffs [do not] always need an express cause of action to have an Article III injury," but immediately follows by maintaining that "the lack of such a right to sue supports the conclusion that Congress did not intend to create any substantive right to the information" and that a deprivation of such information will amount to only a generalized grievance. OMB Br. at 39. Thus, according to OMB, even if an express cause of action is not necessary for standing, its absence will demonstrate that the statute nevertheless does not contain sufficient "rights-creating language" to confer standing. Under this faulty reasoning, plaintiffs' suit is barred either way.

15

private cause of action "does not confer standing; it confers a right to sue upon parties who otherwise already have standing").

Finally, insofar as OMB's discussion of "right-creating language" is meant to invoke an obsolete zone-of-interests analysis, that doctrine also fails to bolster its standing challenge. As the Supreme Court has explained, "[t]hough we once applied the zone-of-interests test as part of a 'prudential standing' doctrine, we have abandoned that label as 'misleading.'" *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1991 n.3 (2025) (*quoting Bank of America Corp. v. Miami*, 581 U.S. 189, 196-197 (2017)). The question of whether a plaintiff falls within the zone of interests to be protected by the statute in question is not "one of standing" but concerns whether the plaintiff has a cause of action. *Id.* This test is not "especially demanding" with respect to APA actions and the "benefit of any doubt goes to the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (internal quotations omitted); *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 593 (D.C. Cir. 2022) ("The zone of interests test is a lenient one, not to be conflated with . . . the court's subject matter jurisdiction[.]"). Here, OMB "advanced no argument that Appellees fail to clear that low bar." Henderson Statement at 12; *see also* JA 33-34, 75-76.

**III. OMB's Arguments Conflict with a Longstanding Line of Informational Standing and Procedural Injury Precedents.**

OMB essentially attempts to create a supplementary test for informational injury: in addition to meeting the D.C. Circuit's standard, *see CLC I*, 952 F.3d at 356, the CREW plaintiffs must purportedly show that the statute under which they seek information "evinces [a] desire by Congress to create . . . private, enforceable rights." OMB Br. at 32. As explained *supra*, OMB's test conflates the cause of action and Article III injury-in-fact inquiries. The test is also vague and susceptible to arbitrary application.[5] But most objectionably, OMB's new standard conflicts with all relevant precedents and would require this Court to abandon decades of its informational standing case law, as OMB concedes.

Perhaps in an attempt to manufacture some limiting principles for its novel inquiry, OMB identifies those informational standing decisions it believes would be

---

[5] Even if OMB's test were more concrete, it has little apparent utility—other than as a tactic to challenge plaintiffs' standing. The second prong of this Circuit's informational standing inquiry already reviews whether a plaintiff suffers "the type of harm Congress sought to prevent by requiring disclosure," *see Jewell II*, 828 F.3d at 992, and thus would seem to cover any valid "zone of interest" question OMB raises. Here, the lower court reviewed the legislative history of the 2022 and 2023 Acts, noting that, according to congressional hearings, they were intended to "provide the public with insight into billions of dollars of federal spending." *See* JA 42-43. It ultimately determined that "CREW and Protect Democracy's use of the apportionment information fits squarely within Congress's goal of providing increased transparency" and that they "suffer[ed] the type of harm that Congress sought to prevent by requiring disclosure of the apportionment information." JA 45. OMB identifies no defect in this analysis of congressional intent except its own dissatisfaction with its outcome.

left undisturbed by its test. First, OMB suggests that a statutory framework in which a plaintiff has "specifically requested, and been refused . . . information" by an agency may give rise to "a sufficiently distinct injury to provide standing." OMB Br. at 37 (citation modified). Thus, plaintiffs who assert claims under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, or the Federal Advisory Committee Act ("FACA"), 5 U.S.C. Appendix, 86 Stat. 770 (1972), can still establish informational injury, according to OMB. *Id*. OMB also distinguishes *Akins* on grounds that FECA contains a cause of action for "aggrieved parties to pursue administrative and judicial remedies for violations of the statute," OMB Br. at 37, and thus should also be understood as creating "private, enforceable rights," *id.* at 32.

While these aspects of FOIA, FACA, and FECA may lower the bar for pleading a cognizable informational injury,[6] these features are not prerequisites for

---

[6] With respect to FOIA, FACA and FECA, there is reason to believe that the Supreme Court has waived or relaxed the requirement that the litigant demonstrate that it has suffered a downstream impact beyond the informational deprivation itself. *See, e.g.*, *Spokeo*, 578 U.S. at 342 (identifying *Public Citizen* and *Akins* as examples of the "circumstances" in which "the violation of a procedural right granted by statute can be sufficient . . . to constitute injury in fact" and the plaintiff "need not allege any additional harm beyond the one Congress has identified"); *TransUnion*, 594 U.S. at 441 (distinguishing the "public-disclosure . . . laws that entitle all members of the public to certain information" at issue in *Akins* and *Public Citizen* from Fair Credit Reporting Act before requiring plaintiffs there to show "downstream consequences" resulting from their failure to receive information required by the Act); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 170 (4th Cir. 2023) (reasoning that need to show "downstream consequences" does "not extend

Article III injury. To the contrary, the Supreme Court has held that a plaintiff need not make a request for information and can base injury-in-fact simply on its inability to obtain information that a statute requires to be made available to the public. *Akins*, 524 U.S. at 21. *See also Ctr. for Biological Diversity*, 77 F.4th at 686 (noting that plaintiff "need not receive a specific denial to sustain an informational injury"); *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858, 867 (9th Cir. 2019) ("Informational injuries exist absent the denial of a request for particular information.").

As to all other informational standing cases—*i.e.*, those outside of the narrow universe of FOIA, FACA and FECA-related litigation—OMB concedes that this precedent would be cast in doubt by its proposed test for informational inquiry. But OMB argues that this Circuit had not considered its argument when it "found standing on . . . informational[] injury" in cases where "the statute did not clearly confer such an individual right to the information." OMB Br. at 37-38 (citing *Ctr.*

---

to the type of informational injury presented in *Public Citizen* and *Akins*"). *See also Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 180 (D.D.C. 2022) (citing *Public Citizen* for the proposition that "in the FACA context, an informational injury—even without an accompanying diversion of resources—is sufficient to confer Article III standing").

In suggesting that FECA and FACA may receive somewhat different treatment, however, the courts did not purport to limit the relevant class of public disclosure laws to only these statutes. Furthermore, the CREW plaintiffs *here* did show particularized injury, and each described both their specific use of the Database information and how they were harmed by its loss. *See supra* at 8-9.

*for Biological Diversity*, 77 F.4th at 685-86; *Env't Def. Fund v. Env't Prot. Agency*, 922 F.3d 446, 452 (D.C. Cir. 2019); *Jewell II*, 828 F.3d at 992). But these cases at least indirectly addressed OMB's "generalized grievance" argument: the Court in each relied on *Akins* which had explicitly held that a deprivation of statutorily-required information, even when "widely shared," still could constitute an injury-in-fact for an individual plaintiff, 524 U.S. at 24. *See Ctr. for Biological Diversity*, 77 F.4th at 685-86 (citing *Akins*); *Env't Def. Fund v. Env't Prot. Agency*, 922 F.3d 446, 452 (D.C. Cir. 2019) (same); *Jewell II*, 828 F.3d at 992 (same). OMB has no support in the case law for its contrary position.[7]

---

[7] The doctrinal conflict does not end there. As discussed *supra* at 11-12, the logic of OMB's "generalized-grievance limitation" for informational standing, OMB Br. at 38, also runs counter to the long line of "procedural injury" precedents—in both the Supreme Court and this Circuit. *See, e.g.*, *Spokeo*, 578 U.S. at 339. These cases cannot be squared with OMB's theory that where "Congress has purported to create a general obligation to which the Executive Branch must adhere," failure to meet this obligation will yield only a "generalized grievance," regardless of the injury an individual plaintiff alleges. OMB Br. at 26. An agency procedural requirement is of course "a general obligation to which the Executive Branch must adhere," *id.*, but nonetheless, these precedents allow an individual plaintiff to establish standing if they can "show that their concrete interest was adversely affected by the procedural deprivation." *See, e.g.*, *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, 143 F.4th 395, 404 (D.C. Cir. 2025) (quotations omitted); *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

**IV. Narrowing the Scope of Informational Standing as Appellants Demand Would Diminish Government Transparency and Reduce Public Accountability for Agency Action.**

"In a republic where the people are sovereign, the ability of the citizenry to make informed choices . . . is essential." *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (per curiam). Citizens need disclosure about public officials and their activities in office, as well as information about the operations of government, if they are to meaningfully engage in democratic self-governance and debate.

The Acts challenged here are but one piece of the extensive, carefully-crafted system that Congress built over decades to ensure a transparent and accountable government. *See, e.g.*, Margaret B. Kwoka, *FOIA, Inc.*, 65 Duke L.J. 1361, 1367 (2016) (noting that the U.S. "led the modern movement in favor of transparency laws"). The recognition that transparency fosters democratic accountability and prevents corruption is the impetus for laws like FECA, FOIA, FACA—as well as the Acts here. Congressional statements made, for instance, upon enacting FOIA explain that: "A democratic society requires an informed, intelligent electorate, and the intelligence of the electorate varies as the quantity and quality of its information varies." H.R. Rep. No. 89-1497, at 2429 (1966). *See also Elec. Priv. Info. Ctr. v. Internal Revenue Serv.*, 261 F. Supp. 3d 1, 6 (D.D.C. 2017), *aff'd*, 910 F.3d 1232 (D.C. Cir. 2018) ("Congress enacted FOIA with a 'broadly conceived' purpose to pierce the veil of administrative secrecy and to open agency action to the light of

public scrutiny.") (quotation marks omitted). Lawmakers voiced similar aims in enacting FECA, declaring that by "giving the American public full access to the facts of political financing, this legislation will guard against campaign abuses and will work to build public confidence in the integrity of the electoral process." Statement on Signing the Federal Election Campaign Act of 1971, 1 Pub. Papers 165 (Feb. 7, 1972).

But Congress and the courts have also recognized that these laws are not self-executing, and to the contrary, that public officials often default to secrecy and resist public inquiry. Private litigation—and meaningful judicial review of such suits—is often crucial to ensure that the transparency laws are effective and enforced, and not simply aspirational. Jennifer Shkabatur, *Transparency with(out) Accountability: Open Government in the United States*, 31 Yale L. & Pol'y Rev. 79, 134 (2012) (noting private suits "reduce the effect of 'agency slack'—underenforcement of statutory requirements because of political pressures, regulatory capture, laziness, or the self-interest of regulators"). Accordingly, in the sphere of FOIA, this Court has subjected agency FOIA decisions to de novo review and interpreted its exceptions narrowly.[8] Similarly, with respect to campaign finance disclosure, this Court has

---

[8] *See Wash. Post Co. v. U.S. Dep't of State*, 840 F.2d 26, 31-32 (D.C. Cir. 1988), *reh'g granted, judgment vacated sub nom.*, *Wash. Post Co. v. Dep't of State*, 898 F.2d 793 (D.C. Cir. 1990) ("When FOIA was originally enacted in 1967, Congress foresaw the need for de novo judicial review in order . . . to prevent the proceeding from becoming meaningless judicial sanctioning of agency discretion.") (citation

recognized the importance of private actions to pursue meritorious claims when the FEC proves "unable or unwilling" to do so. *Democratic Cong. Campaign Comm. v. FEC*, 831 F.2d 1131, 1135 n.5 (D.C. Cir. 1987).

Most fundamental to ensure the efficacy of federal transparency statutes, however, is a reasonable and clear standard for informational injury. A disclosure mandate can be realized only insofar as it can be enforced. If the courtroom doors are barred to citizens seeking the information they are due under these statutes, this countermands Congress's clear intent "to ensure an informed citizenry" which is "vital to the functioning of a democratic society, [and] needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Lab. Rels. Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (citations omitted). Accordingly, courts in this Circuit have recognized that litigants can claim informational standing when seeking to vindicate their right to information under FOIA, FACA and FECA, as well as under the Government in the Sunshine Act, 5 U.S.C. § 552b(a)(1), and the Paperwork Reduction Act.[9]

---

modified); *LaCedra v. Exec. Office for U.S. Att'ys*, 317 F.3d 345 (D.C. Cir. 2003) (holding that agencies have a duty to construe FOIA requests liberally in favor of disclosure); *Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909, 913 (D.C. Cir. 2024) (recognizing "FOIA's 'goal of broad disclosure' and giv[ing] the exemptions 'a narrow compass'") (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989)).

[9] *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617-18 (D.C. Cir. 2006) (noting that deprivation of information "can give a plaintiff standing to enforce the Government in the Sunshine Act"); *United to Protect Democracy v. Presidential*

A reasonable, broad standard for information injury also helps effectuate the transparency mandates in additional statutory regimes, including in the spheres of environmental, health, and economic regulation. Many environmental laws, such as the National Environmental Policy Act and the Emergency Planning and Community Right-to-Know Act ("EPCRA"), are designed as "information-forcing" measures that seek to inform and educate the public. David C. Vladeck, *Information Access-Surveying the Current Legal Landscape of Federal Right-to-Know Laws*, 86 Tex. L. Rev. 1787, 1787-88 (2008); Annie Brett, *Rethinking Environmental Disclosure*, 112 Cal. L. Rev. 1535 (2024). Public access to data on toxins and waste disposal, for example, is often the only way for local communities or groups to identify environmental and health risks.

A broad, workable test for informational standing is thus a prerequisite for public safety and democratic accountability, as it allows communities to compel the disclosure of environmental and other risks that might otherwise remain hidden. To effectuate these interests, this Circuit has acknowledged informational standing

---

*Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99 (D.D.C. 2017) (finding that group had informational standing to challenge a commission's failure to adhere to notice and comment requirements of the Paperwork Reduction Act because it deprived plaintiff of information needed for its public education efforts).

based on provisions of the EPCRA,[10] the Endangered Species Act,[11] the Clean Air Act,[12] including its 1990 Amendments that created the Chemical and Safety Hazard Investigation Board,[13] the Toxic Substances Control Act,[14] and other similar statutes. These are the precedents that OMB threatens here.

But the informational standing cases that OMB seeks to overturn are critical precedent that ensure that the public can obtain the information necessary to monitor agency action, hold agencies accountable for unlawful or arbitrary decision-making, guard against political corruption and abuse of office, and protect the health and security of their own communities. *See, e.g., Ethyl Corp.*, 306 F.3d at 1147-48. As the Supreme Court has noted, "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-

---

[10] *Waterkeeper All. v. Env't Prot. Agency*, 853 F.3d 527, 534 (D.C. Cir. 2017).

[11] *Jewell I*, 824 F.3d at 1042; *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 111-12 (D.D.C. 2009).

[12] *Ethyl Corp.*, 306 F.3d at 1147; *Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 36 (D.D.C. 2015).

[13] *Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118 (D.D.C. 2019) (holding that group had informational standing to compel the Chemical and Safety Hazard Investigation Board to promulgate regulations, because the Boards's enabling act entitled the public to information obtained by the CSB about accidental chemical releases).

[14] *Env't Def. Fund v. Env't Prot. Agency*, 922 F.3d 446 (D.C. Cir. 2019); *Env't Def. Fund v. Regan*, No. 20-cv-762, 2024 WL 3887383 (D.D.C. Aug. 20, 2024).

government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

## CONCLUSION

For these reasons, the district court's judgment should be affirmed.

Dated:     May 4, 2026

Respectfully submitted,

*/s/ Tara Malloy*
Tara Malloy (DC Bar No. 988280)
David Kolker (DC Bar No. 394558)
Erin Chlopak (DC Bar No. 496370)
CAMPAIGN LEGAL CENTER
1101 14 St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
tmalloy@campaignlegalcenter.org
dkolker@campaignlegalcenter.org
echlopak@campaignlegalcenter.org

*Counsel for Amicus Curiae*
*Campaign Legal Center*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because it contains 6,448 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared using Microsoft Office Word in Times New Roman 14-point font.

*/s/ Tara Malloy*
Tara Malloy

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2026, I electronically filed this Amicus Curiae Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

I further certify that I caused the required copies of the Amicus Curiae Brief to be filed with the Clerk of the Court.

*/s/ Tara Malloy*
Tara Malloy